Nos. 23-10935, 23-13928

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

WHITESELL CORPORATION,

*Plaintiff-Appellant-Cross-Appellee*,

v.

HUSQVARNA OUTDOOR PRODUCTS, INC.,

*Defendant-Appellee-Cross-Appellant*,

ELECTROLUX HOME PRODUCTS, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Georgia, No. 1:03-cv-00050, Hon. J. Randal Hall

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT-CROSS-APPELLEE WHITESELL CORPORATION

---

Eugene A. Sokoloff
MOLOLAMKEN LLP
300 N. LaSalle St., Suite 5350
Chicago, IL 60654
(312) 450-6718
esokoloff@mololamken.com

Jeffrey A. Lamken
  *Counsel of Record*
Lucas M. Walker
Walter H Hawes IV
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Ave., N.W.
Washington, D.C. 20037
(202) 556-2000
jlamken@mololamken.com
lwalker@mololamken.com
whawes@mololamken.com

*Counsel for Plaintiff-Appellant-Cross-Appellee Whitesell Corporation*

*Whitesell Corp. v. Husqvarna Outdoor Products, Inc.*, Nos. 23-10935, 23-13928

## <u>CERTIFICATE OF INTERESTED PERSONS<br>AND CORPORATE DISCLOSURE STATEMENT</u>

Plaintiff-Appellant-Cross-Appellee Whitesell Corporation ("Whitesell") files this Certificate of Interested Persons and Corporate Disclosure Statement, listing in alphabetical order the parties and entities interested in this appeal, as required by Federal Rules of Appellate Procedure 26.1 and 28(a)(1) and Eleventh Circuit Rules 26.1-1 and 28-1(b).  Identifiable interested parties to the action are as follows:

- Aloia Roland Lubell & Morgan, PLLC, Counsel for Whitesell

- Alston & Bird, LLP, Counsel for Husqvarna Outdoor Products, Inc. and Husqvarna, A.B. (collectively "Husqvarna") and Electrolux Home Products, Inc. ("Electrolux")

- Balser, David L., Former Counsel for Whitesell

- Barfield, W. Leon, United States Magistrate Judge

- Bowen Jr., Dudley H., United States District Court Judge

- Boyle, Brian J., Counsel for Husqvarna

- Brogan, James M., Counsel for Husqvarna

- Brow, Gregory S., Former Counsel for Whitesell

- Butzel Long, Former Counsel for Whitesell

- Carlock, Copeland & Stair, LLP, Former Counsel for Whitesell

- Cleary, Gottlieb, Steen & Hamilton, LLP, Former Counsel for Whitesell

*Whitesell Corp. v. Husqvarna Outdoor Products, Inc.*, Nos. 23-10935, 23-13928

- Charnes, Adam Howard, Counsel for Husqvarna

- Cheesbro, Benjamin W., United States Magistrate Judge

- Coleman Yovanovich & Koester, P.A., Counsel for Whitesell

- Dentons US, LLP, Former Counsel for Whitesell

- Devisse, Matthew B., Counsel for Whitesell

- Dickert, Neal W., Former Counsel for Whitesell

- DLA Piper LLP, Counsel for Husqvarna

- Dycus, J. Patton, Former Counsel for Whitesell

- Electrolux AB, ticker ELUXY, Parent to Defendant-Appellee

- Electrolux Home Products, Inc., Defendant-Appellee

- Electrolux North America, Inc., Parent to Defendant-Appellee

- Elsberg, David L., Former Counsel for Whitesell

- Epps, Brian K., Former Counsel for Husqvarna and Electrolux

- Fox, Warner S., Counsel for Objector Supply Technologies, LLC

- Gay, Faith E., Former Counsel for Whitesell

- Garroway, Nathan L., Former Counsel for Whitesell

- George, Jamie Smith, Counsel for Electrolux

- Goldberg, Matthew A., Counsel for Husqvarna

- Grant, James C., Counsel for Electrolux

- Hall, J. Randal, Chief United States District Court Judge

*Whitesell Corp. v. Husqvarna Outdoor Products, Inc.*, Nos. 23-10935, 23-13928

- Hartman Simons & Woods, Former Counsel for Whitesell

- Hawes, IV, Walter H, Counsel for Whitesell

- Helmer, Elizabeth H., Counsel for Electrolux

- Herring, II, Wade Wilkes, Special Master

- Honigman Miller Schwartz and Cohn LLP, Former Counsel for Whitesell

- Hudson, David E., Former Counsel for Whitesell

- Huff, Joseph H., Counsel for Husqvarna

- Hull Barrett, PC, Former Counsel for Whitesell

- Husqvarna, A.B., ticker HSQVY, parent to Husqvarna Outdoor Products, Inc., Defendant-Appellee-Cross-Appellant

- Husqvarna Outdoor Products, Inc., now known as Husqvarna Consumer Outdoor Products, N.A., Inc., Defendant-Appellee-Cross-Appellant

- Investor AB, ticker INVE B, a publicly traded company owning 10% or more of Electrolux and Husqvarna Outdoor Products, Inc.

- Jerles, Lisa J., Former Counsel for Whitesell

- Kenny, Michael P., Counsel for Electrolux

- Keogh, III, William James, Former Counsel for Whitesell

- Kessler, Philip J., Former Counsel for Whitesell

- Kilpatrick Townsend & Stockton, LLP, Counsel for Husqvarna and Electrolux

*Whitesell Corp. v. Husqvarna Outdoor Products, Inc.*, Nos. 23-10935, 23-13928

- King & Spalding, LLP, Former Counsel for Whitesell

- Klein, Sheldon, Former Counsel for Whitesell

- Kluger, Alan J., Former Counsel for Whitesell

- Kluger Kaplan Silverman Katzen and Levine, PL, Former Counsel for Whitesell

- Knox, Jr., Wyckliffe A., Former Counsel for Electrolux

- Koester, Edmond E., Counsel for Whitesell

- Konanova, Yelena, Former Counsel for Whitesell

- Krock, Ronald John, Former Counsel for Whitesell

- Lamken, Jeffrey A., Counsel for Whitesell

- Landon, Laurel Payne, Counsel for Husqvarna

- Leitman, Hal, Counsel for Whitesell

- Li, Fu Shek Rocky, Former Counsel for Whitesell

- Lundbergs A.B., ticker LUND-B, a publicly traded company owning 10% or more of Husqvarna, A.B.

- Meadows, Lauren E.H., Former Counsel for Whitesell

- Meyers, Terri, Former Counsel for Whitesell

- MoloLamken LLP, Counsel for Whitesell

- Morgan, III, Jack C., Counsel for Whitesell

- Odom, Mary Joy, Former Counsel for Whitesell

*Whitesell Corp. v. Husqvarna Outdoor Products, Inc.*, Nos. 23-10935, 23-13928

- Oliver Maner, LLP, Former Counsel for Whitesell

- Rice, Patrick J., Former Counsel for Whitesell

- Roberts, Timothy D., Former Counsel for Whitesell

- Rosenthal, Jeffrey A., Former Counsel for Whitesell

- Rountree Leitman Klein & Geer, LLC, Counsel for Whitesell

- Selendy & Gay PLLC, Former Counsel for Whitesell

- Sentell, III, Robert Perry, Counsel for Husqvarna

- Shiver Hamilton Campbell LLC, Former Counsel for Husqvarna and Electrolux

- Shoemaker, Elizabeth Bowen Reichart, Former Counsel for Electrolux

- Silverman, Steve I., Former Counsel for Whitesell

- Sokoloff, Eugene Alexis, Counsel for Whitesell

- Stebbins, III, Charles C., Special Master

- Storey (formerly Magliolo), Caroline M., Counsel for Whitesell,

- Surden, Todd H., Former Counsel for Whitesell

- Taitt, Thuy Vu, Former Counsel for Whitesell

- Troutman Pepper Hamilton Sanders LLP, Former Counsel for Whitesell

- Vernick, Scott M., Counsel for Husqvarna

- Waide, Amanda M., Counsel for Husqvarna and Electrolux

- Walker, Lucas M., Counsel for Whitesell

*Whitesell Corp. v. Husqvarna Outdoor Products, Inc.*, Nos. 23-10935, 23-13928

- Wallace, Kyle G.A., Former Counsel for Husqvarna and Electrolux

- Washburn, James A., Former Counsel for Whitesell

- Weston, James S.V., Former Counsel for Whitesell

- The Weston Law Firm, Former Counsel for Whitesell

- Whitesell Corporation, Plaintiff-Appellant-Cross-Appellee

- Whitesell, Neil, President and CEO of Whitesell Group of Companies

Dated: March 29, 2024                    /s/ Jeffrey A. Lamken
                                         Jeffrey A. Lamken

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument is necessary and will assist the Court in resolving this appeal. The record is extensive, and the appeal raises important and complex questions regarding sanctions authority under Federal Rule of Civil Procedure 37; the interpretation of Georgia statutes, O.C.G.A. §13-6-13; procedural and contractual rights; and errors by the district court that prejudiced Whitesell Corporation at trial.

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF ISSUES ....................................................................3

STATEMENT OF THE CASE..................................................................4

I.    The Parties' Agreements .................................................................4

    A.    The 2000 Strategic Partnership Agreement ...........................................4

    B.    Transition of Covered Parts....................................................5

    C.    The Initial Complaint and 2003 Settlement Memorandum .................7

    D.    The 2005 Consent Order ....................................................8

II.   The District Court's Rulings on the Agreements' Scope and Enforceability .............................................................................9

    A.    Defendants Seek To Narrow the SPA, Without Questioning Its Enforceability ................................................................9

    B.    The District Court *Sua Sponte* Questions the SPA's Enforceability and Then Holds It Unenforceable ...............................10

    C.    EHP Destroys Evidence About the Agreements' Scope....................12

III.  Discovery Sanctions Against Whitesell ........................................12

    A.    The Parties' Dispute over Data from Whitesell's Industrial and Financial System .............................................................13

    B.    Defendants Move To Compel Production of IFS Data *After* Whitesell Produced That Data, and Then Move for Sanctions...........16

    C.    The Court Holds an "Evidentiary Hearing" .......................................17

    D.    The Court Strikes Whitesell's Lost-Profits Claim ..............................19

IV.   Whitesell's Price-Increase Claims ........................................................19

V.    Whitesell's Prejudgment-Interest Request ..........................................21

VI.   Trial ..........................................................................................................21

      A.    Claims and Defenses at Trial ...........................................................21

      B.    Excluded Evidence of Defendants' Bad-Faith Breach .......................23

            1.    Defendants' Bad-Faith Emails ..................................................23

            2.    Defendants' Unpaid Invoices ...................................................25

            3.    Defendants' Misconduct Leading to the Consent Order .........25

      C.    Verdict ..................................................................................................26

VII.  Standards of Review ................................................................................27

SUMMARY OF ARGUMENT .............................................................................28

ARGUMENT ........................................................................................................30

I.    The District Court Erred in Holding the Agreements' Definitions of
      Covered Goods Unenforceable .................................................................30

      A.    The SPA Was an Enforceable Agreement ..........................................30

      B.    The Court's Posited Concerns About the Definition of Covered
            Goods Did Not Justify Deeming the Agreement Unenforceable ........34

      C.    The District Court Misconstrued the Settlement Memorandum .........40

            1.    The Settlement Memorandum's Terms Were Discernible .......40

            2.    The Settlement Memorandum Did Not Supplant the
                  SPA's Definition of "Good(s)" .................................................41

      D.    The Summary-Judgment Ruling Was Premature ...............................43

E.    The District Court's Spoliation Ruling Falls with Its Contract Rulings..................................................................................46

II.    The District Court Erred in Sanctioning Whitesell by Striking Its Lost-Profits Claims .....................................................................47

A.    The District Court Never Issued an Order as Rule 37 Requires........48

B.    The Court's Failure To Address Whitesell's Objections Precluded Sanctions ........................................................50

C.    The District Court Failed To Consider Alternative Sanctions............52

D.    There Was No Alternative Basis for Sanctions..................................54

III.    The District Court Erroneously Granted Summary Judgment on Whitesell's Price-Increase Claims................................................56

A.    A Jury Could Have Found EHP Did Not Request Evidence for Whitesell's Price Increases..................................................57

B.    A Jury Could Find Whitesell Reasonably Documented Its Increased Costs ......................................................59

IV.    Whitesell Was Entitled To Seek Prejudgment Interest .................................60

V.    Evidentiary Errors Warrant a New Trial .......................................63

A.    The Bad-Faith Emails Were Erroneously Excluded ..........................63

B.    The Court Erred in Excluding Evidence Regarding Deliberately Unpaid Invoices..................................................67

C.    Defendants' Misconduct Leading to the Consent Order Was Erroneously Excluded ........................................................69

CONCLUSION .....................................................................71

ADDENDUM

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Adolph Coors Co. v. Movement Against Racism & the Klan*,
  777 F.2d 1538 (11th Cir. 1985) ........................................................... 52

*Alan v. Paxson Commc'ns Corp.*,
  239 F. App'x 475 (11th Cir. 2007) ...................................................... 53

*Allapattah Servs., Inc. v. Exxon Corp.*,
  333 F.3d 1248 (11th Cir. 2003) ........................................................... 37

*Bates v. JP Morgan Chase Bank NA*,
  768 F.3d 1126 (11th Cir. 2014) ........................................................... 52

*Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.*,
  328 S.E.2d 426 (Ga. App. 1985) ....................................................4, 31

*Burks v. Am. Cast Iron Pipe Co.*,
  212 F.3d 1333 (11th Cir. 2000) ........................................................... 44

*Burton v. City of Belle Glade*,
  178 F.3d 1175 (11th Cir. 1999) ........................................................... 58

*Caradigm USA LLC v. PruittHealth, Inc.*,
  No. 1:15-cv-2504, 2018 WL 1959498 (N.D. Ga. Apr. 25, 2018) ...............61, 62

*Carpet Transp., Inc. v. Kenneth Poley Interiors, Inc.*,
  466 S.E.2d 70 (Ga. App. 1995) ........................................................... 62

*In re Chase & Sanborn Corp.*,
  872 F.2d 397 (11th Cir. 1989) ........................................................... 55

\* *Chudasama v. Mazda Motor Corp.*,
  123 F.3d 1353 (11th Cir. 1997) .....................................27, 50, 51, 71

*Coca-Cola Co. v. Allianz Ins. Co.*,
  No. 1:01-cv-3125, 2003 WL 27381620 (N.D. Ga. Jan. 17, 2003) ..................... 60

*Cockrell v. Sparks*,
  510 F.3d 1307 (11th Cir. 2007) .....................................................27, 28

v

*Daewoo Motor Am., Inc. v. Gen. Motors Corp.*,
 459 F.3d 1249 (11th Cir. 2006) ..........................................................27

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993)............................................................................69

*EZ Green Assocs., Inc. v. Ga.-Pac. Corp.*,
 734 S.E.2d 485 (Ga. App. 2012) ........................................................60

*Fernandez v. Bankers Nat'l Life Ins. Co.*,
 906 F.2d 559 (11th Cir. 1990) .......................................................44, 45

*Gillum v. United States*,
 309 F. App'x 267 (10th Cir. 2009) .....................................................54

*Golden Peanut Co. v. Bass*,
 563 S.E.2d 116 (Ga. 2002) .................................................................37

*Gonzalez v. Firestone Tire & Rubber Co.*,
 610 F.2d 241 (5th Cir. 1980) ..............................................................50

*Goode v. Wild Wing Cafe*,
 588 F. App'x 870 (11th Cir. 2014) ......................................................48

* *Gregory, Inc. v. Scandinavian House, L.P.*,
 433 S.E.2d 687 (Ga. App. 1993) ...................................................32, 34

*Hart v. Hart*,
 777 S.E.2d 431 (Ga. 2015) .................................................................27

*Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*,
 573 F.3d 947 (10th Cir. 2009) ............................................................39

*Higgs v. Costa Crociere S.p.A.*,
 720 F. App'x 518 (11th Cir. 2017) .................................................66, 67

*Higgs v. Costa Crociere S.p.A. Co.*,
 969 F.3d 1295 (11th Cir. 2020) ..........................................................54

*Holloway v. State Farm Fire & Cas. Co.*,
 537 S.E.2d 121 (Ga. App. 2000) ........................................................61

*Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*,
    329 S.E.2d 554 (Ga. App. 1985) ........................................................31

*Jones v. City of Columbus*,
    120 F.3d 248 (11th Cir. 1997) .........................................................44

*Kitchen v. Insuramerica Corp.*,
    675 S.E.2d 598 (Ga. App. 2009) ........................................................36

*Koon v. United States*,
    518 U.S. 81 (1996)..............................................................................28

*Langford v. Berry*,
    22 S.E.2d 349 (Ga. App. 1942) ........................................................60

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) .........................................................40

* *Malautea v. Suzuki Motor Co.*,
    987 F.2d 1536 (11th Cir. 1993) ...................................................49, 50

*McManaway v. KBR, Inc*.,
    No. 4:10-cv-1044, 2012 WL 13059724 (S.D. Tex. May 17, 2012) ..................54

*Mori Lee, LLC v. Just Scott Designs, Inc*.,
    754 S.E.2d 616 (Ga. App. 2014) ........................................................36

*Mut. Serv. Ins. Co. v. Frit Indus., Inc.*,
    358 F.3d 1312 (11th Cir. 2004) .........................................................54

* *Norair Eng'g Corp. v. St. Joseph's Hosp., Inc.*,
    249 S.E.2d 642 (Ga. App. 1978) ........................................................62

*O.N. Jonas Co. v. Badische Corp*.,
    706 F.2d 1161 (11th Cir. 1983) ......................................31, 32, 37, 38

*Ocasio v. C.R. Bard, Inc*.,
    No. 8:13-cv-1962, 2015 WL 3496062 (M.D. Fla. June 3, 2015)......................54

*Peat, Inc. v. Vanguard Rsch., Inc.*,
    378 F.3d 1154 (11th Cir. 2004) ...........................................27, 63, 67

*Phipps v. Blakeney*,
   8 F.3d 788 (11th Cir. 1993) .................................................................54

*Proctor v. Fluor Enters., Inc.*,
   494 F.3d 1337 (11th Cir. 2007) ...........................................66, 67, 68

*Royal Ins. Co. of Am. v. Whitaker Contracting Corp.*,
   242 F.3d 1035 (11th Cir. 2001) ..........................................................27

\* *Snook v. Tr. Co. of Ga. Bank of Savannah*,
   859 F.2d 865 (11th Cir. 1988) ......................................................43, 46

*St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*,
   198 F.3d 815, 820 (11th Cir. 1999) .............................................36, 40

*Steed v. EverHome Mortg. Co.*,
   308 F. App'x 364 (11th Cir. 2009) .....................................................48

*Super98, LLC v. Delta Air Lines, Inc.*,
   309 F. Supp. 3d 1368 (N.D. Ga. 2018)................................................36

*Triple Eagle Assocs., Inc. v. PBK, Inc.*,
   704 S.E.2d 189 (Ga. App. 2010) .........................................................36

*Turfgrass Grp., Inc. v. Ga. Cold Storage Co.*,
   816 S.E.2d 716 (Ga. App. 2018) .........................................................32

*Underwriters at Lloyds v. Expeditors Korea Ltd.*,
   882 F.3d 1033 (11th Cir. 2018) ..........................................................36

*Unique Designs, Inc. v. Pittard Mach. Co.*,
   409 S.E.2d 241 (Ga. App. 1991) .........................................................36

*United States v. Certain Real Prop. Located at Route 1*,
   126 F.3d 1314 (11th Cir. 1997) ..........................................................48

*United States v. Cooper*,
   926 F.3d 718 (11th Cir. 2019) ............................................................70

*United States v. Kelly*,
   888 F.2d 732 (11th Cir. 1989) ............................................................66

*United States v. Miller*,
688 F.3d 322 (7th Cir. 2012) ...............................................................67

*United States v. Norton*,
867 F.2d 1354 (11th Cir. 1989) ..........................................................67

*Wachtel v. Health Net, Inc.*,
239 F.R.D. 81 (D.N.J. 2006).............................................................54

*Williams v. Ala. Dep't of Indus. Rels.*,
684 F. App'x 888 (11th Cir. 2017) ....................................................48

*Zocaras v. Castro*,
465 F.3d 479 (11th Cir. 2006) ..........................................................55

## STATUTES

28 U.S.C. §1291 ...............................................................................3

28 U.S.C. §1332 ...............................................................................2

28 U.S.C. §2106 .............................................................................71

O.C.G.A. §9-11-54(c)(1) ...............................................................61

O.C.G.A. §11-2-202 .......................................................................37

O.C.G.A. §11-2-204 .......................................................................36

O.C.G.A. §11-2-204(1)....................................................................32

O.C.G.A. §11-2-204(3)....................................................................32

O.C.G.A. §11-2-306 cmt. 1 ............................................................37

O.C.G.A. §11-2-306 cmt. 2 ..............................................................5

O.C.G.A. §13-6-13 ..........................................................21, 60, 62

## RULES

Fed. R. Civ. P. 6(b)(1)....................................................................54

Fed. R. Civ. P. 37(b)(2)(A) ...........................................................48

Fed. R. Civ. P. 37(c)(1) ............................................................53

Fed. R. Civ. P. 54(c) ...............................................................61

Fed. R. Civ. P. 56(a) ...............................................................57

Fed. R. Civ. P. 56(d) ..............................................................44

Fed. R. Evid. 401 ..............................................................64, 69

11th Cir. R. 28-5 ......................................................................4

## OTHER AUTHORITIES

2A *Lawrence's Anderson on the Uniform Commercial Code*
(3d ed. 1997) ....................................................................31

22 Wright & Miller, *Federal Practice and Procedure*
(2d ed. 1982) ...................................................................69

Whitesell Corporation and defendants had an exclusive requirements contract that required defendants to purchase from Whitesell all of their needs for certain broadly defined categories of parts.  Almost immediately after signing the contract in 2000, however, defendants sought to escape it.  Despite multiple extensions, a settlement, and a consent order, they *never* fully transitioned their purchases of covered parts from incumbent suppliers to Whitesell.  This appeal arises because the trial court gutted Whitesell's claims and, when the case finally reached a jury after 20 years of litigation, prevented Whitesell from telling its side of the story.

Most significantly, the district court ruled *sua sponte* that the parties' contract—*which both sides had sued to enforce*—was unenforceable because its description of the parts defendants agreed to purchase was supposedly too indefinite to evidence a "meeting of the minds."  In the contract's place, the court substituted a far narrower agreement limited to a small fraction of the parts the contract described.  But the court failed to appreciate that long-term requirements contracts, like the one here, are necessarily cast in broad terms to accommodate parties' evolving needs.  The court also ruled without the benefit of discovery into the parties' intent and despite available evidence showing that the contract's terms were discernible to both the parties and the industry.  Disputes over which parts fell within the agreement's scope should have been resolved by a jury—not by declaring the agreement a nullity.

The district court then barred Whitesell from seeking lost-profit damages—a necessary element for most remaining claims—as a discovery sanction. But the court issued that death-knell sanction without ever ordering Whitesell to produce the allegedly withheld materials; without ruling on Whitesell's objections; without considering less drastic sanctions; and despite Whitesell's producing the disputed materials **before** defendants moved to compel.

By the time the case got to trial, after 20 years of pretrial rulings, Whitesell had only a single breach-of-contract claim (partially) intact. But the district court excluded critical evidence even on that. It barred Whitesell from showing that defendants schemed to sabotage the parties' relationship and "do what it takes" to "get out of" their agreements with Whitesell—including "intentionally breech[ing] [sic]" their contractual and court-ordered obligations. Dkt.1134 at 17-18. Those devastating admissions of bad faith would have bolstered Whitesell's claim and refuted defendants' counterclaims against Whitesell. But the jury never heard that evidence. Reversal and a new trial—on the full scope of Whitesell's claims—are warranted.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332. Plaintiff Whitesell is an Alabama corporation with its principal place of business in Alabama. Dkt.578 ¶1. Defendants Electrolux Home Products, Inc. and Husqvarna Outdoor Products, Inc. are Delaware corporations with their principal places of business in North Caro-

lina (and formerly Georgia).  Dkt.578 ¶¶2-3; Dkt.584 ¶3; Dkt.585 ¶2.  The amount-in-controversy exceeds $75,000.  Dkt.578 ¶6; Dkt.584 ¶6.  The district court entered final judgment disposing of all claims on February 28, 2023.  Dkt.1860.  Whitesell filed Rule 50(b) and 59 motions on March 28, 2023.  Dkts.1865, 1867; *see* Dkts.1887, 1888 (supplemental memoranda).  Those motions were denied November 7, 2023.  Dkt.1901.  Whitesell appealed November 28, 2023.  Dkt.1902.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Whether the district court erred in ruling, before meaningful discovery, that the scope of goods covered by the parties' agreements was unenforceable and so indefinite as to be void.

2.    Whether the district court erred in striking Whitesell's lost-profits claims as a sanction for purported discovery violations.

3.    Whether the district court erred in granting summary judgment to defendants on claims that they refused to pay duly enacted price increases.

4.    Whether the district court erred in rejecting Whitesell's request for prejudgment interest.

5.    Whether Whitesell is entitled to a new trial based on the erroneous exclusion of evidence.

3

## STATEMENT OF THE CASE

Pending for over 20 years, this breach-of-contract action generated over 1,900 docket entries.  To efficiently apprise the Court of the facts relevant to each issue—some concerning events and rulings spanning many years—this Statement is organized by topic rather than strict chronology.

## I.    THE PARTIES' AGREEMENTS

Plaintiff Whitesell Corporation makes and distributes fasteners and other parts used by consumer-product manufacturers.  Dkt.578 ¶1.  Defendant Electrolux Home Products ("EHP") makes household appliances like dishwashers; defendant Husqvarna Outdoor Products, Inc. ("HOPI") makes outdoor products like lawnmowers.  Dkt.585 ¶2; Dkt.584 at 1, ¶¶3-5; Dkt.212 at 3 n.4.  HOPI spun off from EHP in 2006, while this action was pending.  It is now undisputed that HOPI assumed the same obligations as EHP under the parties' agreements.  Dkt.1880 (25:24-27:2).[1]

### A.    The 2000 Strategic Partnership Agreement

In 2000, Whitesell and EHP entered into an exclusive requirements contract called the Strategic Partnership Agreement ("SPA").  Dkt.1 at 16-36 ("SPA"); Dkt.212 at 14.  A "requirements contract obligates the buyer to purchase exclusively from the seller all the goods needed for a particular use contemplated by the parties."  *Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.*, 328 S.E.2d 426, 429 (Ga. App.

---

[1] Transcript citations use ECF pagination.  11th Cir. R. 28-5.

1985); *see* O.C.G.A. § 11-2-306 cmt. 2.  The SPA followed that model.  EHP made "a long-term commitment to purchase [from Whitesell] ***all*** of its current and future needs of" a broadly defined set of "Good(s)."  SPA § 2.0 (emphasis added).  In exchange, Whitesell committed to supply those requirements and gave EHP numerous discounts and a ***$2 million*** upfront incentive payment.  SPA §§ 5.1, 6.0, 7.0; Dkt.1886 (1021:13-15).

The SPA defined the covered "Good(s)" to include:

> all cold headed/threaded fasteners, clips, wire ties, nuts, pins, special cold formed parts, screw machined parts, clamps, spacers, plastic fasteners, components, sub-components, or any type of material, whether identified by an Electrolux part number or not assigned to such part, and other Class C items in similar families and/or services.

SPA § 2.1.2.  "Class C" parts are "relatively inexpensive, high-volume items," including screws, clips, adhesives, fittings, and other parts that typically cost less than $5.  Dkt.164 ¶ 6.

Given the numerous parts involved, the contract contemplated EHP transitioning from incumbent suppliers to Whitesell over time, with completion "no later than June 30th 2003."  SPA § 3.1.  If EHP failed to complete the transition by then, the SPA's term would be "proportionally extend[ed]."  *Id.*

## B.    Transition of Covered Parts

As with any requirements contract, the parties understood that EHP's needs would vary over time.  The SPA thus could not and did not list each specific part

5

Whitesell would supply.  SPA § 2.1.2; Dkt.164 ¶ 8.  The parties instead would track the "'Goods to be Purchased by Electrolux from Whitesell'" at any given time in an "Exhibit B" to the agreement, which they would update "no less than every six months."  SPA § 2.1.2.

To prepare an initial Exhibit B, Whitesell requested access to EHP's supplier and part databases.  Dkt.164 ¶¶ 10-11; Dkt.162-2 at 36; Dkt.162-3 at 31.  EHP's responses were often limited, inaccurate, or untimely.  Dkt.164 ¶¶ 10-11; Dkt.162-3 at 31, 38-40.  Whitesell nevertheless prepared an Exhibit B based on available information and sent it to EHP in February 2001.  Dkt.162-2 at 42-43; Dkt.164 ¶¶ 10-11; Dkt.162-8 at 22-56.  In an accompanying letter, Whitesell reiterated "the intent of EHP and Whitesell . . . for Whitesell to supply all of EHP's current and future fasteners and Class C parts."  Dkt.162-2 at 42.  Whitesell asked EHP to "advise[ ] in writing within 10 days" "if there any concerns or issues."  *Id.*  Otherwise, Whitesell would "assume we are in complete agreement on items covered" by the SPA and "proceed accordingly."  *Id.*

EHP raised no issues or concerns.  Dkt.162-4 at 2.  A month later, EHP "confirm[ed]" the parties were "in agreement regarding the initial scope of products to be included in Exhibit B" as Whitesell had described it.  Dkt.162-2 at 45.  EHP affirmed its "intention and position that EHP's Class C parts would be purchased from Whitesell within the scope of goods under the [SPA]."  Dkt.164 ¶ 11.

### C.    The Initial Complaint and 2003 Settlement Memorandum

The parties then became mired in disputes over the SPA's scope.  In March 2003, EHP sued for a declaration that it was not required to source from Whitesell "wireforms"—essentially, parts made from "bent wire," Dkt.127-6 at 67(11:18-23)—and certain parts EHP previously obtained from Brunner Drilling and Manufacturing.  Dkt.1 ¶¶26-31; *see* Dkt.127 at 8-10; Dkt.164 ¶13.[2]

The parties resolved that dispute in a May 2003 Settlement Memorandum, confirming that the "'Brunner' and wire form parts ***would*** be supplied by Whitesell." Dkt.212 at 8 (emphasis added); Dkt.578-2 ¶¶3, 13.  The parties also agreed to produce a "clarified Exhibit 'B,'" to include three additional categories of parts: (a) all parts Whitesell "current[ly] . . . supplie[d] to EHP," (b) "parts in process of being transitioned," and (c) parts then supplied by Bamal, another supplier.  Dkt.578-2 ¶1.

The parties repeatedly reaffirmed their understanding that the Settlement Memorandum supplemented, but did not override, SPA §2.1.2's definition of covered Goods.  The Memorandum declared that the SPA "continue[d] in full force and effect."  Dkt.578-2 ¶14.  In December 2005, EHP's Commodity Director confirmed "Electrolux's intention to transition every part which falls under section 2.1.2 of our [SPA]."  Dkt.162-4 at 30.  EHP's Contracts Administrator agreed EHP's "obliga-

---

[2] The 2003 action culminated in the 2023 judgment under review.  The parties were eventually realigned with Whitesell as plaintiff and EHP and HOPI as defendants.

tions under Section 2.1.2 of the SPA never changed during the entire pendency of the contract, which was from its signing date until it expired in 2008." Dkt.1726-3 at 2 (438:14-23).

### D.    The 2005 Consent Order

Despite voicing commitment to the SPA, EHP failed to transition all covered parts on schedule.  Instead, EHP secretly sought alternative suppliers in an effort to "bust[ ] the Whitesell contract."  Dkt.266-19 at 2; *see* pp. 23, 25-26, *infra*.

Whitesell moved to enforce the Settlement Memorandum.  Dkt.11.  After mediation, the district court entered a Consent Order in May 2005.  Dkt.30.  The Order required EHP to purchase from Whitesell "100 percent of EHP's requirements for all goods and parts" it was currently purchasing from Whitesell, and forbade EHP from using any such goods or parts "obtained from anyone other than Whitesell." Dkt.30 at 2 ¶1.  The Order also required EHP to transition to Whitesell all parts "under the Settlement Memorandum" and "pursuant to the terms of [the SPA]." Dkt.30 at 3 ¶4.

Shortly after entry of the Consent Order, however, EHP executives exchanged emails discussing whether "to intentionally breach [sic] the court order and contract," Dkt.1309-35 at 2, and arrange "alternate supplier[s]," Dkt.1309-42 at 2. Soon afterward, they exchanged emails admitting "we are playing games and not following the court order."  Dkt.1309-41 at 2.

## II.    THE DISTRICT COURT'S RULINGS ON THE AGREEMENTS' SCOPE AND ENFORCEABILITY

EHP still failed to transition parts.  In October 2005, Whitesell filed a complaint asserting breaches of the SPA, Settlement Memorandum, and Consent Order. Dkt.47.  HOPI was added as a defendant in 2006 after it was spun off from EHP and assumed certain EHP obligations under the parties' agreements.  Dkt.68 ¶4; Dkt.1880 (25:24-27:2).

### A.    Defendants Seek To Narrow the SPA, Without Questioning Its Enforceability

In 2007, defendants (EHP and HOPI) moved for partial summary judgment, seeking to narrow the SPA's definition of "Good(s)" to the five categories of parts specifically enumerated in the Settlement Memorandum.  Dkt.127 at 3-4, 8-10; *see* p. 7, *supra*.  They did not argue the SPA was unenforceable.  Dkt.127 at 2.

Whitesell responded that the Settlement Memorandum supplemented and clarified, but did not override, the SPA's definition of "Good(s)."  Dkt.161 at 19-25. Any ambiguity about the scope of covered parts was for a jury to resolve.  Dkt.161 at 6-10.   And the motion was premature:  The parties had neither completed document discovery nor taken any depositions—including depositions of EHP personnel who negotiated the SPA and Settlement Memorandum and could speak to EHP's intent regarding the agreements' scope.  Dkt.161 at 3-4; Dkt.251 at 4, 28-29.

**B.      The District Court *Sua Sponte* Questions the SPA's Enforceability and Then Holds It Unenforceable**

Although no party had questioned the SPA's enforceability—both sides had sued to enforce it—the district court *sua sponte* ordered briefing on "whether there was mutual agreement between the parties" regarding the parts covered by the SPA. Dkt.191 at 1, 5-6.  Defendants then argued—for the first time—that the SPA was unenforceable because there had never been a meeting of the minds.  Dkt.196.

1.      The court ruled for defendants, holding the SPA indefinite and unenforceable.  Dkt.212 at 17-22.  In the court's view, the definition of "Good(s)" in SPA §2.1.2 covered "an indeterminate universe of physical items that cannot serve as a definite subject matter for a legally enforceable agreement."  Dkt.212 at 18.  The SPA was merely "an 'agreement to agree' in the future" through preparation of Exhibit B, which would "identify the goods to be supplied in explicit terms." Dkt.212 at 18-19.  The absence of a final Exhibit B, the court ruled, was "fatal to successful contract formation."  Dkt.212 at 18.  The court did not explain why Exhibit B was essential to formation when it was to be revised "every six months" to reflect EHP's evolving parts needs.  SPA §2.1.2.

2.      The court held the 2003 Settlement Memorandum partially cured the SPA's supposed indefiniteness.  It found that three of the five parts categories listed in the memorandum were "objectively determinable" and thus enforceable.  Dkt.212 at 22-23.  And it found the parties' course of performance established an enforceable

10

agreement as to goods Whitesell was already supplying.  *Id*.  But the court deemed two other categories identified in the Settlement Memorandum—"'wire form' parts" and parts "in the process of being transitioned"—too "amorphous" and "uncertain for the Court to enforce."  Dkt.212 at 23.

3.      Whitesell sought reconsideration, arguing that the court had overlooked its objection that summary judgment was premature.  Dkt.251 at 1.  Not a single deposition had been taken; the court had not ruled on Whitesell's motion to compel production of documents from EHP employees responsible for negotiating and performing the SPA; and the parties had never taken *any* discovery on the previously undisputed issue of the SPA's enforceability.  Dkt.251 at 4, 6-9.

The court denied reconsideration.  It declared the "parties' intent at the time of execution" "irrelevant," because "it is the parties' failure to create an Exhibit B, not their intention with respect to Exhibit B, that is fatal to successful contract formation."  Dkt.288 at 7-8.  The court also declared, for the first time, that the Settlement Memorandum—despite stating that the SPA "shall continue in full force and effect," Dkt.578-2 ¶14—*superseded* the SPA's definition of covered "Good(s)."  Dkt.288 at 10.  The court did not address EHP's acknowledgement, even after the Settlement Memorandum, of its obligation to purchase the goods set forth in the SPA.  *See* p. 7, *supra*.

### C.    EHP Destroys Evidence About the Agreements' Scope

Around the time of the meeting-of-the-minds rulings, Whitesell objected that EHP had not produced executive Roger Leon's emails from 2002-2004, when disputes over the agreements' scope arose and were addressed through the 2003 Settlement Memorandum.  Dkt.625-4 at 13.  Leon had negotiated and signed the SPA, Settlement Memorandum, and Consent Order for EHP, and supervised EHP's performance.  Dkt.755 at 11; Dkt.1726-1 at 2 (21:6-22:9); Dkt.578-1 at 31.[3]  Although EHP repeatedly promised to produce Leon's emails, it eventually became apparent they had been destroyed.  Dkt.625-4 at 13; Dkt.640-1 (63:5-22); Dkt.737 at 9-10.

The district court found EHP violated its preservation obligations, but denied sanctions.  Dkt.755 at 11-12; Dkt.1497 at 8-11.  It ruled Whitesell suffered no prejudice because the court's summary-judgment orders purportedly "resolved" any dispute over the agreements' meaning to which the destroyed emails might be relevant.  Dkt.1497 at 10.

### III.    DISCOVERY SANCTIONS AGAINST WHITESELL

The district court struck Whitesell's request for lost-profits damages—valued at over $100 million—as a sanction for purported discovery violations.

---

[3] Leon became HOPI's CEO following the spin-off.  Dkt.1886 (719:15-25).

## A.    The Dispute over Data from Whitesell's Industrial and Financial System

Defendants requested discovery about "itemized product costs and expenses" that Whitesell incurred or would have incurred in supplying parts defendants failed to purchase from Whitesell.  Dkt.1114-3 at 6-7, 9-10; Dkt.1114-4, Ints. 10, 12(h), 21, 23(h).  Whitesell explained that it does not maintain running tallies of its per-unit costs.  Dkt.775 (94:3-13).  But it produced "[a]ll of the financial information" needed to calculate "any cost" for relevant parts, including "purchase order[s]," "invoice[s]," "financial statements," "tax returns," Dkt.1099-7 at 44 (167:9-168:10), and all other cost data "exist[ing] in written form," Dkt.819 (115:2-4).

Defendants, however, insisted that Whitesell maintained per-unit cost data in the Industrial and Financial System ("IFS")—software Whitesell uses to track customer orders.  Dkt.1028.  Whitesell acknowledged from the start that IFS was *capable* of tracking per-unit costs.  Dkt.683 (36:13-17); Dkt.1099-7 at 6-7 (17:1-6, 18:7-20).  The software includes a "Unit Cost" or "total" cost field for that purpose.  Dkt.1099 at 6.  But, Whitesell consistently explained, it *never used* IFS's costing capability for defendants' parts.  Dkt.683 (36:13-17); Dkt.1099-10 at 8 (20:20-21:19); Dkt.1099-10 at 11 (30:22-25).  The software, however, did not allow the cost field to be left empty.  Dkt.1099 at 6-7; Dkt.1150-5 at 15 (47:3-7).  Whitesell employees thus entered "placeholder" numbers—often dummy figures, with no relationship to actual costs.  Dkt.1099 at 7-8.  Even if initially based on estimates or

13

invoices (*e.g.*, for parts obtained from other suppliers), placeholders were not updated or checked for accuracy, and did not reflect Whitesell's actual per-part costs. Dkt.1099 at 7-9; Dkt.1099-10 at 12 (34:24-36:25); Dkt.1150-5 at 14-15, 48-49 (45:23-46:5-18, 180:4-183:1). If Whitesell needed to determine a particular part's per-unit cost, it would add up materials and other costs attributable to that part and divide by the number of units produced—not consult IFS's cost field. Dkt.1099 at 10-11; Dkt.1150-5 at 14-15 (45:16-46:4).

Defendants raised the unit-cost issue repeatedly. But the court never addressed Whitesell's objections or ordered it to produce unit-cost data from IFS.

**August 2015.** Defendants asked for product cost information, including from IFS, at an August 2015 hearing. Dkt.683 (31:6-32:2, 32:7-8, 33:11-34:24). Whitesell explained that "IFS is capable of" per-unit cost analysis, but that this capability had "never been used" for EHP parts. Dkt.683 (36:13-17). The district court "defer[red] any specific ruling until" defendants reviewed Whitesell's next production. Dkt.683 (48:17).

**January 2016.** In January 2016, defendants deposed Robert Wiese, a Whitesell Rule 30(b)(6) witness. Wiese explained that IFS "has the capability" to track costs product-by-product, but Whitesell doesn't "utilize all the features of the system." Dkt.1099-7 at 6 (15:24-17:23). He made clear that Whitesell did not maintain cost information "on a part-by-part basis." Dkt.1099-7 at 44 (166:8-17).

14

At a discovery hearing soon thereafter, defendants demanded that Whitesell provide a part-by-part, per-unit cost breakdown. Dkt.775 (91:11). Whitesell explained that any part-by-part, per-unit cost breakdown would need to be calculated by its expert. Dkt.775 (94:3-13, 97:12-13). The court did not order Whitesell to produce the breakdown defendants demanded, indicating that it would "take [the issue] back up" at the next hearing. Dkt.775 (98:13-15).

**April 2016.** At an April 2016 hearing, defendants asked Whitesell to certify that all "product cost and expense information" had been produced. Dkt.819 (121:13-123:19). Whitesell agreed. *Id.*; *see* Dkt.923-1. The court issued no ruling, stating it was "at a loss at what more [it could] order or compel." Dkt.819 (123:13-18).

**November 2016.** At a November 2016 hearing, responding to defendants' complaints about Whitesell's productions, Whitesell reiterated that it did not use IFS to "track cost . . . information on part-by-part basis," even for parts from outside suppliers. Dkt.873 (95:16-21). The court issued no ruling, agreeing the parties should resolve the issue through interrogatories. Dkt.873 (106:9-12).

**December 2016.** At a December 2016 hearing, defendants contended that Whitesell's production of cost information was incomplete. Dkt.875 (18:2-19:15). The court and parties agreed they would "work through" any remaining issues at

"the next discovery hearing." Dkt.875(19:13-16). The next discovery hearing, however, was not for another two years and the court never ruled on the matter.

**May 2018.** In May 2018, defendants deposed Whitesell employee Chris Jones regarding IFS. Dkt.1150-5. Jones explained that Whitesell entered a "cost number" for each part added to IFS—***not*** for tracking actual per-unit costs, but because the software "requires" entry of some number in the cost field to operate. Dkt.1150-5 at 13, 15(41:5-14, 47:3-11). Because Whitesell "has no active costing system," Jones explained, someone would have to "dissect" Whitesell's "general ledger" to determine a part's per-unit cost. Dkt.1150-5 at 14-15(45:16-46:4).

**July 2018.** Following Jones's deposition, defendants requested the "per part total product cost" that (according to defendants) Jones said Whitesell assigned to parts in IFS. Dkt.1028-2 at 6. Whitesell objected, explaining—as Jones had—that the numbers defendants characterized as per-part "cost data from IFS" did ***not*** actually reflect the costs of the parts. Dkt.1028-3 at 21. Nevertheless, on July 3, 2018, Whitesell produced the requested data. Dkt.1032 at 1; Dkt.1033 at 2 n.1.

### B. Defendants Move To Compel Production of IFS Data *After* Whitesell Produced That Data, and Then Move for Sanctions

On July 13, 2018—***after*** Whitesell produced the IFS data defendants requested—defendants moved to compel production of that data. Dkt.1028. Defendants claimed they learned for the first time at Jones's May 2018 deposition that IFS included "per-part total product cost." Dkt.1028 at 2. They did not address Jones's

16

testimony that the "cost number" assigned to parts in IFS was not intended to reflect actual per-unit costs. Dkt.1150-5 at 13, 15, 48 (41:5-14, 47:6-18, 180:4-182:4). Nor did defendants address Wiese's January 2016 testimony that Whitesell did not use IFS's costing capabilities. Dkt.1099-7 at 44 (166:8-17).

Before the court ruled on the motion to compel, defendants moved for sanctions, asking the court to strike Whitesell's lost-profits claims. Dkt.1070 at 16-17. Whitesell opposed, arguing that it had not violated any court order compelling production (there was no such order), and that it had in any event produced the information before defendants moved to compel. Dkt.1099 at 14-15. Whitesell reiterated its objection that the information was not responsive to defendants' requests, again explaining—with citations to deposition testimony—that, although IFS *offered* per-part costing, Whitesell *did not use* that functionality, and instead placed numbers in IFS's cost field to enable the software's other features. Dkt.1099 at 7-9, 17-20; *see* Dkt.1099-10 at 8, 11-12 (21:9-19, 31:7-15, 34:24-37-2); Dkt.1150-5 at 14-15, 48-49 (45:23-46:5-18, 180:4-183:1).

## C.    The Court Holds an "Evidentiary Hearing"

The district court calendared an "Evidentiary Hearing," directing the parties to "present full argument," including "any necessary and appropriate evidentiary support." Dkt.1127. Before anyone presented evidence or argument at the hearing, however, the court orally ruled that Whitesell had violated its discovery obligations

17

and deserved some sanction. Dkt.1162(4:21-7:8). The court declined to consider evidence on **whether** to sanction Whitesell, declaring "that dog won't hunt." Dkt.1162(14:8). The only question was **what** sanction to impose. Dkt.1162(7:3-8). The court did not say what sanctions it was contemplating.

Whitesell explained that defendants had not made "a request for specific IFS data," despite having known about IFS and its costing capabilities from the litigation's outset. Dkt.1162(152:15-25). Nor had defendants moved to compel production of such data in response to Whitesell's objections—they moved to compel only **after** Whitesell produced that information. Dkt.1162(103:4-17, 152:19-25). The court, moreover, had never issued an order requiring production. Absent such an order—and its violation—Whitesell argued, no sanctions could be imposed under Rule 37. Dkt.1162(153:1-16).

Whitesell also explained that it understood defendants' requests for "cost data" to mean data reflecting the **actual** cost of goods sold. Whitesell had produced **that** data, turning over years of financial information reflecting everything needed to calculate Whitesell's lost profits. Dkt.1162(20:17-22); Dkt.923-1. But Whitesell never considered IFS's so-called "unit cost" figures responsive to defendants' requests, as they **did not reflect actual costs**. *See* Dkt.1162(17:1-10, 108:7-109:11, 110:1-111:11).

### D.    The Court Strikes Whitesell's Lost-Profits Claim

The court granted defendants' sanctions motion.  Dkt.1159.  It denied the motion to compel "as moot," acknowledging that Whitesell "*did* produce the requested information" *before* EHP moved to compel.  Dkt.1159 at 5, 15 (emphasis added).

The court nonetheless imposed severe sanctions, striking Whitesell's lost-profits claims based on its supposed failure to disclose IFS's "unit cost" data.  Dkt.1159 at 7-8.  The court stated that Whitesell had violated an *oral* order to "provide any and all per-part cost data in its possession in response to the challenged discovery requests."  Dkt.1159 at 7 & n.8.  The court never identified when, if ever, it issued such an order or ruled on Whitesell's objections that IFS contained no responsive data.  Nor did the court consider lesser sanctions or explain why they would be insufficient.  It declared "the only appropriate sanction" was striking Whitesell's lost-profits claims entirely.  Dkt.1159 at 14.

## IV.    WHITESELL'S PRICE-INCREASE CLAIMS

The district court granted defendants summary judgment on Whitesell's claims that it was entitled to more than $30 million in unpaid price increases.  The SPA allowed Whitesell to raise prices whenever an "adverse market situation . . . drastically affect[ed] Whitesell's costs."  SPA §5.5.  Although EHP could request "evidence" supporting proposed increases, the SPA required Whitesell to produce such evidence *only* "upon the request of Electrolux."  *Id.*

In early 2005, Whitesell gave EHP notice that it was increasing certain prices because of increased steel costs.  Dkt.267 ¶7; Dkt.267-2.  EHP "acknowledge[d] receipt" but did not request supporting evidence.  Dkt.290-1 at 3.  Instead, EHP exercised its right under the SPA to solicit competing quotes from other suppliers.  SPA §5.5; Dkt.267 ¶¶8-22.  Whitesell identified numerous problems suggesting EHP's proffered quotes were not valid, bona fide quotes.  Dkt.265 at 16-18; Dkt.267 ¶¶8-17.  EHP, and later HOPI, nevertheless refused to pay the increased prices.  Dkt.266 ¶¶16, 39; Dkt.267 ¶¶18-19.

Whitesell asserted a claim for breach based on defendants' refusal to pay.  Dkt.47 ¶30; Dkt.69 at 6-9; Dkt.265 at 5-12, 14-17.  On cross-motions for partial summary judgment, defendants argued that Whitesell was not entitled to the price increases because it had not provided "cost increase evidence" justifying them.  Dkt.293 at 3.  Whitesell argued that it had no obligation to provide such evidence because defendants never requested it as SPA §5.5 requires.  Dkt.265 at 14-15.

The district court granted summary judgment to defendants.  Dkt.372.  The court identified no direct, contemporaneous evidence of a request for evidence supporting the 2005 price increases.  Yet the court declared it "undisputed" that EHP

*had* requested such evidence based on after-the-fact affidavits from EHP employees and EHP's complaints about the proposed increases.  Dkt.372 at 17-19.[4]

## V.  WHITESELL'S PREJUDGMENT-INTEREST REQUEST

In 2016, Whitesell moved to amend its complaint to seek prejudgment interest on six of its claims under O.C.G.A. § 13-6-13.  Dkt.801.  The court denied the motion, ruling that Whitesell was untimely seeking to add a "new claim" and that prejudgment interest was unavailable regardless.  Dkt.818 at 4, 6.

## VI.  TRIAL

The case was finally tried in January-February 2023.  Whitesell advanced what remained of its breach-of-contract claim against HOPI (the outdoor-products company that spun off from EHP in 2006 and remained bound by the parties' agreements).  EHP and HOPI asserted counterclaims against Whitesell.

### A.    Claims and Defenses at Trial

Whitesell contended that it incurred significant costs building its inventory of parts formerly supplied by Brunner and Matrix Wire ("Brunner and Matrix Parts")

---

[4] Although defendants did not request evidence supporting the 2005 price increases, Whitesell explained that the increases were supported by a summary of costs, materials invoices, and articles documenting rising steel prices—as it had similarly explained for price increases for other parts in mid-2004.  Dkt.267-2 (2005); Dkt.267-1 (2004); Dkt.266-23 (2004).  Whitesell argued that, even if EHP had requested evidence for the early-2005 price increases, the provided evidence sufficed.  Dkt.265 at 15-16.  The court declared that evidence inadequate because it did not "correlate specifically to the unit price increases."  Dkt.372 at 20.

to prepare for the transition contemplated by the Settlement Memorandum. Dkt.1886(140:9-14, 147:11-16, 280:12-17, 353:24-354:6, 609:19-21, 1656:11-1658:11-17, 1661:10-1662:1); Whitesell.Ex.1430 at 3.[5]

Whitesell argued that HOPI had not begun to offer to transition the Brunner and Matrix Parts until 2007, despite its obligation to complete the transition by the end of 2003. Dkt.578-2 ¶3; Dkt.1886(339:10-341:17, 343:24-345:15, 381:18-382:8); Whitesell.Ex.992. Then, in 2009, HOPI refused to accept delivery of the parts based on supposed concerns about Whitesell's "production readiness"—leaving Whitesell with excess, already-made inventory that HOPI refused to purchase. Dkt.1886(401:8-403:19, 448:13-15, 616:18-22, 617:3-9). Barred from seeking lost profits, Whitesell sought $5.3 million in operational losses and inventory costs.

HOPI counterclaimed, contending that the Brunner and Matrix Parts had been awarded to Whitesell in 2003, but that Whitesell made transitioning them impossible by failing to demonstrate it could supply them. Dkt.1886(156:16-157:14). HOPI and EHP also asserted counterclaims alleging that Whitesell failed to satisfy obligations specific to the final six-month "Phase-Out" period of the contract term.

---

[5] The Matrix parts included wireforms; although the court had held the Settlement Memorandum's reference to "wireforms" unenforceably vague, HOPI did not dispute that Matrix wireforms fell "within the enforceable parts categories" the court identified. Dkt.429 at 5 n.8.

According to defendants, an inventory list Whitesell provided in August 2008 understated its remaining inventory of certain parts, causing defendants to incur costs to make up the shortfall from other suppliers. Whitesell asserted an affirmative defense of prior material breach against each counterclaim. Dkt.597 at 2 (Sixth Defense); Dkt.598 at 2 (Sixth Defense); Dkt.1851 at 3-4; Dkt.1886 (1671:20-1672:18).

## B. Excluded Evidence of Defendants' Bad-Faith Breach

Having sharply limited Whitesell's case before trial, the district court issued a series of evidentiary rulings that further restricted Whitesell's ability to try what remained of its claims.

### 1. *Defendants' Bad-Faith Emails*

The district court excluded numerous emails in which defendants' executives discussed their intent to punish Whitesell, breach the parties' agreements, and disregard court orders (collectively, the "Bad-Faith Emails"). Dkt.1863 (112:19-113:4). For example:

- December 2004: An EHP vice president tells EHP purchasing director Don Market that EHP solicited bids from rival suppliers for parts supplied by Whitesell "to *enable the Whitesell contract to be broken*" and that he would like to "fully quantify the savings" from alternative suppliers "before *busting the Whitesell contract*." Dkt.266-19 at 2 (emphasis added).

- January 2005: Market tells an internal purchasing group, "Gang, I want to *stir up some shit with Whitesell*." Another executive

replies, "***We will do what it takes to get out of Whitesell***.  Yesterday is not soon enough for me."

- July 2005: Market tells colleagues that EHP "will need to make a decision soon if we decide to ***intentionally breech [sic] the court order and contract*** and attempt to move away completely."

- August 2005: EHP purchasing agent Steve Callis says, "We are already doing this in [Springfield] and ***doing our best not to give Whitesell any new business***.  I think we need to push back to [EHP leadership in] Augusta, and tell them to ***figure out a way to get us out [of] this contract***."

- September 2005: Market reprimands a colleague, "Your actions in your letter will no doubt end up in court as ***Neil [Whitesell] has documented twice that we are playing games and not following the court order*** [*i.e.*, Consent Order]," and instructs the recipient to "***delete this entire e-mail – that's an order***."

- October 2005: Callis says, "Trust me ***we want out of Whitesell*** much worse than you or anyone in Augusta, just make sure you and the Augusta clan ***honor your commitment to get rid of them***."

Dkt.1134 at 17-19 (emphasis added); *see* Dkt.1309-35; Dkt.1309-33; Dkt.1309-30; Dkt.1309-41; Dkt.1309-43.

Those emails proposing to breach the contracts and court orders, Whitesell argued, were powerful evidence that defendants ***in fact*** breached—a fact central to Whitesell's breach-of-contract claim and prior-material-breach defense.  Dkt.1566 at 2, 18; Dkt.1779 at 2, 6, 11; Dkt.1863 (97:23-98:24).  The district court did not address that argument, but held the emails irrelevant on the ground that they did not specifically address the Brunner and Matrix Parts at issue at trial.  Dkt.1863 (4:17-23, 111:16-25).

### 2.    *Defendants' Unpaid Invoices*

The district court also excluded testimony relating to defendants' failure to pay more than $6.5 million in "undisputed invoices," which Whitesell alleged "constitutes a material breach of the parties' agreements."  Dkt.578 ¶¶177, 179; Dkt.1886(241:4-242:19, 322:7-13, 787:8-18, 1284:5-1289:5).  Unwilling to defend their failure to pay, defendants stipulated to liability and paid the outstanding sums on the eve of trial.  Dkt.1754; Dkt.1772.

Whitesell argued that, although defendants' payment resolved Whitesell's *claims* to recover the withheld sums, their persistent and unjustified non-payment remained "relevant" and "ought to be admissible" as evidence showing defendants' "bad faith," Dkt.1874(70:8-16), and supporting Whitesell's "affirmative defenses . . . that EHP [and HOPI] breached first," Dkt.1864(154:21-155:14).  The court excluded the evidence as irrelevant.  Dkt.1874(70:17-20); Dkt.1880(142:16-143:7).  It continued to exclude evidence of defendants' "prior conduct that occurred through 2008, [including] prior breaches," throughout trial.  Dkt.1886(241:4-25); *see* Dkt.1886(322:7-13, 787:8-18, 1284:5-1289:5).

### 3.    *Defendants' Misconduct Leading to the Consent Order*

Finally, the district court excluded communications leading up to the 2005 Consent Order, showing defendants' efforts to secure alternative suppliers for numerous parts.  Dkt.1863(47:1-197:18).  Those communications, Whitesell ex-

plained, were relevant to proving defendants' breaches because they showed defendants were "going to award" to other suppliers parts they were obligated to buy from Whitesell.  Dkt.1863(160:4-8); *see* Dkt.1863(51:8-15, 98:12-20, 119:12-20, 124:19-125:1).  The documents also provided "important context" by showing the Consent Order was necessitated by defendants' failure to honor the Settlement Memorandum and improper efforts to "transition all parts away from Whitesell." Dkt.1863(117:23-118:1, 150:13-22).

The court excluded the evidence.  Dkt.1863(47:1-197:18).  It recognized the evidence showed defendants' "dissatisfaction with the contract in 2004." Dkt.1863(60:9-18).  But it held, based on a "strict" approach to the Rule "401 [relevancy] standard," that the evidence was irrelevant to the "claims remaining to be tried."  Dkt.1863(60:9-18); Dkt.1863(47:1-197:18).   The court maintained that exclusion even when Whitesell sought to impeach EHP (and later HOPI) executive Roger Leon, who testified that the Consent Order was prompted by ***Whitesell's*** supposed threats to cut off defendants' supplies.  Dkt.1886(820:1-821:5, 1013:4-6, 1010:19-22, 1011:11-13, 1029:16-1030:3).

## C.    Verdict

On Whitesell's breach-of-contract claim, the jury agreed that HOPI breached by failing to buy the Brunner and Matrix inventory in 2009.  Dkt.1851 at 1.  But it

found for HOPI on its affirmative defense that Whitesell failed to perform an unspecified "concurrent condition," precluding recovery.  Dkt.1851 at 2.

On HOPI's counterclaim regarding transition of Brunner and Matrix Parts, the jury found that Whitesell breached by failing to transition the parts and had not proven its affirmative defense of prior material breach.  Dkt.1851 at 2.  On EHP and HOPI's Phase-Out period counterclaims, the jury likewise found for EHP and HOPI and rejected Whitesell's prior-material-breach defense.  Dkt.1851 at 3-4.

The court denied Whitesell's motions for a new trial (Dkt. 1887) and JMOL (Dkt.1888).  Dkt.1901.

## VII.  STANDARDS OF REVIEW

*De novo* review applies to a grant of summary judgment, *Royal Ins. Co. of Am. v. Whitaker Contracting Corp.*, 242 F.3d 1035, 1040 (11th Cir. 2001); interpretation of a contract, including whether it is ambiguous and whether the parties entered an enforceable agreement, *Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1256 (11th Cir. 2006); *Hart v. Hart*, 777 S.E.2d 431, 433 (Ga. 2015); and a determination that amending a complaint would be futile, *Cockrell v. Sparks*, 510 F.3d 1307, 1310 (11th Cir. 2007).

Sanctions for discovery violations are reviewed for abuse of discretion, *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997), as are evidentiary rulings, *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1160 (11th

Cir. 2004), and denials of leave to amend a complaint, *Cockrell*, 510 F.3d at 1310.

"A district court by definition abuses its discretion when it makes an error of law."

*Koon v. United States*, 518 U.S. 81, 100 (1996).

## SUMMARY OF ARGUMENT

**I.**     The district court erred in holding, without meaningful discovery, that the SPA was an unenforceable agreement to agree.  The agreement's text and the parties' conduct demonstrated a present intent to enter a binding contract.  The broad definition of covered goods was consistent with the need to maintain flexibility in a long-term requirements contract.  And there was evidence from which a jury could resolve the meaning of any disputed terms.  The court's interpretation of the Settlement Memorandum as supplanting the SPA's definition of covered goods was similarly inconsistent with the agreement's text and the parties' conduct.  At a minimum, the court erred by ruling without allowing discovery into the parties' intentions concerning the agreements.

**II.**     The district court reversibly erred by striking Whitesell's claims for lost profits as a sanction for purported discovery violations.  It issued no order compelling production of the disputed information—a precondition to Rule 37 sanctions.  It never ruled on Whitesell's objections to defendants' discovery requests.  And it never considered lesser sanctions.  Nor can the court's inherent sanctioning power justify the draconian penalty imposed here.

**III.** The grant of summary judgment on Whitesell's claims for unpaid price increases improperly resolved a factual dispute over whether EHP requested evidence supporting the proposed increases. And even if EHP made such a request, a jury could conclude the evidence Whitesell (unilaterally) provided reasonably documented its increased costs.

**IV.** The court erred in rejecting Whitesell's prayer for prejudgment interest. Because prejudgment interest is not a substantive claim, Whitesell was not required to plead it sooner, and defendants had ample time to assert any defenses. The court's ruling that prejudgment interest was unavailable because Whitesell's damages could not be ascertained at the time of breach misread the statute. A plaintiff with unliquidated damages may seek prejudgment interest so long as it is possible to determine what damages were at the time of breach, even if damages could not have been calculated at that time.

**V.** The erroneous evidentiary rulings substantially prejudiced Whitesell at trial. The exclusion of damning emails where defendants' executives schemed to breach contractual and court-ordered obligations denied Whitesell powerful evidence supporting its defense of prior breach and refuting HOPI's contention that it acted in good faith. Evidence of defendants' persistent refusal to pay undisputed invoices was similarly relevant and improperly excluded. Whitesell also should have been allowed to offer evidence of defendants' efforts to find alternate suppliers

for parts they were obligated to buy from Whitesell—at the very least, to rebut contrary testimony from defendants' witness.

## ARGUMENT

### I. THE DISTRICT COURT ERRED IN HOLDING THE AGREEMENTS' DEFINITIONS OF COVERED GOODS UNENFORCEABLE

Both sides performed under the Strategic Partnership Agreement for years. When disputes arose, both sued to enforce it. But the district court *sua sponte* suggested, and then ruled without allowing any relevant discovery, that the agreement was unenforceable because there was purportedly no "meeting of the minds" about what goods it covered. That was error several times over.

### A. The SPA Was an Enforceable Agreement

A long-term "requirements" contract, the SPA obligated EHP (and, after the spin-off, HOPI too) to source all its needs for identified categories of parts exclusively from Whitesell. The SPA stated EHP's desire "to make a long-term commitment to purchase all of its current and future needs of cold headed/threaded fasteners and various related Class C items" from Whitesell, for at least the contract's 8-year duration. SPA § 2.0. "Whitesell," the parties agreed, "***shall receive the uninterrupted benefit of such long-term commitment***." *Id.* (emphasis added). In return, EHP received substantial incentives—including a ***$2 million*** upfront payment from Whitesell. SPA §§ 2.0, 5.1, 6.0, 7.0; Dkt.1886(1021:13-15).

Given that EHP would require different parts as its products and designs evolved over the years, it would have been impossible when the SPA was signed to anticipate EHP's precise needs throughout the contract term. Accordingly, the parties defined the covered "Good(s)" in broad terms. They also agreed to maintain, and periodically revise, an "Exhibit B" that would track EHP's current needs at any given time. SPA § 2.1.2.

That is how requirements contracts are supposed to work. A "requirements contract obligates the buyer to purchase exclusively from the seller all the goods needed for a particular use contemplated by the parties." *Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.*, 328 S.E.2d 426, 429 (Ga. App. 1985); *see Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*, 329 S.E.2d 554, 556 (Ga. App. 1985); 2A *Lawrence's Anderson on the Uniform Commercial Code* § 2-306:34 (3d ed. 1997). The SPA obligated EHP to purchase all the "cold headed/threaded fasteners and various related Class C items" it needed to manufacture its consumer goods, providing a detailed list describing the categories of covered parts. SPA § 2.1.2. That was enough to bind the parties. Which specific parts "reasonably" fell within the scope of that commitment depended on the "nature" of EHP's business—*i.e.*, the parts' intended use—and the "'commercial standards of fair dealing in the trade.'" *O.N. Jonas Co. v. Badische Corp.*, 706 F.2d 1161, 1165 & n.2 (11th Cir. 1983). The parties did not need to spell out every individual part.

31

The district court's decision turned that understanding on its head. The court thought the breadth of the SPA's definition of covered "Good(s)" meant the contract was merely an "'agreement to agree.'" Dkt.212 at 19. But Georgia law recognizes that "'indefiniteness is ***inherent*** in requirement[s] contracts'" like the SPA. *O.N. Jonas*, 706 F.2d at 1164 (emphasis added). That does not make them unenforceable. *See id.* Even ordinary contracts for sales of goods do "not fail for indefiniteness" just because the parties leave some terms open. O.C.G.A. §11-2-204(3). So long as "the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy," the agreement is enforceable. *Id.*

Here, the SPA, its "'circumstances, and the conduct of the parties'" leave no doubt the parties intended to make a binding, long-term commitment, not merely to agree to contract later. *Turfgrass Grp., Inc. v. Ga. Cold Storage Co.*, 816 S.E.2d 716, 722 (Ga. App. 2018); *see* O.C.G.A. §11-2-204(1). That intent is far clearer here than, for example, in *Gregory, Inc. v. Scandinavian House, L.P.*, 433 S.E.2d 687 (Ga. App. 1993). There, a "letter of intent manifested a clear intention to contract" where it referenced defendant's "'intent to purchase the windows contained in [plaintiff's] proposal.'" *Id.* at 690. The parties' conduct—such as plaintiff's later preparation and delivery of shop drawings for windows—was likewise "inconsistent with the theory that they only agreed to agree," and "demonstrate[d] that they intended to enter into a contract." *Id.* at 691.

The SPA is even more explicit than the letter in *Gregory*. It declares EHP's "intent" to make a "long-term commitment to purchase all of its current and future needs" of specified parts from Whitesell. SPA §2.0. It provides a detailed list of the categories of "Good(s)" the parties understood that commitment to encompass. SPA §2.1.2. And it promises EHP a $2 million upfront payment "in exchange for a long-term purchase commitment from Electrolux to purchase all of its Good(s) from Whitesell." SPA §7.0; *see* SPA §§2.0, 5.1, 6.0.

The parties' conduct after signing the SPA likewise manifested their intent to form a present contract. Whitesell paid the agreed $2 million. Dkt.578 ¶136; Dkt.1886(1021:13-15). The notion that Whitesell would hand over *$2 million* for no binding commitment defies credulity.

EHP also informed its suppliers that it "entered into an agreement with Whitesell Corporation to provide all of EHP's fasteners and related C-type products and services" and would be transitioning away from its prior arrangements. Dkt.162-2 at 5. It would make no sense for EHP to tell existing suppliers it was leaving them unless it was committed to doing so, and understood that Whitesell would take their place.

And the parties performed for years on end. EHP gave Whitesell access to its "Vendor Numbers & Passwords" to facilitate the transition. Dkt.162-2 at 36, 48. By February 2002, the parties had nearly completed transitioning all fasteners, and

began transitioning other Class C parts.  Dkt.162-4 at 2-3.  By the 2008 summary-judgment decision, even the district court observed that the parties had been in a "profitable and mutually beneficial" relationship involving the exchange of 3.5 billion parts and $70 million in 2007 alone.  Dkt.212 at 10.  That conduct is fundamentally "inconsistent with the theory that they only agreed to agree." *Gregory*, 433 S.E.2d at 691.

From the SPA's 2000 signing through defendants' 2008 summary-judgment motion, no party questioned that they had a contract.  EHP sued to ***enforce*** the SPA. *See* Dkts.1, 70, 127, 584, 585.  Defendants' initial summary-judgment motion urged the court to enforce the "***clear intent*** expressed in the parties' original Strategic Partnership Agreement" for Whitesell to supply EHP's "'current and future needs of cold headed/threaded fasteners and various Class C items.'"  Dkt.127 at 4 (emphasis added).  It was only after the district court *sua sponte* questioned the contract's validity—***five years*** after EHP sued to enforce it—that defendants followed the court's lead, reversed course, and argued the SPA was not binding.

## B.    The Court's Posited Concerns About the Definition of Covered Goods Did Not Justify Deeming the Agreement Unenforceable

The district court faulted the SPA because, in its view, its definition of covered "Good(s)" lacked an enforceable "definition either specified by the parties, understood by the industry, or able to be confirmed by factual evidence."  Dkt.212 at 23. The parties' failure to develop a final Exhibit B listing every part to be supplied, the

court ruled, was "fatal to successful contract formation."  Dkt.212 at 18-19.  In other words, the court read the SPA as a mere agreement-to-agree that set the stage for a succession of short-term contracts, as the parties revised Exhibit B "every six months" to reflect EHP's current needs.  Dkt.212 at 5.  That makes no sense.

1.    The notion that the evolving Exhibit B would constitute the contract is impossible to reconcile with the SPA or the parties' conduct.  The whole point of the SPA was to meet EHP's "long-term" requirements for years into the future.  SPA §2.0; Dkt.578-2 §3.  Because EHP's products could change during that time, the SPA's definition of covered "Good(s)" was necessarily framed in broad categories.  Meanwhile, as EHP acknowledged, Exhibit B would maintain an evolving list of currently supplied parts "which fall within the scope *of the Supply Agreement*."  Dkt.1 ¶11 (emphasis added).  Exhibit B thus was meant to *track* EHP's changing needs—not define the agreement's scope.  An exhibit subject to revision "every six months," SPA §2.1.2, would hardly assure EHP's "long-term" needs would be met.

The parties' conduct confirms that understanding.  "Despite the fact that an agreement was never reached as to an appropriate Exhibit 'B,'" EHP admitted it "transitioned the fasteners and other parts which it believed were covered *by the SPA*."  Dkt.127-2 at 26 ¶6 (emphasis added).  By 2007, Whitesell was supplying *3.5 billion* items annually—all without a final Exhibit B.  Dkt.212 at 10.  The parties would not have done that if they thought they had yet to reach agreement on which

35

parts Whitesell would supply.  That evidence of the parties' intentions underscores that summary judgment was improper.  *See Underwriters at Lloyds v. Expeditors Korea Ltd.*, 882 F.3d 1033, 1039 (11th Cir. 2018); *Super98, LLC v. Delta Air Lines, Inc.*, 309 F. Supp. 3d 1368, 1375 (N.D. Ga. 2018).

    2.    The district court was wrong to hold the SPA's definition of "Good(s)" unenforceably vague.  Whitesell presented ample evidence from which a jury could discern the meaning of the SPA's disputed terms.  And discovery—which had barely begun—would have produced still more evidence.

    Under Georgia law, courts interpreting contracts "'must bear in mind that the law leans against the destruction of contracts on the ground of uncertainty.'"  *Mori Lee, LLC v. Just Scott Designs, Inc.*, 754 S.E.2d 616, 622 (Ga. App. 2014); *see Unique Designs, Inc. v. Pittard Mach. Co.*, 409 S.E.2d 241, 246 (Ga. App. 1991); O.C.G.A. § 11-2-204; pp. 31-33, *supra*.  Ambiguity—even severe ambiguity—does not invalidate the contract; at most it yields a dispute for the jury to resolve.  *St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*, 198 F.3d 815, 820 (11th Cir. 1999); *Kitchen v. Insuramerica Corp.*, 675 S.E.2d 598, 602 (Ga. App. 2009).  A contract is unenforceable only if its terms "create an 'indefiniteness in subject matter *so extreme* as not to present *anything* upon which the contract may operate in a definite manner.'"  *Kitchen*, 675 S.E.2d at 602 (emphasis added); *Triple Eagle*

*Assocs., Inc. v. PBK, Inc.*, 704 S.E.2d 189, 193 (Ga. App. 2010). There was nothing approaching "extreme" indefiniteness here.

A jury could easily construe everyday terms like "clips," "wire ties," "nuts," "pins," "clamps," and "spacers," which constitute the vast majority of covered "Good(s)." SPA §2.1.2. That some terms, such as "fasteners" and "cold formed parts," might not be self-explanatory does not make them indefinite (or even ambiguous). *Id.* Terms may "be explained or supplemented" by the parties' "course of performance, course of dealing, or usage of trade," O.C.G.A. §11-2-202, even without a preliminary determination that the terms are ambiguous. *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003); *Golden Peanut Co. v. Bass*, 563 S.E.2d 116, 119 (Ga. 2002). Indeed, the U.C.C. "mandates 'the reading of commercial background and intent' into the language of" requirements contracts. *O.N. Jonas*, 706 F.2d at 1164; *see* O.C.G.A. §11-2-306 cmt. 1. Here, EHP itself offered industry definitions of "fasteners." Dkt.196 at 7, 29. And it acknowledged that terms like "cold headed," "cold formed," and "threaded" refer to specific "manufacturing process[es] or specification[s]." Dkt.196 at 7.

The district court thought the absence of a "***clear and consistent*** definition" of certain terms left "insufficient objective basis" to determine the SPA's scope. Dkt.212 at 20 (emphasis added). The question, however, was whether the definition of "Good(s)" had ***any*** discernible meaning—not whether discerning that meaning

might require a jury to decide among competing or even unclear definitions. The court confused contracts of potentially ambiguous scope—a condition "'inherent'" in requirements contracts, *O.N. Jonas*, 706 F.2d at 1164—with contracts so devoid of intelligibility that they are not contracts at all.

    3.    The court deemed the SPA's reference to "Class C items" too "nebulous" to give "the term 'good(s)' a stable or objectively intelligible meaning." Dkt.212 at 19-20 & n.3. But industry participants have no trouble ascribing "intelligible meaning" to "Class C" items. Inventory managers commonly classify goods using the "ABC system," in which "[t]he C group typically consists of a large number of items accounting for a small" part of a company's budget, including "screws, nails, and washers." Dkt.201-2 at 13. Manufacturers in "many industries" likewise understand that "C-Class Components" are "high volume, low cost" parts such as "screws, bolts, clips, and other fasteners, as well as other items used by the personnel in the supply chain." Dkt.201-2 at 16; *see* Dkt.164 ¶6; Dkt.196 at 25; Dkt.162-12 at 3 ("commodity code that has a large amount of part numbers" but "low dollar value"); Dkt.196 at 25 ("any part or component that costs $5 or less per piece"); Dkt.162-12 at 29-31 (listing "Common Class 'C' Items").

    Defendants shared that understanding. Citing an affidavit by then-EHP executive Roger Leon, who negotiated the SPA, defendants explained to the district court that "Class C items generally consist of lower value type parts," such as washers.

Dkt.127 at 4 n.3.  Discovery produced after the summary-judgment ruling offered further confirmation.  EHP representative David Agee agreed Class C includes "lower-cost, lower-risk items" that are identifiable "based on cost."  Dkt.1726-2 at 2 (96:10-14, 97:4-6).  EHP Vice President of Procurement Don Market also understood the scope of Class C parts, admitting "the typical definition of a Class C item" is a "high-volume, low-dollar part[ ]."  Dkt.1726-1 at 4-5 (42:8-10, 43:6-45-7).  Market attended a presentation on Whitesell's Class C offerings before the SPA was signed—and *agreed* with Whitesell's description of the parts within Class C.  Dkt.1726-1 at 4-6, 8 (42:4-47:3, 75:12-20).

4.      The court suggested it would be impossible for a jury to "classify" the "innumerable" parts into the SPA's covered categories.  Dkt.212 at 22.  But categorizing voluminous information is a classic function of expert testimony.  *See, e.g.*, *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 966 (10th Cir. 2009) (expert's categorization of data reduced risk that jury would face "computational headaches" in resolving complex damages issue).  There is no reason to think a jury, presented with the evidence and guided by expert testimony, could not discern which parts were covered.  Yet—over Whitesell's objection—the district court entered summary judgment before expert discovery even began.  Dkt.1171-1.[6]

---

[6] Evidence produced post-summary judgment showed that EHP itself classified parts into the SPA's categories.  *See* p. 46, *infra*.

### C.    The District Court Misconstrued the Settlement Memorandum

To resolve certain coverage disputes, the parties entered into the Settlement Memorandum in 2003.  The district court compounded its misinterpretation of the SPA by misconstruing the Settlement Memorandum—first by declaring parts of it unenforceably vague as well, and then by declaring that it **supplanted** rather than **supplemented** the SPA's definition of covered "Good(s)."  Any disputes over the Settlement Memorandum's scope were, at most, questions for trial.

#### 1.    *The Settlement Memorandum's Terms Were Discernible*

Among other things, the Settlement Memorandum required defendants to buy from Whitesell "wire forms" and "parts in [the] process of being transitioned." Dkt.578-2 ¶¶ 1, 3.  The court invalidated those requirements, holding that those terms "lack a stable definition either specified by the parties, understood by the industry, or able to be confirmed by factual evidence."  Dkt.212 at 23.

But Georgia law directs such disputes to the jury, *Maiz v. Virani*, 253 F.3d 641, 658-59 (11th Cir. 2001); *St. Charles*, 198 F.3d at 819, which would have had ample basis for resolving the issue in Whitesell's favor.  Whitesell understood that a "wireform" "is just a bent wire in different forms," and can include rods, bolts, and pins.  Dkt.127-6 at 67(11:18-23).  EHP likewise understood that "[w]ireform parts generally tend to include parts described by a layperson as clips, loops, hooks, and/or rods."  Dkt.127-2 at 26 ¶ 6.  While the parties disagreed about items on the periphery,

40

such as dishwasher baskets formed from bent wires, such disputes are classic jury questions—particularly given evidence that EHP believed those products to be wireforms. Dkt.127 at 27. When later deposed, EHP executive Don Market admitted "a wireform product is like a dishwasher basket." Dkt.1726-1 at 13(120:5-121:8). Nothing warranted the conclusion that the term "wireform" was too "amorphous" to put to a jury. Dkt.212 at 23.[7]

The meaning of parts "in [the] process of being transitioned" likewise should have been resolved at trial. Dkt.578-2 ¶ 1(b). A jury could readily interpret that term to refer to parts EHP had begun transitioning to Whitesell (*e.g.*, by identifying them as parts for Whitesell to supply), but that Whitesell had not started supplying, at the time of the May 2003 Settlement Memorandum. The court offered no explanation why a jury could not have resolved any disputes over what parts fell into that category by evaluating evidence about the transition's status in May 2003.

2. *The Settlement Memorandum Did Not Supplant the SPA's Definition of "Good(s)"*

The Settlement Memorandum was intended to resolve a dispute over whether the SPA covered Brunner and wireform parts, not reshape the overall scope of goods

---

[7] That the parties never prepared a final Exhibit B-1 listing the wireform and Brunner parts, Dkt.212 at 8-9, does not render the Settlement Memorandum indefinite any more than the lack of a final Exhibit B renders the SPA indefinite, *see* pp. 34-36, *supra*.

under the SPA.  Dkt.578-2 ¶13.  The district court initially understood that.  It explained that the Memorandum "resolved the disputes underlying EHP's [original] complaint," which centered on those parts.  Dkt.212 at 7; *see* Dkt.1 ¶27.  When denying reconsideration, however, the court declared that the categories listed in the Memorandum ***supplanted*** the SPA's definition of "Good(s)."  Dkt.288 at 10.

But the Settlement Memorandum declared that the SPA "***shall continue in full force and effect***" except "as modified."  Dkt.578-2 ¶14 (emphasis added).  The Memorandum expressly modified a number of SPA provisions, including the agreement's term and transition deadline.  *Id.*  But it did not say anything about replacing SPA §2.1.2's definition of "Good(s)."  EHP understood as much.  EHP Purchasing VP Kim Rio confirmed in October 2005 that EHP "need[s] to award ***all the fastener parts and 'C' parts*** to Whitesell to according to our contract."  Dkt.162-4 at 35 (emphasis added).  EHP purchasing agent Lynn Knutson agreed that, "per our Whitesell agreement, there was a direction to move ***all Class C items*** to Whitesell."  Dkt.162-4 at 38 (emphasis added).  The "contract" and "agreement" they referenced could only be the SPA—the Settlement Memorandum did not mention Class C items.

The parties performed accordingly:  In December 2005, two years after the Settlement Memorandum, EHP Commodity Director Alberto Padilla affirmed "Electrolux's intention to transition ***every part which falls under section 2.1.2 of our agreement***,"—*i.e.*, the SPA.  Dkt.162-4 at 30 (emphasis added).  Padilla sent

Whitesell a "New Exhibit B" that included both "parts which we believe *fall under section 2.1.2 of our agreement*" and "wire forms which we believe are part of the settlement agreement." *Id.* (emphasis added). If Whitesell identified "any additional parts" "*covered under section 2.1.2 of our agreement*," Padilla pledged to "include[] them in our transition." *Id.* (emphasis added). None of that would make sense if EHP understood the Memorandum to supplant, rather than supplement, the SPA's definition of covered "Good(s)."

By disregarding that evidence, the court transformed a settlement agreement resolving a discrete dispute into a radical narrowing of the parties' entire relationship. That is not how the parties intended or understood the Settlement Memorandum. To the contrary, as then-EHP executive Roger Leon later admitted, "Electrolux's obligations under Section 2.1.2 of the SPA *never changed* during the entire pendency of the contract." Dkt.1726-3 at 2 (438:14-23) (emphasis added).

If there were a litigable issue on whether the Settlement Memorandum displaced the SPA's definition of covered goods, that would have been for the jury to resolve. By resolving the issue itself, the district court usurped the jury's role.

### D.    The Summary-Judgment Ruling Was Premature

This Court forbids summary judgment where discovery "relevant to the issues raised" is outstanding. *Snook v. Tr. Co. of Ga. Bank of Savannah*, 859 F.2d 865, 871 (11th Cir. 1988) (reversing summary judgment granted while motion to compel was

pending); *see Jones v. City of Columbus*, 120 F.3d 248, 253 (11th Cir. 1997).  A district court abuses its discretion when it denies an opportunity to obtain "[e]xtrinsic evidence" that "may be necessary to illuminate" the meaning of relevant agreements. *Burks v. Am. Cast Iron Pipe Co.*, 212 F.3d 1333, 1337 (11th Cir. 2000) (per curiam).

1.    The district court's refusal to allow discovery before ruling on summary judgment defies that precedent.  Whitesell argued that it had not yet been able to obtain critical evidence about the agreements' validity and the goods they covered: The court had not ruled on Whitesell's motion to compel production of defendants' pre-2006 communications regarding negotiation of the SPA and Settlement Memorandum, and no depositions had been taken.  Dkt.161 at 1, 3-4, 37-38; Dkt.117-2 at 13-24; Dkt.198 at 24 & n.7.

Importantly, defendants had failed to produce documents from EHP's principal negotiator, Roger Leon.  Dkt.161 at 37-38.  Without an opportunity to review those documents or depose Leon and other "prominent EHP employees," "there remain[ed] numerous questions that Whitesell is entitled to probe," including EHP's understanding of the disputed categories of parts.  *Id.*; *see* Dkt.181 at 8; Dkt.198 at 24 n.7; Dkt.251 at 3-4, 6-9.[8]

---

[8] While a non-movant must explain why, absent further discovery, "it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), "the opposing party need not file an affidavit pursuant to Federal Rule of Civil Procedure 56[d]." *Fer-*

The district court's initial summary-judgment order failed to consider those arguments. On reconsideration, the court declared discovery on "the parties' intent at the time" of the SPA's execution "irrelevant" because "it [was] the parties' failure to create an Exhibit B, not their intention with respect to Exhibit B, that is fatal to successful contract formation." Dkt.288 at 7, 8. That is circular. The parties' intent would have revealed *whether* they understood Exhibit B as necessary to "give meaningful content" to the SPA's definition of "Good(s)," as the court believed, Dkt.212 at 18, or whether they understood Exhibit B as simply a tool for tracking which parts covered by that definition were being supplied at a given time.

The court also declared that broad categories—such as "fasteners" and "Class C" parts—were not discernible through "factual evidence." Dkt.212 at 23. But the court could not know that without considering the evidence Whitesell was trying to obtain through discovery. Likewise, the court opined that the Settlement Memorandum overrode the SPA's definition of covered "Good(s)," Dkt.288 at 10, despite the Memorandum's express terms and without letting Whitesell obtain evidence of *whether* that was what the parties meant.

---

*nandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 570 (11th Cir. 1990). A motion to compel or "'written representation by [the non-movant's] lawyer, an officer of the court,'" satisfies "the spirit of Rule 56[d]." *Id.*

2.    Discovery Whitesell obtained *after* the summary-judgment order confirms the error.  It showed that EHP understood the part categories in the SPA and Settlement Memorandum.  An EHP employee testified that "Class C" is "an accounting term" that includes "lower-cost, lower-risk items" identifiable "based on cost."  Dkt.1726-2 at 2 (96:10-14, 97:4-6).  EHP Contracts Administrator Don Market admitted he could identify both Class C parts and wireforms.  Dkt.1726-1 at 4-6 (42:4-47:3); Dkt.1726-1 at 13 (120:5-25).  EHP classified its Class C parts using the same categories as the agreements.  Dkt.1726-1 at 10-11 (97:6-17, 98:4-9); Dkt.1726-4.  And Roger Leon, EHP's chief negotiator, conceded the Settlement Memorandum did *not* override the SPA's definition of covered goods, testifying that "***Electrolux's obligations under Section 2.1.2 of the SPA never changed*** during the entire pendency of the contract, which was from its signing date until it expired in 2008."  Dkt.1726-3 at 2 (438:14-23) (emphasis added).

The premature summary-judgment ruling deprived Whitesell of its "right to utilize the discovery process to discover the facts necessary to justify [its] opposition."  *Snook*, 859 F.2d at 871.  That is a textbook abuse of discretion.

### E.    The District Court's Spoliation Ruling Falls with Its Contract Rulings

The court found EHP improperly destroyed emails from Roger Leon—a "principal player in the relationship between EHP and Whitesell" and "signatory to the [SPA] and the 2003 Settlement Memorandum."  Dkt.755 at 11; Dkt.1497 at 8-

10; Dkt.1726-1 at 2-3 (21:6-23:20).  The court denied sanctions on the ground that its summary-judgment order resolved "the 'scope of goods' issue," rendering evidence of EHP's intent when entering the agreements irrelevant.  Dkt.1497 at 8-11.  If the "scope of goods" decision is reversed, that sanctions ruling must be, too.

*    *    *

The district court's decision threatens far-reaching implications.  If the contract here, with industry-standard terms and manifestations of understanding from both sides over a lengthy period, is so incapable of construction that it must be invalidated, then *no* requirements contract can survive.  Requirements contracts—especially long-term contracts like the SPA—necessarily use broad categories to account for parties' evolving needs.  The U.C.C.'s flexible rules are meant to facilitate that by setting an intentionally high bar to holding contracts indefinite.  The district court ignored those rules and, with them, the important policies they promote.  Reversal is warranted.

## II.  THE DISTRICT COURT ERRED IN SANCTIONING WHITESELL BY STRIKING ITS LOST-PROFITS CLAIMS

The Federal Rules and precedent establish clear preconditions for discovery sanctions.  The district court's decision striking Whitesell's lost-profits claims ignored those preconditions.  The court never ordered Whitesell to produce data from its IFS software; no motion to compel was filed until *after* Whitesell voluntarily produced the disputed data.  The court never addressed Whitesell's objections

to defendants' demands.  It never gave Whitesell notice it was considering such an extreme sanction.  And it failed to consider whether lesser sanctions would suffice.

### A.    The District Court Never Issued an Order as Rule 37 Requires

1.    Rule 37 is clear:  Discovery sanctions can be issued *if* a party "fails to obey ***an order to provide*** . . . discovery."  Fed. R. Civ. P. 37(b)(2)(A) (emphasis added).  This Court has repeatedly held that "draconian" sanctions such as striking claims "***must be preceded by an order*** of the court ***compelling discovery***, the ***violation*** of which might authorize such sanctions."  *United States v. Certain Real Prop. Located at Route 1*, 126 F.3d 1314, 1317-18 (11th Cir. 1997) (emphasis added); *see Williams v. Ala. Dep't of Indus. Rels.*, 684 F. App'x 888, 895 (11th Cir. 2017) (rejecting Rule 37 sanctions because party "could not seek sanctions under that rule without a discovery order"); *Goode v. Wild Wing Cafe*, 588 F. App'x 870, 874 (11th Cir. 2014); *Steed v. EverHome Mortg. Co*., 308 F. App'x 364, 371 (11th Cir. 2009).

No such order was issued here.  The court sanctioned Whitesell for supposedly concealing "unit cost" data from Whitesell's IFS accounting software.  *See* p. 19, *supra*.  But Whitesell explained, from when defendants first raised IFS, that while IFS was ***capable*** of tracking unit costs, Whitesell never ***used*** that capability for defendants' parts.  Dkt.683 (32:4-9, 33:11-23, 36:13-17).  Time and again the issue arose—defendants demanding per-unit cost data from IFS; Whitesell objecting that it never used IFS to track per-unit costs.  *See* pp. 13-18, *supra*.

Yet the court ***never*** ordered Whitesell to produce per-part cost data from IFS, choosing instead to ***defer ruling*** on discovery disputes.  *See* pp. 14-16, *supra*. Indeed, defendants did not move to compel production of IFS "unit cost" data until after Whitesell had ***already produced*** that information.  Dkt.1028; Dkt.1032 at 1; Dkt.1033 at 2 n.1.  Even then, the court never ruled on (much less granted) that motion or addressed Whitesell's objections.  Instead, the court denied the motion to compel ***as moot*** at the same time it imposed sanctions.  Dkt.1159 at 15.  The absence of an order compelling discovery—let alone violation of such an order—could not be clearer.  Under this Court's precedent, it is also dispositive.

2.     The sanctions order asserted—without citation—that the district court had "orally pronounced during the discovery hearings that Plaintiff should provide any and all per-part cost data in its possession in response to the challenged discovery requests."  Dkt.1159 at 7.  It cited *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536 (11th Cir. 1993), for the proposition that a violation of an oral order can support Rule 37 sanctions.  *Id.*  But *Malautea* highlights the infirmities of the court's sanctions order.  The oral orders in *Malautea* gave specific directions to produce documents on specific topics.  *Id.* at 1539.  The court then "confirmed [its] oral order with a written 'Minute order,' compelling the production of" those documents, and an additional order "requiring the production of any material subject to a previous

49

order." *Id.* (internal quotation omitted).  It also warned it would impose increasingly harsh sanctions if the documents were not produced within a set timeframe.  *Id.*

The court here did ***none*** of those things.  It did not issue oral orders directing production of specific material.  It repeatedly ***deferred*** ruling, and never identified the "oral[] pronounce[ment]" that supposedly justified its sanctions ruling. Dkt.1159 at 7.  The court did not issue any written order.  And it did not warn Whitesell that it would impose sanctions for non-compliance.  *See Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 248 (5th Cir. 1980) (failure to warn party of potential sanctions was abuse of discretion).  Those omissions foreclosed Rule 37 sanctions here.

### B.    The Court's Failure To Address Whitesell's Objections Precluded Sanctions

Even if the court had directed Whitesell to "provide any and all per-part cost data in its possession," Dkt.1159 at 7, that could not support the sanctions here.  The court never addressed—let alone overruled—Whitesell's objection that the figures in IFS's "cost" field ***did not*** reflect actual per-part costs.  *See* pp. 14-17, *supra*.

"When a party moves the court to compel discovery, the court should consider and rule on the objections filed by the resisting party." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 (11th Cir. 1997).  It "should not grant the motion" to compel—let alone impose sanctions—"in the face of well-developed, bona fide objections without a meaningful explanation of its decision."  *Id.*

50

In *Chudasama*, for example, Mazda objected to plaintiffs' discovery requests. 123 F.3d at 1361-62.  The court held multiple hearings without ruling on Mazda's objections, even after learning that Mazda was withholding responsive information until the objections were resolved.  *Id.* at 1362.  Eventually, the court ordered Mazda to "make complete, proper, non-evasive responses" to plaintiffs' requests, or the court would impose "the ultimate sanction of judgment by default."  *Id.*  Mazda produced the documents one day late, and the court entered a default.  *Id.* at 1364.  This Court held that an abuse of discretion, finding the district court's "utter failure to clarify Mazda's obligations were largely to blame" for Mazda's non-production.  *Id.* at 1371.  Because "the district court disregarded Mazda's emphatic requests for rulings or clarification and issued a compel order containing no guidance as to how it was to be satisfied," sanctions were inappropriate.  *Id.*

That is what happened here—except that, here, no compel order ever issued. The district court admitted Whitesell had objected to defendants' requests as "overly broad."  Dkt.1162(5:4-12).  But the court did not identify any ruling that resolved Whitesell's objection; it stated only that defendants kept asking for the information. *Id*.  That is not how discovery works.  If defendants wished to overcome Whitesell's objections, they had to file a motion to compel and explain why those objections should be overruled.  They were not entitled to skip straight to sanctions.

51

The court declared that Whitesell "failed to disclose the existence of the [disputed] IFS data." Dkt.1159 at 7. That misapprehends what happened. Whitesell consistently represented that IFS contained no actual unit-cost data. Dkt.863 at 32-48, Dkt.775 at 80-96; Dkt.1032. It maintains that position. The court apparently concluded otherwise. But until the court announced that determination, Whitesell was entitled to hold to its belief that the IFS contained no data responsive to defendants' demand for per-unit costs.

Regardless, once defendants specifically requested that Whitesell produce the data in IFS's so-called "unit cost" field in June 2018, Dkt.1028-2 at 6, ***Whitesell produced that information*** while preserving its objection that the data was irrelevant to its actual per-part costs, Dkt.1032; Dkt.1099-20 at 21-22. The record thus reflects a bona fide disagreement over whether IFS contained data responsive to defendants' discovery requests. The district court could not impose sanctions without first resolving that dispute and affording Whitesell an opportunity to comply with its order.

### C.    The District Court Failed To Consider Alternative Sanctions

"A district court abuses its discretion under Rule 37(b)(2) if it enters a default when less draconian but equally effective sanctions were available." *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985). The sanction here had the effect of terminating multiple of Whitesell's breach-of-contract claims: Damages are an element of those claims, *Bates v. JP Morgan Chase*

*Bank NA*, 768 F.3d 1126, 1130 (11th Cir. 2014), and Whitesell sought ***only*** lost profits for several breaches.  *See* Dkt.1415 at 2 & n.2 (noting that sanctions order eliminated remainder of Counts I and IV, and much of Count II).  Yet the district court never considered sanctions short of striking those claims entirely.

The district court saw "simply no alternative" to striking Whitesell's lost-profits claims.  Dkt.1159 at 14; *see* Dkt.1159 at 8.  But lesser sanctions ***were*** available.  Rule 37 states that an appropriate sanction for a party's "failure to provide information" required by Rule 26 is that "the party is not allowed to use that information."  Fed. R. Civ. P. 37(c)(1); Dkt.1159 at 8.  Even if delay in producing figures from IFS's "unit cost" field violated some discovery obligation, a suitable penalty would be to bar Whitesell (but not defendants) from using that information.  The district court never explained why that would not suffice.

The court also could have required Whitesell to sit for additional depositions.  The court urged that "defendants have been deprived of the opportunity to select deponents" and take depositions based on the putative IFS cost data.  Dkt.1159 at 13.  But if that was the prejudice defendants suffered, extending discovery to allow those depositions—potentially at Whitesell's expense—would cure it.  *See Alan v. Paxson Commc'ns Corp.*, 239 F. App'x 475, 476 (11th Cir. 2007) (affirming addi-

tional deposition time following Rule 37 violation); Fed. R. Civ. P. 6(b)(1).[9]  EHP

requested that remedy, Dkt.1070 at 17, and Whitesell agreed to it, Dkt.1162 (149:17-

25).  Nor would that cause undue delay:  No trial date had been set, and trial would

not occur for another *four years*.  Dkt.1517; *see* Dkt.1718 (trial held in 2023).

    The district court did not even ***address*** the possibility of such alternative

sanctions.  That alone warrants reversal.  *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358

F.3d 1312, 1327 (11th Cir. 2004); *Phipps v. Blakeney*, 8 F.3d 788, 791 (11th Cir.

1993).

### D.    There Was No Alternative Basis for Sanctions

    Nor could the district court's "inherent sanctioning authority," Dkt.1159 at 7

n.8, justify its sanctions. The "key to unlocking" inherent sanctioning authority "is

a finding of bad faith."  *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1304

(11th Cir. 2020).  The court purported to find bad faith in Whitesell's statements that

IFS contained no per-part cost data.  Dkt.1159 at 14.  But that finding is entitled to

---

[9] *See also Gillum v. United States*, 309 F. App'x 267, 270 (10th Cir. 2009) (holding sanction inappropriate where prejudice could have been cured with additional deposition); *McManaway v. KBR, Inc.*, No. CV H-10-1044, 2012 WL 13059724, at *4 (S.D. Tex. May 17, 2012) (imposing additional depositions for failure to disclose); *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 110 (D.N.J. 2006) (same); *Ocasio v. C.R. Bard, Inc.*, No. 8:13-CV-1962-T-36AEP, 2015 WL 3496062, at *4 (M.D. Fla. June 3, 2015) (additional deposition "remed[ied] any potential prejudice").

deference only insofar as it is "fully supported by the record." *In re Chase & Sanborn Corp.*, 872 F.2d 397, 400 (11th Cir. 1989). That support is absent.

Whitesell consistently maintained that it did not use IFS to track per-part costs. Dkt.1162(59:9-21); Dkt.819(111:9, 115:25-116:3) (explaining for "the fifth time" that accurate cost figures "never got put into" IFS). That it declined to produce the meaningless IFS "unit cost" field, in line with repeatedly stated objections, is not indicative of bad faith where the court never overruled those objections.

The court asserted that Whitesell's Chris Jones "disclosed under oath that the [requested] cost information did, in fact, exist in [Whitesell's] IFS system." Dkt.1159(5:19-21). What Jones actually said was that IFS required that some "cost number"—***not*** actual per-unit cost information—be assigned to each part. Dkt.1150-5 at 13, 15(41:5-14, 47:3-11); p. 16, *supra*. That was consistent with Whitesell's representations that, although IFS ***could*** track per-unit costs, Whitesell did not ***use*** that functionality. Dkt.819(115:25-116:3); *see* pp. 13-18, *supra*. When Whitesell tried to explain that at the evidentiary hearing, the court refused to hear it, declaring its "findings are that dog won't hunt." Dkt.1162(14:8-16:9).

Whitesell's conduct could not justify the extreme sanction here regardless. Sanctions are intended to prevent unfair prejudice to litigants and to ensure the integrity of the judicial process. *See Zocaras v. Castro*, 465 F.3d 479, 483-85 (11th Cir. 2006). There was no threat to the integrity of the judicial process. Unlike EHP

(*see* pp. 12, 46-47, *supra*), Whitesell did not destroy evidence.  It provided all the information defendants demanded—and did so ***before*** defendants moved to compel.

Nor was there prejudice warranting dismissal of Whitesell's lost-profits claims.  The court asserted that defendants were "hampered by the lack of product cost information both in supporting their theory of defense and in evaluating any lost profits calculation."  Dkt.1159 at 11, 13.  But the ledgers and other financial information Whitesell had already produced were more than sufficient—they were all the information needed to calculate per-unit costs and lost profits.  Dkt.923-1; Dkt.1028-3 at 21-22.  Producing data from IFS's "cost" field earlier would not have helped defendants with that, because it did not reflect actual costs.  Even if the field were product cost information (it was not), it was at best one "piece of the puzzle" of determining per-part costs in a complex manufacturing organization.  Dkt.1159 at 13.  And whatever prejudice defendants claimed could have been remedied by extending discovery—as defendants themselves requested.

## III. THE DISTRICT COURT ERRONEOUSLY GRANTED SUMMARY JUDGMENT ON WHITESELL'S PRICE-INCREASE CLAIMS

The district court erroneously granted defendants summary judgment on Whitesell's price-increase claims.  A reasonable jury could have found (1) EHP did not trigger any requirement that Whitesell provide evidence for its proposed price increases, or (2) the evidence Whitesell provided was sufficient regardless.

### A.    A Jury Could Have Found EHP Did Not Request Evidence for Whitesell's Price Increases

Summary judgment is inappropriate where there is a "genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  Here, there was a material dispute over whether EHP *requested* evidence justifying Whitesell's price increases—a prerequisite for Whitesell's obligation to *provide* such documentation.  *See* pp. 19-20, *supra*.

In early 2005, Whitesell sent EHP proposed price increases, citing increased steel prices.  Dkt.267 ¶7; Dkt.267-2.  The SPA required Whitesell to provide evidence supporting a proposed increase "*upon the request of Electrolux*."  SPA §5.5 (emphasis added).  But EHP did not request such evidence.  Instead, EHP executive Don Market responded that EHP "acknowledge[d] receipt of [Whitesell's] price increase notifications," *without* requesting more information.  Dkt.290-1 at 3.

There is *no* contemporaneous evidence that EHP requested evidence supporting the 2005 increases.  To the contrary, internal emails from that time show that EHP recognized that Whitesell's price-increase notice triggered a "drop dead date" under the SPA to obtain competing quotes from other suppliers, and expressed concern that "[t]his deadline has now been missed."  Dkt.266-15 at 4, 5.  That concern would make no sense if EHP were waiting for Whitesell to provide requested documentation.

By contrast, there *are* documents in which EHP requested evidence supporting price increases in *other* years.  Dkt.290-2 at 2 (2007: "Whitesell, per the

agreement, we are requesting the cost increase evidence[.]"); Dkt.289-1 at 2 (2004). From EHP's own conduct and inability to produce any contemporary record of a request for evidence supporting the *2005* price increases, a jury could reasonably infer that EHP did *not* seek that evidence.

In ruling otherwise, the district court invoked affidavits submitted by EHP employees, an email from Neil Whitesell, and court filings. Dkt.372 at 17-18; *see* Dkt.289; Dkt.290. *None* of those documents identifies an actual request for evidence supporting the 2005 increases. The court instead relied on *inferences* from those documents. But "'even where the parties agree on the basic facts,'" summary judgment is inappropriate if "'reasonable minds might differ on the inferences arising from'" those facts. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). Just so here.

The affidavits reflected EHP's complaints that the 2005 price increases were not supported by evidence Whitesell supplied in mid-2004 to justify increases for other parts. Dkt.289 ¶ 7; Dkt.290 ¶¶ 5-7. The court read those complaints as requests for new evidence. Dkt.372 at 17. But a jury could draw a different inference—namely, that EHP was simply pushing back on Whitesell's need to raise prices six months after increasing other prices. That inference was further supported by the email from Neil Whitesell, who responded to EHP's complaints by explaining that

the 2004 rise in steel prices continued to impact Whitesell's costs in early 2005. Dkt.290-5 at 2-3.

The court also found significant that—years earlier—Whitesell had not contradicted EHP's assertion in court filings that it had demanded cost-justification evidence. Dkt.372 at 17-18. But Whitesell's decision at the time to argue that the evidence it provided was sufficient was hardly conclusive evidence that EHP actually made the contractually required request. Rather than resolve the competing inferences against Whitesell, the court should have denied summary judgment and let the jury do its job.

## B. A Jury Could Find Whitesell Reasonably Documented Its Increased Costs

Even if EHP had requested cost-justification evidence (it did not), the district court further erred in concluding that the evidence Whitesell (unilaterally) provided was insufficient as a matter of law. Alongside its price-increase notice, Whitesell provided documentation of increases in steel prices, including invoices, summaries of materials costs, and articles. Dkt.372 at 19; p. 21, n.4, *supra*. The district court believed that evidence was inadequate because it showed "generalized" increases in steel costs, while the SPA supposedly required Whitesell to substantiate price increases on an individualized, per-unit basis. Dkt.372 at 20.

The SPA, however, requires only "reasonable documentation" of increased costs. SPA §5.5. Whether Whitesell's documentation was "reasonable" is a factual

59

question that should have been left to the jury. *See EZ Green Assocs., Inc. v. Ga.-Pac. Corp.*, 734 S.E.2d 485, 488-89 (Ga. App. 2012) (whether actions were "commercially reasonable" was jury question); *Coca-Cola Co. v. Allianz Ins. Co.*, No. 1:01-CV-3125-RWS, 2003 WL 27381620, at *3 (N.D. Ga. Jan. 17, 2003) (whether party made "all reasonable efforts to comply" was jury question); *Langford v. Berry*, 22 S.E.2d 349, 349 (Ga. App. 1942) (meaning of "reasonable time" was jury question).  The court erred in deciding that question itself.

The district court overread Whitesell's obligation under SPA § 5.5 to provide (upon request) evidence supporting "'changes in any specific unit prices.'"  Dkt.372 at 19.  That simply requires evidence that supports changes in the prices of any specific units.  It does not further require that the supporting "evidence" ***also*** be pegged to specific unit prices.  To the contrary, it refers to price changes necessitated by "an adverse market situation [that] drastically affects Whitesell's costs" generally.  *Id.* at 22.  A jury could conclude that evidence of steel-cost increases met that requirement, showing a market-wide "situation" impacting "Whitesell's costs."

## IV.    WHITESELL WAS ENTITLED TO SEEK PREJUDGMENT INTEREST

Georgia law permits prejudgment interest for contract claims seeking unliquidated damages "[i]n all cases where an amount ascertained would be the damages at the time of the breach."  O.C.G.A. § 13-6-13.  The district court denied Whitesell's

motion to amend its complaint to request prejudgment interest, deeming it too late to assert a "new claim."  Dkt.818 at 4; *see* p. 21, *supra*.

That was error.  Prejudgment interest is a form of relief, "not a substantive-law claim."  *Caradigm USA LLC v. PruittHealth, Inc.*, No. 1:15-CV-2504-SCJ, 2018 WL 1959498, at *5 (N.D. Ga. Apr. 25, 2018).  Section 13-6-13 "sets forth no specific pleading requirement" and "simply gives the factfinder"—*i.e.*, the jury—"discretion to award legal interest."  *Id.* at *4.  Parties thus may seek prejudgment interest even when it is not pleaded ***at all***—and even when it is first raised at trial—so long as the opposing party has an opportunity to litigate the issue.  *See id.* at *5 (raised in pretrial order); *Holloway v. State Farm Fire & Cas. Co.*, 537 S.E.2d 121, 123-24 (Ga. App. 2000) (raised in proposed findings); Fed. R. Civ. P. 54(c) ("final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"); O.C.G.A. §9-11-54(c)(1) (similar).  The court legally erred, and thus abused its discretion, in denying Whitesell an opportunity to pursue prejudgment interest.  It was not a new "claim."  And defendants had ample time to assert defenses:  At the time of the 2016 order, trial had not been set—and would not be held for another ***seven years***.

The court also ruled that prejudgment interest was unavailable because "Whitesell's monetary loss was not ascertainable at the time of the breach."  Dkt.818 at 7.  That was legal error.  The prejudgment-interest statute Whitesell invoked does

not ask whether damages were "ascertainable at the time of the breach." It asks whether the "amount ascertained [by the jury] ***would be*** the damages at the time of the breach." O.C.G.A. §13-6-13 (emphasis added). That is, it asks whether it is possible to ascertain at trial what damages ***were*** "at the time of, and as a result of," the breach—or whether they would be unascertainable pending later events. *Carpet Transp., Inc. v. Kenneth Poley Interiors, Inc*., 466 S.E.2d 70, 74 (Ga. App. 1995).

The court urged that "damages in th[is] case could only be known after the jury evaluated several alleged breaches and the effect of numerous delays." Dkt.818 at 6. But that amounts are "disputed and must be calculated by a jury" does not mean they were unascertainable as of the breach. *Caradigm*, 2018 WL 1959498, at *5. A properly instructed jury would calculate the harm incurred "at the time of a breach"—which includes any "monetary loss immediately and necessarily flow[ing] to the injured party" from the breach. *Norair Eng'g Corp. v. St. Joseph's Hosp., Inc.*, 249 S.E.2d 642, 649 (Ga. App. 1978).

*Norair* makes that clear. There, a hospital sued a contractor over construction defects. 249 S.E.2d at 645. The Georgia Court of Appeals held "the hospital's damages were complete at the time [it] took over the building." *Id.* at 649. The "monetary loss 'immediately and necessarily' flow[ing]" from that breach included "delay[s]" in "the hospital's opening," causing "likely lost services," and a lawsuit by a patient "injured due to a defective grab bar." *Id.* at 649 & n.4. If lost services

from a delayed opening and ***liability in a future lawsuit*** "immediately and necessarily flowed" from the breach in *Norair*, Whitesell's damages surely qualify.

## V.    EVIDENTIARY ERRORS WARRANT A NEW TRIAL

The district court's evidentiary rulings eviscerated what remained of Whitesell's claims and crippled its defenses at trial. Those rulings—excluding plainly relevant evidence of defendants' bad-faith efforts to evade their obligations—seriously prejudiced Whitesell. A new trial is warranted.

### A.    The Bad-Faith Emails Were Erroneously Excluded

The district court barred Whitesell from introducing emails in which defendants' executives discussed "busting the Whitesell contract," Dkt.266-19 at 2, weighed whether "to intentionally breech [sic] the court order and contract" and "move away [from Whitesell] completely," Dkt.1309-35 at 2, and eventually admitted "we are playing games and not following the court order," Dkt.1309-41 at 2. *See* pp. 23-24, *supra*.

1.    Those emails were powerful evidence, straight from the horse's mouth, that defendants intended to—and did—breach their obligations. Such unvarnished statements from high-level executives are rare. They are highly probative of whether defendants ***in fact*** breached. And they went to "critical issue[s]," *Peat, Inc. v. Vanguard Rsch., Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004)—including Whitesell's

prior-breach defense, HOPI's defense that Whitesell failed to perform a "concurrent condition," and the good-faith element of HOPI's counterclaim.

The jury was instructed that a party that "refuses to abide by a contract provision" is "properly considered to have repudiated the contract and as such is properly considered to have breached the contract[,] *which estops that party from seeking to enforce the provision of the agreement*."  Dkt.1886(1672:9-18) (emphasis added). Defendants' scheming "to do what it takes to get out of Whitesell," Dkt.1309-33 at 2, and "intentionally bre[a]ch" their obligations, Dkt.1309-35 at 2—and later admission that they were "playing games and not following" the Consent Order, Dkt.1309-41 at 2—had an obvious "tendency" to make it more probable that defendants *in fact* breached, Fed. R. Evid. 401.  That the statements came in 2004-2005, *years before* Whitesell's alleged 2008 breach of Phase-Out obligations, could have led jurors to find defendants breached *first*.  That prior breach would give Whitesell an affirmative defense to defendants' counterclaims.  Dkt.1886(1672:9-18).

An earlier breach would also refute HOPI's contention that its failure to pay inventory and other costs in 2009 should be excused by Whitesell's purported failure to perform some "concurrent" condition.  Dkt.1851 at 1-2; Dkt.1886(1672:1-18). Indeed, defendants' bragging about "doing our best not to give Whitesell any new business," Dkt.1309-30 at 2, could persuade jurors that the supposedly missed con-

current condition—HOPI's professed concern about Whitesell's "production readiness," Dkt.1886(1624:13-1625:21, 1630:1-5)—was pretextual.

The excluded emails also went to the good-faith element of HOPI's counterclaim regarding Brunner and Matrix Parts.  That counterclaim required HOPI to show it "performed its contractual obligations relating to the transition of Brunner and Matrix parts" "in good faith."  Dkt.1886(1670:21-22, 1669:14-15).  Defendants' avowed plans to "stir up some shit with Whitesell," Dkt.1309-33 at 2, admission that "***we are playing games and not following the court order***," and "order" to "delete" the incriminating admission, Dkt.1309-41 at 2 (emphasis added)—were glaring evidence of HOPI's bad faith.[10]

A major dispute at trial, moreover, concerned whether the Brunner and Matrix Parts were awarded to Whitesell in 2003 (as HOPI contended) or not until 2007 (as Whitesell contended).  *See* pp. 21-22, *supra*.  A jury presented with defendants' admissions in 2004-2005 that they were, *e.g.*, "doing [their] best not to give Whitesell any new business," Dkt.1309-30 at 2, could readily disbelieve HOPI's account.

2.    The district court declared the Bad-Faith Emails irrelevant because it thought they did not specifically concern the Brunner and Matrix Parts at issue in

---

[10] The Bad-Faith Emails predated HOPI's 2006 spinoff; a jury could reasonably infer that the scheme to breach the SPA, Settlement Memorandum, and Consent Order carried over to the new company, which was bound by those agreements.  *See* Dkt.1880(25:24-27:2); Dkt.1886(1009:16-18).

the claims at trial. Dkt.1863 (111:16-25). That crabbed reading was unwarranted. The emails—from top-ranking executives—expressed a desire to "do what it takes to *get out of Whitesell*" and "move away [from Whitesell] *completely*." Dkt.1309-33 at 2; Dkt.1309-35 at 2 (emphasis added). A jury could reasonably understand them to reflect a scheme to scuttle the *entire* contractual relationship.

Even if the emails could somehow be read to cover only certain parts, the jury was instructed that a party's refusal to abide by *any* contractual obligation could be a "repudiation" of the contract relevant to Whitesell's affirmative defense. Dkt.1886 (1672:9-18); *see Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1350 (11th Cir. 2007) (evidence relevant where probative of affirmative defense). And while the court worried the Bad-Faith Emails would "create a cloud of bad faith," Dkt.1863 (112:11-12), that is precisely what made them relevant to showing that defendants did *not* perform their obligations in good faith. It was error to exclude them. *See United States v. Kelly*, 888 F.2d 732, 743 (11th Cir. 1989) (court's discretion does not extend "to the exclusion of crucial relevant evidence necessary to establish a valid defense").[11]

_____

[11] Any argument that the district court excluded the Bad-Faith Emails under Rule 403 is misplaced. The district court made clear its "guide" was the "401 relevancy standard." Dkt.1863 (111:16-19). While it made general references to "risk of prejudice and confusion," it never engaged in the balancing that would be required before invoking the "extraordinary remedy" of exclusion under Rule 403. *Higgs v.*

3.    Exclusion of the Bad-Faith Emails was deeply prejudicial.  Defendants' plans to intentionally breach the contracts and Consent Order—and admission that they did so—plainly "could potentially convince a reasonable jury" that defendants breached first and acted in bad faith.  *Proctor*, 494 F.3d at 1355.  Such findings would have offered Whitesell a defense, refuted HOPI's "concurrent-condition" defense, and defeated HOPI's counterclaim requiring HOPI's own good faith.  The exclusion "likely had a substantial impact on the jury's verdict" and warrants a new trial.  *Proctor*, 494 F.3d at 1355 (exclusion of evidence establishing defense to liability warranted new trial); *Peat*, 378 F.3d at 1162; *Higgs*, 720 F. App'x at 520-21 (ordering new trial where exclusion prevented defendant from challenging plaintiff's theory).

### B.    The Court Erred in Excluding Evidence Regarding Deliberately Unpaid Invoices

Consistent with the attitude reflected in the Bad-Faith Emails, defendants for years refused to pay millions of dollars in invoices, without any good-faith basis to

---

*Costa Crociere S.p.A.*, 720 F. App'x 518, 520-21 (11th Cir. 2017).  If the court **had** relied on Rule 403, the failure to conduct necessary balancing would itself be error. *United States v. Miller*, 688 F.3d 322, 327 (7th Cir. 2012) ("a district court commits error by not clearly articulating its Rule 403 rationale"); *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir. 1989) (Rule 403 "balance" "should be struck in favor of admissibility").

dispute them.  Unable to defend their serial non-payment, defendants stipulated liability and paid off the unpaid invoices just before trial.  *See* p. 25, *supra.*

The district court ruled that defendants' late-breaking concession rendered any evidence relating to the unpaid invoices irrelevant.  Dkt.1863(148:1-5); Dkt.1874(70:17-18); Dkt.1886(241:16-25); Dkt.1754.  That makes no sense.  That Whitesell no longer had live ***claims*** for unpaid invoices did not mean the underlying ***conduct*** was irrelevant.  Jurors presented with evidence that defendants repeatedly and unjustifiably failed to make payments due under the contract—for years, totaling millions of dollars—could readily conclude that defendants "refuse[d] to abide by a contract provision" and so were "estop[ped]" from seeking to enforce the contract against Whitesell.  Dkt.1886(1672:1-18); *see* pp. 64-65, *supra*.

The jury likewise could find HOPI had not performed its obligations in "good faith" and "substantially in compliance with the spirit and letter of the contract"—requirements of HOPI's counterclaim.  Dkt.1886(1669:1-25); *see* Dkt.1874(70:10-13).  That was especially true given that the Consent Order expressly directed defendants to "remain current on all future . . . invoices" they had no basis for disputing.  Dkt.30 at 2 ¶2.  The district court abused its discretion by blessing defendants' eve-of-trial bid to bury this damning evidence.  *See Proctor*, 494 F.3d at 1355.

### C.   Defendants' Misconduct Leading to the Consent Order Was Erroneously Excluded

The district court also excluded Whitesell's evidence that, leading up to the 2005 Consent Order, defendants improperly sought alternative suppliers for parts they were obligated to buy from Whitesell—with an eye toward "busting the Whitesell contract," Dkt.266-19 at 2; Dkt.1863 (47:1-197:18); Dkt.1886 (820:1-821:5, 1011:11-1013:6); pp. 25-26, *supra*.  Applying a "strict" approach to relevance, the court declared that evidence irrelevant.  Dkt.1863 (60:9-18).  That was legal error: Rule 401's relevance standard is "liberal," not strict.  *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579, 587 (1993); 22 Wright & Miller, *Federal Practice and Procedure* § 5162.2 (2d ed. 1982) (Rule 401 standard "very low").  And the evidence was plainly relevant.

The context leading to the Consent Order—one of the agreements defining the parties' obligations, precipitated by defendants' breach of the other agreements—was critical to understanding the parties' relationship.  Evidence that defendants sought to evade their obligations to purchase parts from Whitesell bore on whether they committed prior breaches or failed to act in good faith.  And evidence that defendants were actively seeking in 2004 to re-source parts ***away from Whitesell*** could readily lead jurors to disbelieve any claim that defendants were simultaneously trying in good faith to facilitate transition of ***additional*** parts ***to*** Whitesell.  *See* pp. 63-65, *supra*.

At the very least, the evidence should have been admitted to rebut defendants' own skewed account.  Roger Leon—EHP's chief negotiator and contract administrator, and later HOPI's CEO—testified that the Consent Order was prompted by supposed Whitesell threats to cut off supply.  Dkt.1886(820:1-821:5, 1009:12-1013:6).  Whitesell sought to impeach that testimony by showing that the Order was prompted by *defendants'* improper efforts to re-source parts.  *Id.*  Whatever the evidence's relevance otherwise, it was plainly fair game once Leon "opened the door."  *United States v. Cooper*, 926 F.3d 718, 730 (11th Cir. 2019).

The court, however, barred that impeachment.  It uncritically accepted defendants' assertion that the Consent Order "reflected"—purportedly "[o]n the first page"—that Whitesell was "threatening to cut off supply."  Dkt.1886(1011:11-1013:9).  The Order said no such thing.  It forbade *EHP* from "utiliz[ing] any goods and/or parts . . . obtained from anyone other than Whitesell," Dkt.30 at 2 ¶1—supporting *Whitesell's* account that defendants improperly sought alternative suppliers.  Barring Whitesell from responding, based on a misapprehension of the Consent Order, was a clear abuse of discretion.  And it left the jury with defendants' unchallenged and misleading assertion that the Order was necessitated by *Whitesell's* misconduct instead of *defendants'*.  Dkt.1886(820:1-821:5, 1011:11-13).  That one-sided presentation—in a case all about who was to blame for the failure to transition parts and the breakdown of the parties' relationship—was immensely prejudicial.

70

*     *     *

Myriad errors prevented Whitesell from presenting a complete picture of defendants' bad-faith disregard for their contractual and court-ordered obligations. The result was a badly skewed narrative, where defendants freely portrayed Whitesell as breaching the agreements but Whitesell was hindered from raising defendants' violations. Had the jury heard the full story, there is every likelihood it would have decided the tried claims differently. Vacatur and a new trial are warranted.

On remand, the Court may wish to consider relieving the district judge of the burdens of this protracted case.[12] *See* 28 U.S.C. § 2106; *cf. Chudasama*, 123 F.3d at 1373. That would allow a fresh-eyed judge to guide this decades-long litigation to prompt resolution.

## CONCLUSION

The judgment should be reversed or vacated.

---

[12] Judge Hall presided over this case for 10 years (2013-2023); Judge Bowen previously presided for 10 years (2003-2013) before "declin[ing] to handle the case any longer" and withdrawing without explanation, Dkt.497.

March 29, 2024

Respectfully submitted,

/s/ Jeffrey A. Lamken
Jeffrey A. Lamken
  *Counsel of Record*
Lucas M. Walker
Walter H Hawes IV
MOLOLAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Ave., N.W.
Washington, D.C.  20037
(202) 556-2000
jlamken@mololamken.com
lwalker@mololamken.com
whawes@mololamken.com

Eugene A. Sokoloff
MOLOLAMKEN LLP
300 N. LaSalle St., Suite 5350
Chicago, IL 60654
(312) 450-6718
esokoloff@mololamken.com

*Counsel for Plaintiff-Appellant-Cross-Appellee Whitesell Corporation*

**ADDENDUM OF RELEVANT AGREEMENTS**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Dkt.1 at 16 (2000 Strategic Partnership Agreement)...................................................1

Dkt.578-2 (2003 Settlement Memorandum)............................................................23

Dkt.30 (2005 Consent Order) ...................................................................................34

2000 Strategic Partnership Agreement

Signed 12/10/00

# ELECTROLUX HOME PRODUCTS
## And
# WHITESELL CORPORATION

## Strategic Partnership Agreement

1

Electrolux and Whitesell

TABLE OF CONTENTS                                    PAGE

1.    PARTIES............................................................................    4
2.    INTENT............................................................................    4

2.1   DEFINITIONS....................................................................    4
      2.1.1   CONTRACT ADMINISTRATOR.........................................    4
      2.1.2   GOOD(S)...............................................................    4
3.    TERM.............................................................................    5
      3.1   FASTENER TRANSITION COUNCIL.............................    5
4.    PAYMENT TERMS..............................................................    5
5.    PRICING.........................................................................    5
      5.0.1   WHITESELL DISCOUNT............................................    5
      5.0.2   INITIAL PRICING....................................................    6
      5.0.3   SERVICE GOOD(S) PRICING.......................................    6
      5.0.4   SUBSEQUENT PRICING..........................................    7
      5.0.5   COST JUSTIFICATION..............................................    7
      5.0.6   NEW GOOD(S) PRICING...........................................    7
      5.0.7   OBSOLETE GOOD(S)................................................    7
6.    COST REDUCTION PROGRAMS.........................................    8
7.    CASH PAYMENT................................................................    9
8.    TERMS AND CONDITIONS................................................    9
9.    TOOLING COST.................................................................    9
10.   SAMPLES........................................................................    10
11.   QUALITY.........................................................................    10
      11.1   QUALITY GOALS....................................................    10
            11.1.1 TRANSACTION RECOVERY SHORTFALL...............    11
      11.2   QUALITY SHORTFALL...............................................    11
      11.3   GENERAL QUALITY COMPLIANCE COMMITMENTS........    11
12.   WHITESELL QUALITY COMMITMENTS.................................    12
13.   DEMAND FLOW MANAGEMENT..........................................    13
14.   ELECTROLUX QUALITY COMMITMENTS..............................    13
15.   DISTRIBUTION.................................................................    13
16.   MANAGED INVENTORY PROGRAM.......................................    14
17.   SERVICE........................................................................    14
      17.1   FLEXIBILTY/PRODUCTION CAPACITY..........................    14
      17.2   DESIGN/ENGINEERING ASSISTANCE..........................    14
      17.3   REPORTING.........................................................    15
18.   WARRANTY.....................................................................    15
19.   FORCE MAJEURE.............................................................    15
20.   EPIDEMIC FAILURE..........................................................    16
21.   IDEMNITY AND INSURANCE...............................................    16
      21.1   IDEMNITY BY OTHER PARTY......................................    16
      21.2   PRODUCT LIABILITY INSURANCE...............................    16
22.   MANAGEMENT REVIEW.....................................................    16
23.   TERMINATION BY MUTUAL AGREEMENT..............................    17

2

**Add.-3**

23.1   PHASE OUT PERIOD................................................ 17

23.2   TERMINATION FOR CAUSE......................................... 17

24.   COMPETITION........................................................... 18

24.1   MEETING COMPETITION PROCEDURE........................... 18

25.   DISPUTE RESOLUTION.................................................. 18

26.   BREACH OF PURCHASE COMMITMENT................................ 19

27.   GOVERNING LAW......................................................... 19

28.   MISCELLANEOUS......................................................... 19

28.1   COUNTERPARTS..................................................... 19

28.2   BINDING EFFECT.....................................................20

29.   NOTICES.................................................................20

3

ELECTROLUX HOME PRODUCTS
And
WHITESELL CORPORATION

# Strategic Partnership Agreement

## 1.0 PARTIES:

This Strategic Partnership Agreement (the "Agreement") is entered into as of the ___14th___ day of December, 2000, by Electrolux Home Products, of White Consolidated Industries Inc, a Delaware corporation, its Affiliates and related organizations, with offices at 250 Bobby Jones Expressway, Augusta, GA 30907, hereafter collectively referred to as "Electrolux," and Whitesell Corporation, with its principal offices at P.O. Box 2571, 2703 East Avalon Avenue, Muscle Shoals, Alabama 35662-2571, hereafter referred to as "Whitesell". {Exhibit A shall set forth the names, and locations of the parties.}

## 2.0 INTENT:

Electrolux and Whitesell desire to enter into a strategic business relationship in which Electrolux is willing to make a long-term commitment to purchase all of its current and future needs of cold headed/ threaded fasteners and various related Class C items hereafter referenced as Good(s) (as herein after defined in section 2.1.2 ) from Whitesell. Whitesell shall receive the uninterrupted benefit of such long-term commitment and is willing to supply such Goods and provide its best efforts to fulfill all requirements designed to improve productivity, to improve the quality of Electrolux's products, to reduce the total cost of manufacturing products, to increase flexibility, and generally to enhance Electrolux's competitive position in the market. Electrolux and Whitesell intend to work cooperatively to develop improved Good(s) which will benefit both parties. Upon request, Whitesell will provide its Standard Industry Classification code (SIC code) to Electrolux.

### 2.1. DEFINITIONS:

For purposes of this Agreement, the following terms will have the meanings specified below:

2.1.1   CONTRACT ADMINISTRATOR shall mean, with respect to each party, the individual specified on Exhibit A, who shall be responsible for monitoring the obligations of the party in which he is employed. The Contract Administrator shall be available to participate and cooperatively resolve internal organizational disputes within his organization, divisional conflict, and shall be authorized to receive on behalf of a party any notices provided for in this Agreement. The Contract Administrators shall be responsible for communicating, negotiating, and finalizing revisions to the Exhibits at the times necessary in this Agreement.

2.1.2   GOOD(S) shall mean, all cold headed/ threaded fasteners, clips, wire ties, nuts, pins, special cold formed parts, screw machined parts, clamps, spacers, plastic fasteners, components, sub-components, or any type of material, whether identified by an Electrolux part number or not assigned to such part, and other Class C items

4

**Add.-5**

in similar families and /or services. These Goods shall be listed on Exhibit B entitled "Goods to be Purchased by Electrolux from Whitesell." Goods shall be deemed to be added to Exhibit B during each calendar year by the issuance of a FPA and a Production Purchase Orders ("Purchase Orders") to Whitesell for new Goods. This Exhibit B shall be updated no less than every six months under the provisions of the Agreement.

## 3.0 TERM:

This Agreement begins January 1, 2001 and will continue until April 1, 2008. This Agreement may be renewed only after both parties review and mutually consent in writing to continue, each continuing term must be mutually agreed. The first date for review will occur in October of 2007.

### 3.1 FASTENER TRANSITION COUNCIL:

Both parties agree to develop a Fastener Transition Council to regularly meet as needed until implementation and full transition of all Goods to Whitesell is complete. Both parties agree to use their best efforts to comply with the need to meet mutual goals and objectives. It is the intent of both parties to complete the implementation as soon as possible. Whitesell commits to provide its best efforts to transition as much business as quickly as possible without jeopardizing the integrity of this program. Due to the existing supplier contractual commitments of Electrolux, the transition is to be completed no later than June 30th 2003. Failure to complete the transition by this date shall proportionally extend the initial term of this Agreement.

## 4.0 PAYMENT TERMS:

2% 15; Net 60 days from receipt of Good(s) by Electrolux.

A discount of 2% of the invoice amount may be taken if an invoice is paid and funds received prior to 20 days from receipt of goods. In the event of any payment delays that extended beyond 20 days and if any discounts are taken inappropriately, Electrolux will promptly refund within 15 days after written notice with supportive documentation is delivered to Electrolux of such inappropriate discounts taken.

## 5.0 PRICING:

### 5.1 WHITESELL DISCOUNT:

Pricing shall be at ten percent (10%) below the Total Electrolux Unit Cost per Exhibit B for cold headed threaded fasteners that Whitesell has the current internal manufacturing capability to produce. All other Goods shall not receive a discount and are to be priced at the Total Electrolux Unit Cost entered into Exhibit B. Such purchase cost shall include all product purchase costs, tooling costs, vendor managed inventory costs, and any other direct purchase costs as referenced in Initial Pricing as set forth in section 5.2. The Electrolux costs used for calculating the discount shall not be less than the actual total costs being paid as of date of this Agreement.

5

**Add.-6**

## 5.2 INITIAL PRICING:

The price for each Good shall be the Whitesell Unit Price as set forth in Exhibit B; provided, that the Whitesell Unit Price for any Good added to Exhibit B during any calendar year through the issuance of a FPA and Purchase Order shall be the unit price contained in such Whitesell Sales Quotation and Electrolux Purchase Orders.

If necessary, within thirty days of signing this Agreement, Electrolux shall provide spreadsheets of the current costs and annual volumes for evaluation for all Goods to be transitioned to Whitesell. If requested, Whitesell shall have access to such original cost documents and invoices to verify volumes, current costs, vendor managed inventory costs, and other Goods related costs in order to verify the actual total cost currently being paid to establish the Total Electrolux Unit Cost for Exhibit B which shall be used to calculate the discounted or non-discounted Whitesell Unit Cost for each Good(s) as referenced in 5.1.

Within 90 days or less after validating and mutually agreeing on the current Total Electrolux Unit Cost, Whitesell shall provide Goods pricing that cumulatively yields the agreed upon discount. It is agreed that each Good referenced in 5.1 may not receive exactly the same price discount, however, Electrolux shall receive the cumulative full discount from Whitesell. In the event any Goods are shipped to Electrolux prior to the completion by Whitesell of the Initial Pricing, Whitesell shall quote a firm price and that price shall be factored in and utilized in the overall discount pricing by Whitesell. Whitesell shall provide a firm price so that nothing will be shipped to Electrolux with a temporary price. The initial price for any Good, will be fixed and will be used as part of the final pricing but this shall in no way affect or decrease the full discount that shall still be realized by Electrolux.

## 5.3 SERVICE GOOD(S) PRICING:

Whitesell shall make available the same OEM pricing for Goods purchased for service as is available on current Goods, provided a one-carton minimum order is placed with Whitesell and the order can be combined with a current production order. Once a Good has become Obsolete as defined by no current production requirements whether advised by Electrolux or not, Whitesell shall thereafter, provide service pricing which will be at OEM level plus up charges for premium costs (i.e. set-up, outside services, break-in charges, tooling, raw material, extraordinary labor, small production lot charges for quantities under 100,000 pieces, etc.). If Whitesell is required to work overtime to fulfill Good(s) requirements due to causes controlled by Electrolux (i.e. stock loss, schedule changes within specific defined period, etc.), Electrolux will pay an overtime premium equal to ½ of the labor content of the Good(s) required. If overtime is required to satisfy increased purchase requirements, or normal seasonality of the business, Whitesell will not be entitled to an overtime premium and will supply the Good(s) at the Whitesell Unit Price listed in Exhibit B.

6

**Add.-7**

**5.4 SUBSEQUENT PRICING:**

Thirty (30) days prior to the commencement of each calendar year during the term of this Agreement, Whitesell shall supply a revised list of Good(s) in a revised Exhibit B. This revised Exhibit B shall reflect any new Good(s) purchased as evidenced by and agreed FPA and Purchase Orders added during the calendar year and shall supercede and replace for the following year the Exhibit B currently in effect.

**5.5 COST JUSTIFICATION:**

It is Whitesell's intent to maintain and hold firm all pricing for the duration of the Agreement. Only if in an adverse market situation that drastically affects Whitesell's costs would Whitesell request a price increase from Electrolux.

In the event Whitesell requests a price increase for any Good(s) Whitesell provides, then upon the request of Electrolux, Whitesell shall provide such cost increase evidence to Electrolux for any requested changes in any specific unit prices. After supplying reasonable documentation of such cost increase, Electrolux shall make the determination on the price change request.

After such validation of increased costs, both parties shall have a face to face meeting and within 30 days mutually agree on any price changes to be implemented. Electrolux shall have the sole option to either accept the substantiated price change request on any specific Good(s) that a price change was requested or quote those specific Good(s) with Qualified Suppliers. Whitesell shall be given thirty days to evaluate any bonafide written offer after receiving copies of such third party offer. However, Whitesell shall have the last right of refusal to match all bonafide written offers received by Electrolux on all such Good(s).

**5.6 NEW GOOD(S) PRICING:**

All new Goods shall be priced at a Whitesell Unit Price comparative with the Whitesell Unit Price charged for the most similar Good in Exhibit B used as a reference guide for a Good having similar characteristics and sold in similar volumes. At the time of quoting a price for a new Good, Whitesell agrees to provide Electrolux with a cost change breakdown for such new Good if requested by Electrolux. If requested, an explanation or example of the cost differentials shall accompany the new price. Examples of cost increase justification that might require cost change submittals include but are not limited to: increased or unique tooling costs, volume differentials, different material costs, special or additional outside service costs (if any), manufacturing changes and their cost (segregated by specific manufacturing process), packaging enhancements, and special inspection or sorting costs if not previously required.

**5.7 OBSOLETE GOOD(S):**

Whitesell shall receive from Electrolux formal written notification of a Good going inactive or Obsolete. On any Good that becomes Obsolete, Electrolux will work with Whitesell in a fair and cooperative manner for full disposition of any inventory that Whitesell may have in stock in an effort to minimize and eliminate any financial burden to Whitesell. It is not Electrolux's intent to place a hardship on Whitesell by not using Goods if Whitesell was trying to meet Electrolux's scheduled needs.

7

**Add.-8**

It is agreed for those Good(s) rendered obsolete, Electrolux shall be obligated to purchase at a minimum: on Good(s) with an EAU of less than 100,000(minimum production run) up to the complete Whitesell stock of 100,000 pieces; for Good(s) greater than EAU 100,000 Electrolux will take up to 16 weeks of Good(s) or other mutually agreed stock levels on specific unique Good(s) per Exhibit B, based on a 16 week normal average usage during seasonal peak production periods over the last twenty four months upon which EAUs were used for planning purposes until all Good(s) have been transitioned to Whitesell. After the transition is complete, the 100,000 minimum shall be reduced to 50,000 pieces and the 16 weeks reduced to 12 weeks. Whitesell will make every effort to minimize and eliminate Obsolete Goods and yet not run out of Goods for production. As soon as Whitesell receives formalized notice that a Good will be Obsolete, it shall interrupt production, seek alternative buyers, cancel purchase requirements, and do whatever is necessary to rapidly respond. Whitesell will also advise Electrolux of the use-up Goods on hand.

If a change is taking place for a cost reduction and if Whitesell has any stock levels greater than the 16 week average normal usage or other mutually agreed stock level, Electrolux shall use up all the excess Goods. However, such excess Good(s) shall have a reduced use-up price for the excess stock equivalent to the cost reduction pricing. It is both parties' intent to strive to use up all stock to reduce everyone's total Good(s) costs. Obsolescence invoices shall be submitted quarterly or as soon as accurately available and Electrolux will make prompt payment in accordance with payment terms.

## 6.0 COST REDUCTION PROGRAMS:

Whitesell and Electrolux agree to form a joint cost improvement/productivity team, that will work together to reduce costs, improve processes, and generate savings. Whitesell will work for continuous total cost reductions in sku reductions, productivity improvements, quality improvements, engineering projects, SCR incidence rate reductions, administrative cost savings, product tear-down savings, part consolidations, fastener drawing database management, or anything that results in definable, measurable reduction in total costs for Electrolux.

After full transition by plant location, during the initial term to Whitesell, annual cost reduction programs will have a minimum annual cost/price improvement guarantee of 2 % of Whitesell's annual sales to Electrolux of cold headed threaded fasteners it had the in-house manufacturing capability to provide to Electrolux on Good(s) which did receive the initial pricing discounts. Although the guarantee is 2% Whitesell will work toward cost reductions goals of 5% per year. Electrolux and Whitesell agree to define a method of implementation on an individual basis on the Whitesell Cost Savings form (Exhibit D) if applicable. Annual savings over the 2% goal may be credited toward subsequent annual goals or price requirements. Cost savings ideas shall benefit Whitesell from contract start date and accumulate during initial ramp-up / transition. Electrolux agrees that if a project should result in identifiable, viable measurable productivity improvements or cost savings but Electrolux elects not to implement such project, then the cost savings, that would have been realized through implementation of such project, will be credited against Whitesell's 2% annual requirement. Whitesell agrees to test and provide that data to Electrolux. On a

8

priority basis, Electrolux agrees to verify testing on all cost reductions that Whitesell may introduce. If the cost savings for any project implemented cannot be readily ascertained by measurement of direct reductions in cost to Electrolux, then the parties, in good faith, shall agree on the amount of cost savings to be credited to Whitesell for such project. In the event cost improvement ideas submitted for implementation during a calendar Agreement year do not accumulate to at least 2%, then the unit prices of cold headed threaded fasteners shall be proportionately adjusted by Whitesell in Exhibit B to provide for such shortfall deficiency. Such price reduction will be implemented at the beginning of the next calendar year.

7.0 CASH PAYMENT:

At the request of Electrolux, Whitesell shall pay to Electrolux a $2,000,000.00 cash payment paid at the signing of this Agreement in exchange for a long-term purchase commitment from Electrolux to purchase all of its Good(s) from Whitesell.

In the event this Agreement is cancelled prior to the agreed term regardless of any other previsions to the contrary in this Agreement, no matter the cause, reason, or justification, Electrolux shall refund within thirty (30) days the Cash Payment plus interest costs at prime.

8.0 TERMS AND CONDITIONS:

During the term of this Agreement or any extensions, any and all sales, purchase orders, service agreements, or contracts for sale of the goods shall be governed by the terms and provisions of this Agreement (including all attachments and amendments hereto), and the terms and conditions of the Electrolux locations if mutually agreed upon. In the event the terms and conditions of the Electrolux locations conflict with terms set forth in this Agreement, the terms of this Agreement shall solely prevail. This Agreement may be amended or modified in whole, or in part, by an agreement in writing or by mutual consent of the parties in writing. The parties acknowledge and agree that all understandings of the parties that may exist as of the date of this Agreement or may be entered into during the term of this Agreement with regard to their relationship must be set forth in writing, and that no oral agreements shall be effective unless and until reduced to writing.

No party hereto shall assign this Agreement or any part hereof without the prior written consent of the other parties, except that the parties can assign this Agreement to a subsidiary or other entity controlled by its parent company or to its successors by way of a sale of assets or merger. Except as otherwise provided herein, this Agreement shall be binding upon and for the benefit of the parties hereto and their respective permitted successors and assigns. Any initial usage volumes supplied by Electrolux to Whitesell are estimates to assist Whitesell with internal planning. Purchase orders and release/delivery schedules provided in the Demand Flow Management information represent Electrolux's best estimates of its actual needs.

9.0 TOOLING COST:

All tooling and equipment (i.e. cutting dies, molds, forms, jigs, new part tooling, printing plates, etc.) paid for by Electrolux or Whitesell shall be proprietary to and owned by

9

**Add.-10**

purchaser. Purchaser's proprietary tooling and/or equipment is not to be used for other business without the written consent of purchaser, and in the event purchaser gives such

consent, it shall be compensated a reasonable amount to be negotiated prior to the time of use. The tooling/ equipment usage fee will be paid by other party to purchaser no later than thirty (30) days subsequent to the completion of each calendar quarter. All tooling for Good(s) owned by Electrolux at Agreement date shall be made available and used by Whitesell. Upon tool disposal, the owner of the tool shall replace the existing tool or its equivalent costs.

The other party must comply with the purchaser's tooling/equipment agreement and complete the administrative requirements for UCC (Universal Commercial Code) filing for protection on any purchaser-owned tooling/equipment.

10.0 SAMPLES:

Small quantities of samples (i.e.: under 100 pieces cumulatively) submitted by Whitesell in conjunction with first piece submissions or revisions must comply with all specifications, and will be supplied at no charge unless requested for Electrolux's convenience at expedited costs and agreed by Electrolux in advance.

11.0 QUALITY:

Each Electrolux location shall provide to Whitesell a reject measurement of the actual defective parts per million (hereafter PPM) for tracking of quality. Each location's method will be consistent with Electrolux's quality program for purposes of tracking progress as it relates to this Agreement.

Whitesell agrees to an initial PPM level not to exceed 7500 PPM, on a rolling, company wide cumulative 6-month average. In the event the Electrolux location is not currently doing business with Whitesell, the first six (6) months should be accumulated and establish an average PPM at the end of the first six months. Electrolux and Whitesell agree to track PPM quality performance and progress.   Sufficient written notice and mutual agreement are required for any changes in measurement method, or fiscal PPM goal.

11.1 QUALITY GOALS:

1st Year –7500 PPM,  2nd Year – 6750 PPM,  3rd Year – 6075 PPM.

Each subsequent year will show a 10% improvement over the preceding year.

| Excess PPM to requirement: | Reimbursement: |
|---|---|
| 0 to 1,000 | 1.0% |
| 1,000 to 2,000 | 1.5% |
| 2,000 and up | 2.0% |

10

**Add.-11**

## 11.1.1 TRANSACTION RECOVERY COST:

Electrolux Home Products transaction recovery cost policy shall be defined as the recovery of transaction costs for downtime and loss of production to be defined as the direct, verifiable out-of-pocket cost due to unavailable components/materials caused by Whitesell by a late delivery (excluding demands in side of Whitesell's lead times) or rejected product due to a quality or non-conforming good not useable in the production assembly process. In no event shall such out-of-pocket costs include any amount for loss profits or business goodwill or any other punitive or indirect cost for consequential damages.

## 11.2 QUALITY SHORTFALL:

If Whitesell's 6-month rolling average PPM quality levels are ever equal to, or greater than 1% for critical components or 2% for non-critical components Electrolux may require Whitesell, (notification in writing), to correct such quality PPM performance shortfall and within five (5) days, Whitesell shall have such non-conforming Good(s) sorted or monitored and certified by a 3rd party company that is approved by Electrolux either externally or in Whitesell's facility, at Whitesell's expense, to make 100% inspection of Good(s) to be shipped to Electrolux. Such inspection efforts shall continue for a minimum of 30-days, or until a satisfactory corrective action plan has been submitted to Electrolux, implemented, and actively demonstrating that the PPM-level is reduced to the acceptable level. If after 90 days, progress is still insufficient to meet the PPM level for the specific Good(s) that caused the PPM non-conformance, Electrolux shall notify Whitesell in writing of such insufficiency detailing the specifics of the deficiencies and further detailing its performance requirements and needs. After this, in the event Electrolux deems it necessary to out-source the specific problem Good(s) for quality reasons, Electrolux shall advise Whitesell of the criteria, consistent with the same third party criteria, with which it must comply for Electrolux to resume purchases from Whitesell of that problem Good.

Electrolux and Whitesell agree to establish quality improvement teams with support from quality, production, engineering. and purchasing.

If the non-conformance with the annual PPM average for the critical and non-critical clause above is in acted and continues for a period in excess of 6 months, Electrolux shall have the right to cancel that specific Good from the Agreement and resource such specific Good(s) that caused the PPM non-conformance.

## 11.3 GENERAL QUALITY COMPLIANCE COMMITMENTS:

Whitesell further acknowledges and agrees that Whitesell's compliance with such quality requirements will be measured and determined by the methods consistent with all divisions and mutually agreed and no location shall deviate from this procedure as it relates to quality compliance. The parties agree that Whitesell will not be required to effect quality improvement requirements through the implementation of technology, which is not feasible in the industry utilized to produce a specific Good(s).

11

12.0 WHITESELL QUALITY COMMITMENTS:

12.1   To ship lots that meet quality and engineering specification requirements as mutually agreed.

12.2   To document process inspections during the course of manufacture.

12.3   To maintain inspection documents and certificates of conformance, upon request to allow for review, for any article/shipment, shipped, as requested by each Electrolux location. Since Whitesell is ISO9002 and QS9000 certified, if it maintains its certifications in good standing it shall therefore be deemed to have met an even higher manufacturing standard and shall constitute full compliance without further need or audit by Electrolux.

12.4   To insure the latest agreed upon editions of drawings and other documents are used as based on current Purchase Orders, individual releases, and EDI communications; and to expedite implementation of changes based on standard Whitesell manufacturing lead times agreed to by both Electrolux and Whitesell as attached in Exhibit C "LEAD TIMES REQUIRED and FIRM PLAN SCHEDULEING."

12.5   Whitesell will establish an agreed upon Self-Certification First Article approval process which shall be approved and certified by Electrolux.

12.6   To self-certify First Article Samples after major tool adjustments, change of manufacturing method, production moves or other actions that may influence form, fit, or function and to notify any and all affected Electrolux plants of the same.

12.7   To immediately notify Electrolux of any suspicions that the quality requirements are not met in a lot already delivered or in route.

12.8   To replace nonconforming Good(s) found and authorize it be returned from assembly by Electrolux or discovered by Electrolux in some other way; to grant credit for debits regarding returned Good(s); to pay the costs of Electrolux for sorting of fasteners in urgent cases after notification and approval by Whitesell.  To calculate accurate defective PPMs, Whitesell shall be allowed to sort or test sort at Electrolux or to return the Good(s) to Whitesell for sorting and Whitesell will report the actual defectives in the respective lots and only the actual defectives after testing or sorting shall be used in the calculation of Average 6-month PPM. Labeling and other similar lot rejections that do not affect line production shall not affect PPM calculations and are to be excluded.

12.9   To establish with Electrolux an ongoing quality improvement program which encompasses the following:

12.9.1  Measurement systems that encompass nonconformance of the most frequently reported or observed defects Electrolux Good(s); which provide that systems are in place to measure data collected at final Good(s) audit, at critical points in the Whitesell's production process, and in Whitesell's incoming inspection of Good(s)s and parts. Procedures and policies should be able to be demonstrated that they are in place and functioning.

12.9.2  Analysis showing the most likely root causes of each of these frequently reported nonconformance.

12.9.3  Time-phased corrective action plans for each of the top ranked defects, so as to eliminate or minimize nonconformance.

12.9.4  Specific objectives, which qualify, targeted nonconformance levels to be reached within stated timing. Future plans should include transition to measuring progress in terms of nonconforming parts per million.

12

**Add.-13**

12.9.5 Formal quarterly or semi-annual quality audits and certifications as required by ISO-9000 and QS9000 certification reviews must be initiated by Whitesell.

12.9.6 To attain a "Certified Supplier" status, continue striving towards "Preferred Supplier" status, and to provide "ship to stock" Good(s), thus eliminating need for Electrolux to utilize receiving inspection on Whitesell's Good(s).

12.9.7 Routine ISO9002 or QS9000 re-certification at Whitesell's expense would support the compliance with the above requirements.

12.9.8 The overall goal of Whitesell is to maintain the processes and documentation capability of ISO-9000 and the even more stringent QS-9000 certification, at Whitesell's manufacturing and distribution locations shipping directly to Electrolux.

12.9.9 Whitesell will continue to maintain its Statistical Process Control (S.P.C.).

12.9.10 Whitesell is to inform Electrolux contacts of any manufacturing disruptions that may cause delivery requirements to suffer in volume or timeliness.

12.10 Whitesell shall address any non-conforming responsibilities related to the above and plan a corrective quality plan to eliminate such non-conformance.

## 13.0 DEMAND FLOW MANAGEMENT:

Whitesell is expected to use the Electrolux Web-Site for Good(s) releases, schedule attainment, and information exchange.

## 14.0 ELECTROLUX QUALITY COMMITMENTS:

14.1 To fully support the joint cost and quality improvement programs described above and elsewhere in this Agreement.

14.2 To assist Whitesell in quality planning.

14.3 To participate in joint visits to Whitesell's facilities with the objective of improving communications and understanding of Whitesell's production processes, process control systems, design parameters, capabilities, capacities, and operational problems.

14.4 To contact Whitesell prior to sorting or rework, except when impossible due to emergency requirements or circumstances.

## 15.0 DISTRIBUTION:

Deliveries are to be made F.O.B. destination freight collect. Since Whitesell will be providing a Managed Inventory Program to all locations, in lieu of the above freight terms Whitesell will provide the goods delivered to the divisions and shall bill freight costs to Electrolux based on the freight rates included in Exhibit A. Freight costs are to be invoiced for the usage of Good(s) at the divisions. A mutually agreed determination on freight rates at each division shall be made and rates shall be entered appropriately for each shipping destination on Exhibit A. Less than truckload quantities shipped for the convenience of Whitesell or to cover late shipments will be Whitesell's responsibility at no additional charge to Electrolux over the original cost or rates. Any excess freight cost associated with a change caused by Whitesell is the responsibility of Whitesell except where the change is caused by an Electrolux location failure. Additionally, Whitesell will be responsible for any additional freight costs due to their movement of manufacturing to a qualified backup facility, or to any other location in order to meet Electrolux's requirements. Conversely, if Whitesell incurs any additional expedite costs, fees, break-ins

13

**Add.-14**

or other charges caused by Electrolux, Whitesell shall invoice the location and it will be paid per agreed pay terms.

Whitesell will also ship, freight collect, Good(s) for service to Electrolux locations, or to the Electrolux Service Parts Center, as directed by Electrolux. Good(s) covered under this Agreement will be listed in Electrolux's Purchase Orders and/or delivery/release schedules (or other methods as defined by Demand Flow Management), which will be supplied to Whitesell by each Electrolux location or the Service Parts Center. Release requirements will be based on mutually agreed (carton/bundle/container/lot.) quantities, with no overages allowed.

Electrolux's locations possess varying schedule techniques. Whitesell will work with each Electrolux location in satisfying schedule requirements.

16.0 MANAGED INVENTORY PROGRAM:

Whitesell shall provide an on-site vendor Managed Inventory Program at the locations in Exhibit E. The Managed Inventory program shall be defined as one Whitesell onsite employee or will agree to match any documented and verifiable current on site services provided and paid for by your current suppliers and an On-Site storage concept. Whitesell shall be provided complete facility access and the adequate in plant storage capacity to meet the reasonable economic needs of Whitesell Managed Inventory as defined in Exhibit E. All other costs of the Whitesell Managed Inventory Program or any related services contemplated under this Agreement above this base level shall be reimbursed to Whitesell at its actual cost. Whitesell shall receive regular shipments to its stock; and issue Good(s) on a daily basis and provide such issue information into Electrolux's receiving system-acknowledging transfer of Good(s) ownership and basis for invoicing from Whitesell.

17.0 SERVICE:

17.1 FLEXIBILITY/PRODUCTION CAPACITY:

Whitesell agrees to guarantee Good(s) and production capacity availability to meet Electrolux's requirements at all participating plant locations once Whitesell assumes responsibility for each Good as defined in a mutually agreed transition plan based on planning requirements supplied by Electrolux (i.e.: production schedules, Bill of Material accuracy, EAU, stock levels on hand, adherence to Whitesell lead time requirements). Any problems regarding conflicting schedules or conflicting demands will be quickly referred to Electrolux's designated plant agent. Whitesell will allocate scarce resources (i.e. time, equipment, or material inventory) to resolve such conflicts. In the event of any shortage, Whitesell shall not give any disadvantage to Electrolux's orders over all other customer orders in any allocation and shall give due consideration to any special needs of Electrolux.

17.2 DESIGN/ENGINEERING ASSISTANCE:

Whitesell will support Electrolux in design application and integration. Whitesell will present to Electrolux the latest in design, technology, manufacturing, etc. to ensure that Electrolux is held in a leadership position within their industry. Whitesell will provide assistance in consolidating and rationalizing SKUs in both current production requirements and in Service Parts. Whitesell will also provide use of their testing

14

**Add.-15**

facilities to Electrolux, upon request, Whitesell shall provide Good(s) to Electrolux's specifications, prints, and request. However, Electrolux agrees to utilize any specific Good(s) that may have a minor non-conformance to print specifications yet such non-conformance will have no functional or adverse affect in the application or its joint integrity. Whitesell will recommend the best Good(s) design in its professional opinion subject to Electrolux approval.

Whitesell shall be responsible to maintain a drawing database for all Good(s) sold to Electrolux under this agreement.

## 17.3 REPORTING:

When requested, Whitesell will provide summarized monthly reports of purchases, including Good(s) purchased for service, by dollar amount and by amount of Good(s), by individual Electrolux location, to the Electrolux Commodity Director and to each appropriate Electrolux location.

## 18.0 WARRANTY:

EXPRESS LIMITED WARRANTY: Whitesell warrants that the Goods will substantially conform to Electrolux's applicable specifications and will be free from defects in workmanship for a period of two (2) years from date of installation. This express limited warranty does not apply to (a) defects resulting from Electrolux's design of the Goods; or (b) Goods that has been abused, damaged, altered or misused by any person or entity after title passes to Electrolux. Notwithstanding anything else in this Agreement, Whitesell assumes no liability for or obligation related to the performance, accuracy, specifications, failure to meet specifications or defects of or due to tooling, designs or instructions produced or supplied by Electrolux and Electrolux shall be liable for costs or expenses incurred by Whitesell related thereto. Upon any failure of a Good to comply with the above warranty, Whitesell's sole obligation, and Electrolux's sole remedy, is for Whitesell to promptly replace such Good.

WHITESELL MAKES NO OTHER WARRANTIES OR CONDITIONS ON THE PRODUCTS, EXPRESS, IMPLIED, STATUTORY, OR IN ANY OTHER PROVISION OF THIS AGREEMENT OR COMMUNICATION WITH ELECTROLUX, AND WHITESELL SPECIFICALLY DISCLAIMS ANY IMPLIED WARRANTY OR CONDITION OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Upon written notification from Electrolux, Whitesell will define an implementation plan for Service Call Rate (SCR) improvement for excess field failure solely caused by Whitesell manufacturing deficiencies in the Good(s). In no event shall such reimbursement of out-of-pocket costs include any amounts for lost profits or business goodwill or any other special, punitive or indirect costs or consequential or other damages.

## 19.0 FORCE MAJEURE:

15

**Add.-16**

Neither party shall be liable for any failure, inability or delay in performing its obligations hereunder, if such failure, inability or delay be due to any Act of God, war, explosion or sabotage, accident, casualty, government law, order or regulation, or failure or delays in usual sources of supply of components, raw materials domestic or ocean transportation, or of any other cause beyond the reasonable control of the party whose performance is prevented or delayed, but prompt notice, due diligence and every reasonable effort shall be used by each party in curing such cause and in resuming performance, such as substitution of material sources or utilization of overtime or additional workers. Toward that end, evidence of the reason for delay shall be submitted for discussion and arrangements will be made to the fullest extent practicable to minimize adverse impact of the delay on the parties including, if necessary, seeking alternate sources of supply of comparable Goods.

## 20.0 EPIDEMIC FAILURE:

Notwithstanding anything to the contrary in the Agreement, in the event all Goods contain defects for which Whitesell has responsibility, in an amount which exceeds one percent (1 %) for critical components or two percent (2%) for non-critical components of the cumulative total Goods supplied by Whitesell to Electrolux in any calendar quarter during the Term ("Epidemic Failure"), Whitesell shall in addition to normal warranty obligations, be responsible to repair and replace, or reimburse Electrolux for its actual labor rates, and other reasonable direct costs and direct expenses incurred by Electrolux and directly attributable to the failure of such excessively defective Goods. Except as to the foregoing Epidemic Failure, Electrolux shall be responsible for the labor and administration costs of curing defective Goods under the warranty provided by Whitesell.

## 21.0 INDEMNITY AND INSURANCE:

### 21.1 INDEMNITY BY OTHER PARTY:
Each party shall save harmless, defend and indemnify, at its own expense, the other party and its customers or suppliers from and against all liability, costs and expenses (including attorney fees and expenses) arising out of the death or injury to any person or damage to any property, by whomsoever suffered, resulting from:
21.1. (i) Defaulting Party' breach of its obligations under this Agreement,
21.1. (ii) Failure of the Goods to conform to Part Specifications unless within standard industry specifications of goods.
21.1. (iii) Defects in manufacturing unless goods mis-installed

### 21.2 PRODUCT LIABILITY INSURANCE:
Whitesell shall, at its own cost and expense, buy and maintain product liability insurance, which contains contract liability endorsements, with a personal injury limit of not less than Two Million Dollars (S2,000,000.00) and a property damage limit of not less than One Million Dollars (S1,000,000.00). Any such policy shall include Electrolux as an additional named insured and provide that coverage thereunder shall not be terminated or changed during the Term without at least thirty (30) days' notice in writing to Electrolux.

## 22.0 MANAGEMENT REVIEW:

16

**Add.-17**

Electrolux and Whitesell agree to meet quarterly to review all projects and aspects of this business relationship. Upper management personnel should represent Whitesell with Electrolux being represented by select representatives from cross-functional disciplines.

17

## 23.0 TERMINATION BY MUTUAL AGREEMENT:

Electrolux or Whitesell may terminate this Agreement at any time by mutual written agreement. Alternatively, either party may terminate this Agreement in its sole discretion. ,after completion of the initial term, or upon expiration of any subsequent term after the initial term, by providing written notice of such termination to the other party not less than six (6) months prior to the end of such term.

## 23.1 PHASE OUT PERIOD:

If notice of termination is given then from and after the delivery of such notice of termination and until the effective date of such termination shall be called the "Phase-Out Period". The parties shall cooperate in good faith and use their best efforts to wind up and complete the full utilization prior to the end of the Phase-Out Period, of all of supplier's product made for Electrolux. Whitesell shall advise the quantities of all finished goods, work-in-process, and committed purchased products and Electrolux shall take delivery of all such Good(s) during this period. To the extent reasonably feasible, any development projects as of the date notice of termination is given shall be completed. Except as otherwise provided herein, all terms and conditions of this Agreement shall continue in effect throughout the Phase-Out Period.

## 23.2 TERMINATION FOR CAUSE:

In addition to any other rights or remedies provided by this Agreement, each of Electrolux and Whitesell shall have the unilateral right to terminate this Agreement for Cause upon the delivery of written notice of termination to the other party (the "Defaulting Party"). For purposes of this Agreement, "Cause" shall be defined as the occurrence of any one or more of the following events:

23.2.1. Assignment: The Defaulting Party attempts to assign this Agreement without approval of the other party as specified in section 8.0.
23.2.2 Dissolution: The voluntary or involuntary dissolution of the Defaulting Party.
23.2.3 Insolvency: The (i) making of a general assignment for the benefit of creditors by the Defaulting Party; (ii) filing of any petition by the Defaulting Party or the commencement of any proceeding voluntarily by the Defaulting Party for any relief under any bankruptcy or insolvency laws or any law relating to the relief of debtors; (iii) consent by the Defaulting Party to the entry of an order in an involuntary bankruptcy or insolvency case; (iv) entry of an order or decree for relief against the Defaulting Party by a court of competent jurisdiction in an involuntary case under any bankruptcy or insolvency laws or any law relating to the relief of debtors, which order or decree is unstated and in effect for a period of thirty (30) consecutive days; (v) appointment, with or without the consent of the Defaulting Party, of any receiver, liquidater, custodian, assignee, trustee, or other similar official of the Defaulting Party or any substantial part of its property; or (vi) admission by the Defaulting Party in writing of its inability to pay its debts generally as they become due.
23.2.4 Except as otherwise provided above, the occurrence of any act or omission by the Defaulting Party that constitutes a material breach of this Agreement as defined in Section 26.0.

18

**Add.-19**

24.0 COMPETITION:

If it is perceived that a significant offer is made in writing to Electrolux more favorable from a Qualified Supplier with similar supplier capabilities, the following procedure will be utilized. The intent is to establish a course of action that recognizes the need to keep Electrolux competitive and for Whitesell to make a reasonable profit, and the mutual desire to continue the Agreement.

24.1 MEETING COMPETITION PROCEDURE:
If Electrolux is offered the opportunity to purchase the Goods on Exhibit B at a price less than that which Electrolux could realize under this Agreement (taking into account all comparable pricing, service, and comparable capabilities Whitesell is providing under this Agreement ) after the initial term, Electrolux may so notify Whitesell in writing and submit therewith such verifiable third party documentation and written proof of such third party offer. Whitesell shall have the last right of refusal to match all terms and conditions of such offers.

If Whitesell rejects Electrolux's other offer for all Good(s) and fails to match the price and terms of the third party offer within ninety (90) days after Electrolux notifies Whitesell of the offer, Electrolux may buy the Goods from the third party after all Whitesell's existing inventories have been purchased. In applying the foregoing provision, it is the intent of both parties in this Agreement that Whitesell shall not be asked to meet any quotations:

    24.1.1 from a supplier, which does not have similar supplier capabilities and will provide such capabilities that Whitesell provides under this agreement;

    24.1.2 Whitesell is not to be asked to meet "Cherry-Picking" quotations.

25.0 DISPUTE RESOLUTION:

To the extent feasible, the parties desire to resolve any controversies or claims arising out of or relating to this Agreement through discussions and negotiations between each other, and any dispute arising under or alleged breach of this Agreement shall be referred in writing to the Contract Administrators for resolution. Such written notice shall define the problems, issues, and non-compliance with the Agreement and the specific remedies requested for compliance. Within thirty (30) days of such notice, both parties shall meet to use their best efforts in good faith to resolve any disputes, controversies or claims arising out of or relating to this Agreement by face-to-face negotiations with the other party.

In the event that, after good faith discussions, such controversies or claims cannot be resolved solely between the parties, the parties may agree upon any type of informal dispute resolution that is feasible under the circumstances, including referral of any such dispute, controversy or claim to any third party for resolution. In the absence of any such agreement, either party may proceed with resolving any such controversy, claim or dispute through any other proceedings as may be deemed appropriate by such party. If the dispute is a perceived breach of Agreement, the procedures to address these concerns are stated in section 26.0.

19

**Add.-20**

## 26.0 BREACH OF PURCHASE COMMITMENT:

Upon material breach of this Agreement by one party, the other party after compliance
with the Dispute Resolution procedure, may suspend or modify its commitment to
purchase/sell a specific Good(s) so as to preserve the balance of this Agreement. Or, if the
breach relates to any other term, covenant or provision of this Agreement, upon the
delivery of written notice to the defaulting party and failing to cure such breach within 30-
days, the other party may suspend or modify its commitment under this Agreement. Such
notice shall state the grounds upon which material breach of this Agreement is asserted,
specify the extent to which the commitment is to be suspended, and set forth the conditions
under which the other party must comply to cure the breach so that both parties are willing
to resume business. It is critical that this be communicated in writing and formally
delivered.

## 27.0 GOVERNING LAW:

This Agreement shall be deemed to have been made in the State of Georgia and shall be
construed in accordance with the laws of that state.

## 28.0 MISCELLANEOUS:

### 28.1 COUNTERPARTS:
This Agreement may be executed simultaneously in two (2) or more counterparts,
each of which shall be deemed an original but all of which together shall constitute
one (1) and the same instrument.

### 28.2 BINDING EFFECT:
The provisions of this Agreement shall be binding upon and accrue to the benefit of
the Parties and their respective heirs, legal representatives, successors and assigns.

20

**Add.-21**

29.0 NOTICES:

Any notice required or desired to be given in connection with this Agreement shall be in writing and effective upon the earlier of its delivery or 5-days after deposit in the U. S. mail, postage prepaid, certified return receipt requested, addressed as follows, or to such other address as to which either party gives notice to the other:

If to Electrolux:      Electrolux Home Products
                       Attn: Mr. Clarence C. Frauendienst
                       701 33rd Avenue North
                       St. Cloud, MN 56303
                       Fax # 320.240.3493
                       Email: Clarence.frauendienst@electrolux.com


If to Whitesell:       Whitesell Corporation
                       Attn: Mr. Neil L. Whitesell
                       P.O. Box 2571
                       2703 E. Avalon Avenue
                       Muscle Shoals, Alabama
                       35662-2571
                       Fax #: 256.248.8588
                       Email: neil@whitesellcorp.com


The undersigned are duly authorized agents for Electrolux and Whitesell, and do understand and accept without reservation, this Agreement as detailed on Pages 1 through  21 , including all schedules and attachments. Accept as otherwise set forth herein, this Agreement shall not be changed or amended except by a written document, signed and dated by both Electrolux and Whitesell.

Whitesell Corporation                    Electrolux Home Products        12/14/00

Neil L. Whitesell,                       Paul Bertrand
President, CEO

12-15-00                                 Roger Leen
DATE

                                         Clarence C. Frauendienst

                                         12/14/00
                                         DATE

21

**Add.-22**

2003 Settlement Memorandum

## SETTLEMENT MEMORANDUM

WHEREAS, Electrolux Home Products, Inc. ("EHP") and Whitesell Corporation ("Whitesell") entered into a Strategic Partnership Agreement (hereinafter the "Agreement") on December 14 and 15, 2000; and

WHEREAS, disputes arose between EHP and Whitesell concerning the meaning of certain terms and conditions under the Agreement; and

WHEREAS, EHP filed suit in the United States District Court for the Southern District of Georgia, Augusta Division ("the Court"), Civil Action File No. CV103-050, in which EHP sought a temporary restraining order, declaratory judgment, and additional equitable relief; and

WHEREAS, EHP and Whitesell desire to resolve any and all disputes which they have with each other arising out of the Agreement;

THEREFORE, EHP and Whitesell, in an effort to resolve the disputes under the Agreement, hereby agree as follows:

1.

Within thirty (30) days from the execution of this Settlement Memorandum, the parties will prepare and the parties will mutually agree upon a clarified Exhibit "B" under the Agreement which will include the following:

      a.     Parts numbers for all current parts Whitesell now supplies to EHP;

      b.     Part numbers for parts in process of being transitioned, a list of which will be prepared by Whitesell as soon as possible; and

AUGLIB01 629112

Received   Jun-17-03   15:40       From-706 722 1215            To-Whitesell Corp. Exec       Page   006

Add.-24

c.     Part numbers for all Springfield Division parts currently being supplied by Bamal as of January 1, 2003.

During the initial term of the Agreement, the parties will update Exhibits "B" and "B-1" (as defined in paragraph 3 below) every six (6) months by deleting the numbers for parts which are no longer used, adding new numbers for the parts which have been renumbered and determining whether there are new parts being used by EHP which fall within the same categories of parts listed in Exhibits "B" and "B-1" which should be included in this exhibit. The method used to establish the pricing for all new and/or renumbered parts is according to the Agreement, however the parties will mutually agree on the price prior to the initial purchase of that new and/or renumbered part or on what part is comparable in the current Exhibit B or B-1.

2.

EHP and Whitesell hereby specifically agree that Whitesell is not required to "meet competition" for Exhibit "B" and Exhibit "B-1" parts during the initial term of the Agreement. The Agreement initial term is redefined in Section 3 of this Settlement Memorandum.

3.

Whitesell will make product supply capability presentations to EHP for any or all of the Brunner and/or wireform parts. To the extent that EHP does not transition the supply of all Brunner and wireform parts to Whitesell, EHP agrees to transition additional mutually agreed upon parts for Whitesell to supply in an amount which creates gross purchases, plus freight charges (unless freight charges are already included in the price paid for these parts), equal to the calendar year 2002 purchase value of the Brunner and wireform parts not transitioned (hereinafter, "substitute parts.") While the parties will immediately begin the process of determining which Brunner, wireform and/or

substitute parts to transition to Whitesell, full transition will not be made until December 31, 2003.

Any shortfall in the annual purchase volume of Brunner and wireform part(s) that are actually to be purchased from Whitesell as compared to the prior 2002 annual purchase volume (verified at Whitesell's expense by a third party audit if requested by Whitesell) of Brunner and wireforms parts shall be made up of mutually agreed substitute parts and added to Exhibit "B-1."

The initial term under the Agreement for all parts listed on Exhibit "B" and Exhibit "B-1" as of December 31, 2003, will expire on November 1, 2008. In the event that the annual purchase volume of Exhibit B-1 parts fully transitioned beginning on January 1, 2004, is less than EHP's prior 2002 annual purchase volume of Brunner and wireform parts, then additional, mutually agreed to, parts will be added to Exhibit "B-1" to make up for this shortfall and the initial term, only as to these most recently added parts, will be proportionately extended by the time it takes to fully transition these parts. In the event that all Exhibit B parts are not transitioned by December 31, 2003, the initial term for those parts not transitioned will be proportionately extended by the time it takes to fully transition those parts.

In addition to the annual rebate provided in Section 7 of this Memorandum, all Exhibit "B-1" Brunner, wireform or substitute parts transitioned to Whitesell will receive a five percent (5%) discount from the EHP piece price, plus freight, now being paid by EHP, unless other terms and pricing are mutually agreed to by the parties in writing.

4.

The parties further agree to begin, as soon as possible, the Q-18 qualification process as previously utilized on Whitesell's prior parts submissions for all Brunner and wireform parts which Whitesell holds in its inventory as of the execution date of this settlement memorandum. For any of

these Brunner and/or wireform parts which pass the Q-18 qualification process and are not transitioned to Whitesell pursuant to Exhibit "B-1," EHP shall purchase these parts from Whitesell for a price which is five percent below (-5%) EHP's current costs, plus freight, for these parts, as needed in EHP's manufacturing process but in no event greater than nine months from the date of this agreement. If EHP advises Whitesell it does not intend to buy all Brunner and wireform parts under exhibit B-1, then within thirty (30) days from the date EHP advises which Brunner and/or wireforms it will not buy from Whitesell under Exhibit B-1, Whitesell shall make available to a mutually agreed independent third party auditor the amount of contract buyout expenses associated with those specific parts EHP does not wish to purchase under Exhibit B-1 from Whitesell and such supportive documentation and complete information to validate the contract buyout costs for only the specific contracted Brunner and wireform parts covered by non-cancelable supply contracts that EHP does wish to purchase from Whitesell under Exhibit B-1. Such independent third party shall sign a confidentiality agreement on all such information received and shall only use such information to confirm and validate the accuracy of the buyout expenses required of Whitesell. If, within one hundred and eighty (180) days from its receipt of this information, EHP and Whitesell are unable to agree on how to deal with these expenses, then EHP agrees to immediately reimburse Whitesell for all supply contract buyout expenses for these parts.

5.

EHP and Whitesell agree that the discount pricing provided by the Agreement for the initial unit price discount contained in Sections 5.1 and 5.2 of the Agreement, shall be verified by a disinterested third-party mutually acceptable to both EHP and Whitesell at EHP's expense. Whitesell

and EHP shall meet to discuss any errors discovered by said audit and agree to any necessary adjustments.

6.

EHP agrees to immediately begin transitioning to Whitesell the parts currently being supplied by Bamal to EHP's Springfield Division.  EHP agrees to notify Bamal immediately to cancel all orders, and warrants that it has no contracts or commitments to Bamal which extend the inventory or supply of parts beyond December 31, 2003.  EHP and Whitesell agree to mutually work to reduce the amount of current Bamal inventory and/or commitments.  To the extent that any such Bamal inventory and/or commitments are non-cancelable, Whitesell will buy such parts at a mutually agreed upon price between Whitesell and Bamal and Whitesell further agrees to manage such inventory Whitesell purchases from Bamal at no cost to EHP; provided, that Whitesell does not agree to purchase or manage Bamal inventory that would not be used by EHP before December 31, 2003.

7.

Whitesell agrees, at the end of each calendar year beginning with calendar year 2003, to pay to EHP a two percent (2%) rebate of the total receipts for all parts purchased which Whitesell receives from EHP during that calendar year.  Such rebate satisfies all of Whitesell's obligations of the unit piece price under Section 6.0 of the Agreement however Whitesell will continue to provide its best efforts to provide EHP with annual Total Cost Reductions.

8.

As an inducement to transition additional parts to Whitesell which are not within Exhibits "B" and "B-1," Whitesell agrees to offer a minimum five percent (5%) discount to EHP from the EHP unit piece-price of any part that EHP is willing to buy and Whitesell is willing to sell to EHP.  Any

AUGL1801 629113

5

such part will be listed on an Exhibit "B-2." All parts listed on Exhibit "B-2" are subject to a "meet competition" requirement.

If EHP is offered the opportunity to purchase a part on Exhibit "B-2" at a price less than what EHP is paying for that part, then EHP may so notify Whitesell in writing and submit to Whitesell a verifiable written third-party offer. Whitesell shall have the right to exercise, within thirty (30) days, the last right of refusal to match any such offer.

If Whitesell does not match any such offer, EHP may cancel its commitment to purchase such part by providing a six (6) months written notice to Whitesell, and EHP further agrees to purchase up to six (6) months' worth of Whitesell's existing stock or non-cancelable commitments of such parts not to exceed the six (6) months' notice period. In the event that Whitesell has previously notified EHP in writing that it is required to commit to more than six (6) months' worth of the part, and EHP agrees in writing, then EHP will buy whatever longer stock commitments are specified in its written agreement.

9.

EHP agrees to provide Whitesell with eight thousand (8,000) square feet at the EHP Orangeburg Plant for Exhibit "B" parts for Whitesell to manage inventory by August 1, 2003 and, in exchange, Whitesell agrees to waive all of its claimed warehousing charges with respect to the off-site warehouse facility.  The amount of space at the EHP Orangeburg Plant to be provided to Whitesell shall increase proportionate to any increase in volume of parts supplied by Whitesell and/or any proportionate increase in product supplied by Whitesell.  When Whitesell moves onsite, the Orangeburg current delivered unit prices for all Orangeburg Exhibit B parts shall be reduced by one and one-half percent (1½ %) and freight costs shall revert to FOB Muscle Shoals, Alabama, per the Agreement.

10.

Each party agrees that any notices, letters or other communications notifying the other of any claimed breach of the Agreement, attempting to terminate the Agreement, or demanding Whitesell to meet competition made prior to the date of this Settlement Memorandum are hereby unconditionally withdrawn and declared void and of no effect.

11.

Any notice required by this Settlement Memorandum shall be in writing and shall be addressed to the following individuals or to such other individuals as the parties so designate in writing:

If to EHP:

Mr. Roger J. Leon
Electrolux Home Products
250 Bobby Jones Expressway
Post Office Box 212378
Augusta, Georgia 30907

AUGLI801 61911.3

7

Received   Jun-17-03  15:40        From-706 722 1215        To-Whitesell Corp. Exec    Page 012

Add.-30

Facsimile: (706) 651-7113

If to Whitesell:

Mr. Neil L. Whitesell
Whitesell Corporation
Post Office Box 2571
2703 East Avalon Avenue
Muscle Shoals, Alabama 35662-2571
Facsimile: (256) 248-8588

12.

If Whitesell or EHP, for any reason, shall determine that it will seek to terminate or modify its performance under the Agreement, due to an unresolved dispute, both parties agree to continue to supply and purchase all parts until such dispute is resolved. Both parties agree to submit such unresolved disputes to mediation.

13.

This Settlement Memorandum settles all disputes between Whitesell and EHP, except initial discount pricing, past due obsolescence and accounts receivable invoices and disputes relating to Whitesell's implementation of its managed inventory system at EHP's McRae Division (excluding the previously EHP claimed debit). To the extent that the parties are not amicably able to resolve these issues, as well as any other issues which may arise in the performance of this Settlement Memorandum, the parties agree to submit such disputes to mediation by Mr. Montague Miller or such other mediator as mutually agreed.

14.

The Agreement, except as modified herein, shall continue in full force and effect.

ALGL1801 629113

8

15.

All pending litigation between the parties shall be dismissed without prejudice, with each party to bear its own costs and expenses. The parties further agree that the United States District Court, Southern District of Georgia, Augusta Division, shall retain jurisdiction to enforce this Settlement Memorandum.

This 28th day of May , 2003.

| ELECTROLUX HOME PRODUCTS, INC. | ATTORNEYS FOR PLAINTIFF ELECTROLUX HOME PRODUCTS, INC. |
|---|---|
| By: _____ Robert J. Leon As Its: VP | By: R. Perry Sentell, III _____ R. Perry Sentell, III Georgia Bar No. 635805 Wyck A. Knox, Jr. Georgia Bar No. 427300 Raymond G. Chadwick, Jr. Georgia Bar No. 118475 Brian K. Epps Georgia Bar No. 231459 KILPATRICK STOCKTON LLP 699 Broad Street, Suite 1400 Post Office Box 2043 Augusta, Georgia 30903 (706) 724-2622 |

Received   Jun-17-03  15:40        From-706 722 1215        To-Whitesell Corp. Exec   Page  014

Add.-32

WHITESELL CORPORATION

By: _____

As Its: _____

ATTORNEYS FOR DEFENDANT
WHITESELL CORPORATION

By: _____
    Thomas E. Magill
      Georgia Bar No. 465571
    David M. Atkinson
      Georgia Bar No. 026460

MAGILL & ATKINSON LLP
1175 PEACHTREE STREET, N.E.
100 COLONY SQUARE N.E., SUITE 2000
ATLANTA, GEORGIA 30361
(404) 892-8884

    William J. Keogh, III
      Georgia Bar No. 415781

HULL, TOWILL, NORMAN,
BARRETT & SALLEY
POST OFFICE BOX 1564
AUGUSTA, GEORGIA 30903
(706) 722-4481

2005 Consent Order

**ORIGINAL**

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2005 MAY 17 AM 8: 03

CLERK
SO. DIST. OF GA.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

ELECTROLUX HOME PRODUCTS,  )
INC.                        )
                            )
          Plaintiff,        )
                            )       CASE NO. CV103-050
v.                          )
                            )   **SEALED AND**
WHITESELL CORPORATION,      )
                            )   **IMPOUNDED**
          Defendant.        )

### CONSENT ORDER ON WHITESELL'S MOTION FOR
### PRELIMINARY RELIEF AND TO ENFORCE SETTLEMENT AGREEMENT

This Cause, having come before the Court on Whitesell Corporation's ("Whitesell")

Motion for Preliminary Relief and to Enforce Settlement Agreement ("Motion for Enforcement")

and the Court having considered the agreement of the parties to the entry of this Consent Order,

reviewed the file, and otherwise being duly advised in the premises, hereby

FINDS THAT:

1.     The parties have various disputes related to their respective obligations under

their Strategic Partnership Agreement ("Supply Agreement") dated December 14 and 15, 2000,

and Settlement Memorandum dated May 28, 2003, which they have agreed to resolve through

the entry of this Consent Order, future settlement discussions and / or litigation.

2.     The parties are adequately represented by counsel and fully understand the impact

and importance of the finality of this Consent Order and agree to the entry of this Consent Order

through their own free will and desire that this Consent Order be entered for their mutual benefit

and security particularly to prevent future disputes, settlement negotiations, or litigation from

**Add.-35**

impacting the day-to-day operations of each of the parties.

3. Whitesell and EHP have a continuing interest in having this Consent Order govern the purchase and sale of product between them to prevent unnecessary injury and irreparable harm as a result of any current or future disputes whether the parties engage in settlement negotiations or litigation to resolve any such current or future disputes.

ORDERS:

1. Until the issues between the parties are resolved, under the provisions of this Consent Order Electrolux Home Products, Inc. ("EHP") shall purchase from Whitesell and Whitesell shall sell to EHP, through the end of the initial term of the Supply Agreement, 100 percent of EHP's requirements for all goods and parts currently being purchased by EHP from Whitesell today ("Whitesell Business") and further EHP shall not utilize any goods and / or parts identified as Whitesell Business obtained from anyone other than Whitesell before or after the date of this Order.

2. EHP shall pay to Whitesell the amount of $3,382,216.07, as follows: (i) $2,475,976.44 within fifteen (15) days of the date of this Order; (ii) $906,239.63 within fifteen (15) days of receipt of the obsolete and excess inventory represented by the $906,239.63. Whitesell shall deliver to EHP within fifteen (15) days all goods or parts represented by the obsolete and excess inventory or any other goods or parts that have not been shipped. EHP shall remain current on all future undisputed invoices. Following the above payments the parties shall meet within forty-five days and attempt to resolve disputed invoices for which such payments have been conditionally made pursuant to this paragraph. For those disputed invoices which cannot be resolved, EHP shall have the right of set off against any moneys owed or outstanding to Whitesell, including uncontested amounts owed on open invoices and materials should it be

-2-

**Add.-36**

successful in litigation concerning such disputed invoices.

3.    EHP claims that it is not obligated to pay the price increases submitted by Whitesell in 2005 through the date of this Consent Order ("Price Increases"), and Whitesell claims the full Price Increases are due and owing and must be paid going forward. If Whitesell prevails on the Price Increase litigation, Whitesell shall be entitled to payment of the Price Increases from their effective date forward plus twelve percent annual interest thereon through the date of recovery of the Price Increases. If EHP prevails on the Price Increase litigation, EHP shall be entitled to the differential between the price paid to Whitesell and the price reflected by the quotes submitted by EHP plus twelve percent annual interest on any recovery. If EHP resources the particular part(s) that Whitesell submitted Price Increases, EHP shall purchase the inventory in Whitesell's supply chain at prices in effect on January 1, 2005.

4.    EHP shall transition to Whitesell on or before December 31, 2005, all wireform products used or to be used by EHP's Orangeburg, South Carolina, McRae, Georgia, or any future or alternative locations or production facilities within North America and all parts that were to be transitioned under the Settlement Memorandum (collectively "Whitesell Transition Parts"); however this transition shall not impair any new product launches. Whitesell shall supply conforming parts to the standards and specifications as established by EHP pursuant to the terms of Supply Agreement to enable the timely and smooth transition. The Whitesell Transition Parts shall be included within the definition of Whitesell Business. EHP shall purchase inventory as requested by Whitesell from its current suppliers to facilitate the transition. EHP may provide to Whitesell any EHP owned tooling from the current suppliers as soon as reasonably practicable. The purchase price for the Whitesell Transition Parts shall be determined in accord with Exhibit "1" attached to this Consent Order. Exhibit "1" shall be sealed and

-3-

**Add.-37**

remain confidential.

5.     The Court reserves jurisdiction to enforce the terms of this Consent Order through
its contempt powers or other appropriate means, including without limitation the award of any
damages incurred by either party as a result of any breach the terms this Consent Order.

6.     Where a conflict exists between this Consent Order and the Supply Agreement
and / or Settlement Memorandum, this Consent Order shall control.   No dispute of any kind
between the parties shall alter their respective obligations to strictly comply with the terms of
this Consent Order.

7.     The primary purpose of this Consent Order is to preserve and govern the rights of
the parties prior to this Court's final judgment on the parties' disputes regarding the
interpretation, enforcement, validity and meaning of the parties Settlement Memorandum and
Supply Agreement.  The Court hereby grants Whitesell leave to file, in this Case, within one
hundred eighty-days of the date this Consent Order, a complaint setting forth its unresolved
claims and EHP shall respond to said complaint within thirty-days of service.  This provision
does not preclude EHP from filing a complaint prior to being served with a complaint by
Whitesell. If EHP files its complaint first, Whitesell shall respond to the complaint within thirty-
days of service. After EHP and Whitesell have filed their respective claims, the Court will hold
a case management conference to determine the status and nature of the claims and to determine
whether a case management and scheduling order is appropriate.

DONE AND ORDERED this __17th__ day of May 2005.

JUDGE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

-4-

**Add.-38**

**Agreement and Stipulation of the Parties**

Whitesell and EHP unequivocally understand and agree to the terms of this Judgment and to the entry of this Judgment and evidence such agreement by their signatures below:

WHITESELL CORPORATION

Neil Whitesell, As President

Dated: _5-4-05_

ELECTROLUX HOME PRODUCTS, INC.

Roger Leon, As Vice President

Dated: _5-4-05_

cc: Counsel of Record

**Add.-39**

| Note | EHP Part Number | Price | Date Price Effective | New Pricing |
|------|-----------------|-------|----------------------|-------------|

*This Exhibit is to be updated from time-to-time in accord with the parties obligations under the Strategic Partnership and / or Settlement Agreement. The part identification and prices are as accurate as reasonably possible and are a compilation of data provided by both Electrolux and Whitesell. While every attempt by both parties has been made to assure accuracy, omissions and errors may occur and are subject to audit or verification. All other new parts and wireforms are to be priced pursuant to the Strategic Partnership and / or Settlement Agreement.*

** All L'Assomption Prices are listed in Canadian Dollars

*** Wireform Pricing to be completed reflecting a 5% price reduction per part price savings off of Northern Wire and Mitchell Bissell pricing for all current Orangeburg wireforms as of 12-01-04 and also the same 5% savings on all McRae wireform pricing as of 12-01-04 from all suppliers being replaced. Due to the new platform designs being implemented in 2005, all new replacement or redesigned wireforms due to design modifications for the Northern Wire and Mitchell Bissell parts shall be priced at 4% less than verified Northern Wire and Mitchell Bissell quoted prices and shall be eligible for a 2% rebate represented a total savings of 6% annually. As Electrolux's strategic supplier for all fastener families, wireform products and all other product families covered by the Strategic Partnership Agreement, all current and new parts are to be priced pursuant to the Strategic Partnership and / or Settlement Agreement.*



## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document complies with the word limit requested in Whitesell Corporation's pending Unopposed Motion for Leave To File an Opening Brief in Excess of the Default Word Limit (Dkt. 44) because it contains 15,955 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Eleventh Circuit Rule 32-4. I further certify that this motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using a Microsoft Word word-processing program in 14-point Times New Roman font.


<u>/s/ Jeffrey A. Lamken</u>
Jeffrey A. Lamken

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2024, I electronically filed the foregoing with the Clerk of the Court using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

<u>/s/ Jeffrey A. Lamken</u>
Jeffrey A. Lamken