No. 23-10935

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

WHITESELL CORPORATION,

*Appellant*,

*v.*

HUSQVARNA OUTDOOR PRODUCTS, INC. and ELECTROLUX HOME PRODUCTS, INC.,

*Appellees.*

Appeal from the United States District Court
for the Southern District of Georgia

## HUSQVARNA OUTDOOR PRODUCTS, INC. AND ELECTROLUX HOME PRODUCTS, INC.'S RESPONSE BRIEF

AMANDA M. WAIDE
JAMIE S. GEORGE
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
amanda.waide@alston.com
jamie.george@alston.com

ADAM H. CHARNES
KILPATRICK TOWNSEND
 & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7106
acharnes@ktslaw.com

*Counsel for Appellee Electrolux
Home Products, Inc.*

*Counsel for Appellee Husqvarna
Outdoor Products, Inc.*

*Additional counsel listed on following page*

R. Perry Sentell, III
Laurel Payne Landon
Kilpatrick Townsend
 & Stockton LLP
1450 Green Street, Suite 230
Augusta, Georgia 30901
(706) 724-2622
psentell@ktslaw.com
llandon@ktslaw.com

James M. Brogan
Brian J. Boyle
DLA Piper LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, Pennsylvania 19103
(215) 656-3300
james.brogan@dlapiper.com
brian.boyle@dlapiper.com

*Additional Counsel for Appellee*
*Husqvarna Outdoor Products, Inc.*

11th Cir. No. 23-10935

*Whitesell Corporation v. Husqvarna Outdoor Products, Inc., et al.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1 through 26.1-3, Appellees Husqvarna Outdoor Products, Inc. and Electrolux Home Products, Inc. submit the following list of all trial judges, attorneys, persons, associates of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party as may be known to Husqvarna Outdoor Products, Inc. and Electrolux Home Products, Inc.

- AB Electrolux (ELUXY)

- Aloia Roland Lubell & Morgan, PLLC

- Alston & Bird, LLP

- Balser, David L.

- Barfield, Honorable W. Leon

- Bowen Jr., Honorable Dudley H.

- Boyle, Brian J.

11th Cir. No. 23-10935

*Whitesell Corporation v. Husqvarna Outdoor Products, Inc., et al.*

- Brogan, James M.

- Brow, Gregory S.

- Butzel Long

- Carlock, Copeland & Stair LLP

- Charnes, Adam H.

- Cheesbro, Honorable Benjamin J.

- Clearly, Gottlieb, Steen & Hamilton, LLP

- Coleman, Yovanovitch & Koester, P.A.

- Dentons US, LLP

- Devisee, Matthew B.

- Dickert, Neal W.

- DLA Piper LLP

- Dycus, J. Patton

- Electrolux Home Products, Inc.

- Electrolux North America, Inc.

- Elsberg, David L.

- Epps, Brian K.

- Garroway, Nathan L.

- Gay, Faith E.

11th Cir. No. 23-10935

*Whitesell Corporation v. Husqvarna Outdoor Products, Inc., et al.*

- George, Jamie Smith

- Goldberg, Matthew A.

- Grant, James C.

- Hall, Honorable J. Randal

- Hartman Simons & Wood

- Hawes, IV, Walter H.

- Helmer, Elizabeth H.

- Herring, II, Wade Wilkes

- Honigman Miller Schwartz and Cohn LLP

- HTC-HVA, LLC

- Hudson, David E.

- Huff, Joseph H.

- Hull Barrett, PC

- Husqvarna AB (HUSQVY)

- Husqvarna Construction Products North America, Inc.

- Husqvarna Forestry Products N.A., Inc.

- Husqvarna Outdoor Products, Inc. now known as Husqvarna Consumer Outdoor Products, N.A., Inc.

- Husqvarna Professional Products, Inc.

11th Cir. No. 23-10935

*Whitesell Corporation v. Husqvarna Outdoor Products, Inc., et al.*

- Husqvarna U.S. Holding, Inc.

- Jerles, Lisa J.

- Kenny, Michael P.

- Keough, III, William James

- Kessler, Philip J.

- Kilpatrick Townsend & Stockton, LLP

- King & Spalding, LLP

- Klein, Sheldon

- Kluger, Alan J.

- Kluger Kaplan Silverman Katzen and Levine, PL

- Knox, Jr., Wyckliffe A.

- Koester, Edmond E.

- Konanova, Yelena

- Krock, Ronald John

- Lamken, Jeffrey A.

- Landon, Laurel Payne

- Leitman, Hal J.

- Li, Fu Shek Rocky

11th Cir. No. 23-10935

*Whitesell Corporation v. Husqvarna Outdoor Products, Inc., et al.*

- Lundbergs A.B. (LUND-B), a publicly traded company owning

  10% or more of Husqvarna, A.B.

- Magliolo, Caroline Marisa

- Meadows, Lauren E.H.

- Meyers, Terri

- MoloLamken LLP

- Morgan, III, Jack C.

- Odom, Mary Joy

- Oliver Manner, LLP

- Orbit Irrigation Products, LLC

- Rice, Patrick J.

- Roberts, Timothy D.

- Rosenthal, Jeffrey A.

- Rountree Leitman Klein & Greer, LLC

- Selendy & Gay PLLC

- Sentell III, R. Perry

- Shoemaker, Elizabeth Bown Reichart

- Silverman, Steve I.

- Sokoloff, Eugene A.

11th Cir. No. 23-10935

*Whitesell Corporation v. Husqvarna Outdoor Products, Inc., et al.*

- Stebbins, Charles C.

- Surden, Todd H.

- Taitt, Thuy Vu

- Troutman Pepper Hamilton Sanders, LLP

- Vernick, Scott M.

- Waide, Amanda M.

- Walker, Lucas M.

- Wallace, Kyle G.A.

- Washburn, James A.

- Weston, James S.V.

- The Weston Law Firm

- Whitesell Corporation

- Whitesell, Neil

## STATEMENT REGARDING ORAL ARGUMENT

Defendants request oral argument. Although the governing legal principles are straightforward, well established, and fully explained by the district court, the case has a long history and there is an extensive factual background to which those principles apply. For these reasons, Defendants believe that oral argument will assist the Court.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ..................................... C - 1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF CONTENTS .......................................................... ii

TABLE OF AUTHORITIES ...................................................... vi

INTRODUCTION ................................................................ 1

STATEMENT OF THE ISSUES .................................................... 3

STATEMENT OF THE CASE ..................................................... 4

A.  The parties attempted to create the SPA and Settlement
    Memorandum. ........................................................... 5

B.  The district court concluded that the subject matter of
    both the SPA and Settlement Memorandum was
    indefinite and unenforceable. .......................................... 9

C.  The district court sanctioned Whitesell after Whitesell
    repeatedly made misrepresentations to the court during
    discovery. ............................................................. 12

D.  The district court denied Whitesell's sanctions motion. ............... 18

E.  The district court granted summary judgment on
    Whitesell's price-increase claims. .................................... 18

F.  The district court denied Whitesell's motion to amend its
    complaint to seek prejudgment interest. .............................. 20

G.  The jury ruled for Husqvarna on its affirmative defense
    and for Husqvarna and Electrolux on their counterclaims. ........... 21

H.   Standard of review. ..........................................................23

SUMMARY OF THE ARGUMENT ......................................24

ARGUMENT ............................................................................27

I.   The district court correctly held that the subject matter of the agreement was too indefinite to enforce.................................27

    A.   The subject matter of the SPA is incomplete and indefinite. .................................................................27

    B.   None of Whitesell's arguments save the SPA. .....................30

    C.   The district court did not misconstrue the Settlement Memorandum. ..................................................39

        1.   The district court correctly concluded that "wireform parts" and "parts in process of being transitioned" were too indefinite to enforce. ..............39

        2.   The district court correctly concluded that the Settlement Memorandum supplanted the SPA. .........41

    D.   The district court did not abuse its discretion by not granting additional discovery. ...............................................42

    E.   The district court did not abuse its discretion in denying Whitesell's sanctions motion..................................44

II.   The district court did not abuse its discretion in sanctioning Whitesell.......................................................................45

    A.   The district court had discretion to sanction Whitesell.................................................................47

        1.   The district court appropriately exercised its discretion to strike Whitesell's lost profits claims under Rule 37. .................................................47

2.  The district court appropriately exercised its discretion to strike Whitesell's lost profits claims under its inherent authority. ...........................55

B.  The district court considered alternative sanctions and correctly determined that striking Whitesell's lost profits claims was necessary.........................................57

III.  The district court correctly granted summary judgment on Whitesell's price-increase claims. ...................................59

A.  The undisputed record shows that Electrolux requested evidence to justify Whitesell's price increases. ..................................................................60

B.  The undisputed evidence shows that Whitesell failed to provide sufficient cost increase evidence..........................64

IV.  The district court, in its sound discretion, properly denied Whitesell's request to amend its complaint to add prejudgment interest.......................................................66

A.  The court did not abuse its discretion in denying Whitesell's untimely motion to amend. ...............................66

B.  The district court correctly found that amendment would be futile. .....................................................68

V.  The district court properly exercised its discretion in excluding irrelevant evidence that would unfairly prejudice and confuse the jury. .....................................71

A.  The district court properly excluded the "bad-faith emails." ............................................................71

B.  The district court properly excluded evidence regarding unpaid invoices...................................................77

C.  The district court properly excluded evidence of events purportedly leading to the consent order.................79

iv

CONCLUSION ........................................................................................82

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AgriCommodities, Inc. v. J.D. Heiskell & Co.,*
    676 S.E.2d 847 (Ga. Ct. App. 2009) .......................................... 28, 41

*Alan's of Atlanta, Inc. v. Minolta Corp.,*
    903 F.2d 1414 (11th Cir. 1990) ...................................................... 76

*Anderson v. Anderson,*
    552 S.E.2d 801 (Ga. 2001) ............................................................. 31

*Anderson v. Brown Indus.,*
    No. 4:11-cv-0225, 2014 WL 12521732 (N.D. Ga. Mar. 14,
    2014) ................................................................................................ 80

*Avirgan v. Hull,*
    932 F.2d 1572 (11th Cir. 1991) ...................................................... 53

*Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.,*
    328 S.E.2d 426 (Ga. Ct. App. 1985) .......................................... 32, 33

* *Caradigm USA LLC v. PruittHealth, Inc.,*
    No. 1:15-cv-2504, 2018 WL 1959498 (N.D. Ga. Apr. 25,
    2018) ..................................................................... 67, 68, 69, 70

*Carmichael v. Kellogg, Brown & Root Servs., Inc.,*
    572 F.3d 1271 (11th Cir. 2009) ...................................................... 82

*Chudasama v. Mazda Motor Corp.,*
    123 F.3d 1353 (11th Cir. 1997) ...................................................... 82

*Clower v. Orthalliance, Inc.,*
    337 F. Supp. 2d 1322 (N.D. Ga. 2004) .......................................... 73

* *Consumer Fin. Prot. Bureau v. Brown,*
    69 F.4th 1321 (11th Cir. 2023) .......................................... 57, 58, 59

*Corsello v. Lincare, Inc.*,
    428 F.3d 1008 (11th Cir. 2005) ...................................................24

*Cox Caulking & Insulating Co. v. Brockett Distrib. Co.*,
    258 S.E.2d 51 (Ga. Ct. App. 1979) ...............................................33

*Douglas Asphalt Co. v. Martin Marietta Aggregates*,
    793 S.E.2d 615 (Ga. Ct. App. 2016) ..............................................28

*Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*,
    458 S.E.2d 170 (Ga. Ct. App. 1995) ..............................................28

*Endurance Am. Specialty Ins. Co. v. Liberty Mut. Ins. Co.*,
    34 F.4th 978 (11th Cir. 2022).........................................................74

*Farmer v. Argenta*,
    331 S.E.2d 60 (Ga. Ct. App. 1985) .........................................28, 29

*Feliciano v. City of Miami Beach*,
    707 F.3d 1244 (11th Cir. 2013) .....................................................60

*Gardner v. Marcum*,
    665 S.E.2d 336 (Ga. Ct. App. 2008) .......................................40, 41

*Ginsburg v. United States*,
    17 F.4th 78 (11th Cir. 2021)...........................................................23

*Great Lakes Ins. SE v. Waver Cruiser LLC*,
    36 F.4th 1346 (11th Cir. 2022).......................................................24

*Higgs v. Costa Crociere S.P.A. Co.*,
    969 F.3d 1295 (11th Cir. 2020) .....................................................47

*Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*,
    329 S.E.2d 554 (Ga. Ct. App. 1985) ..............................................32

*J. Lee Gregory, Inc. v. Scandinavian House, L.P.*,
    433 S.E.2d 687 (Ga. Ct. App. 1993) ..............................................35

*Jackson v. Williams*,
    434 S.E.2d 98 (Ga. Ct. App. 1993) ................................................ 36

*James River Ins. Co. v. Ultratec Special Effects Inc.*,
    22 F.4th 1246 (11th Cir. 2022) ....................................................... 63

*Josendis v. Wall to Wall Residence Repairs, Inc.*,
    662 F.3d 1292 (11th Cir. 2011) ...................................................... 42

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001) ........................................................ 40

*Malautea v. Suzuki Motor Co.*,
    987 F.2d 1536 (11th Cir. 1993) ................................................ 50, 54

*Malta Constr. Co. v. Henningson, Durham & Richardson, Inc.*,
    716 F. Supp. 1466 (N.D. Ga. 1989) .......................................... 69, 70

* *McTerry v. Free for All Missionary Baptist Church No. 1*,
    200 S.E.2d 915 (Ga. Ct. App. 1973) ........................................ 36, 44

*Moore v. Grady Memorial Hospital Corporation*,
    778 F. App'x 699 (11th Cir. 2019) ........................................... 72, 73

*Nationwide Agribusiness Ins. Co. v. Onionman Co.*,
    894 S.E.2d 152 (Ga. Ct. App. 2023) ............................................. 43

*Norair Engineering Corp. v. St. Joseph's Hospital, Inc.*,
    249 S.E. 2d 642 (Ga. Ct. App. 1978) ............................................ 70

*O.N. Jonas Co., v. Badische Corp.*,
    706 F.2d 1161 (11th Cir. 1983) ..................................................... 32

*OfficeMax, Inc. v. Sapp*,
    132 F. Supp. 2d 1079 (M.D. Ga. 2001) ........................................ 29

* *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*,
    549 F.3d 1344 (11th Cir. 2008) ................................... 51, 52, 54, 55

\* *Parks v. Atlanta News Agency, Inc.*,
    156 S.E.2d 137 (Ga. Ct. App. 1967) ........................................ 29, 30

*Pesaplastic, C.A. v. Cincinnati Milacron Co.*,
    799 F.2d 1510 (11th Cir. 1986) ..................................................... 24

*Phipps v. Blakeney*,
    8 F.3d 788 (11th Cir. 1993) ........................................................... 59

*Primary Invs. LLC v. Wee Tender Care III, Inc.*,
    746 S.E.2d 823 (Ga. Ct. App. 2013) ............................................. 65

*Reebaa Constr. Co. v. Chong*,
    657 S.E.2d 826 (Ga. 2008) ............................................................. 34

*Roberts v. Smith*,
    801 S.E.2d 915 (Ga. Ct. App. 2017) ............................................. 29

*Scovill Fasteners, Inc. v. Northern Metals, Inc.*,
    692 S.E.2d 840 (Ga. Ct. App. 2010) ............................................. 34

*St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co.*,
    198 F.3d 815 (11th Cir. 1999) ....................................................... 40

*Stuckey Health Care, Inc. v. State*,
    389 S.E.2d 349 (Ga. Ct. App. 1989) ............................................. 67

*Taliafaro, Inc. v. Rose*,
    469 S.E.2d 246 (Ga. Ct. App. 1996) ............................................. 63

*Transcon. Gas Pipe Line Co. v. 6.04 Acres*,
    910 F.3d 1130 (11th Cir. 2018) ..................................................... 42

*Trevor v. Icon Legacy Custom Modular Homes, LLC*,
    217 A.3d 496 (Vt. 2019) ................................................................. 50

*Turfgrass Group, Inc. v. Georgia Cold Storage Co.*,
    816 S.E.2d 716 (Ga. Ct. App. 2018) ............................................. 35

*United States v. Alvarez,*
    142 F.3d 1243 (10th Cir. 1998) ........................................................ 3

*United States v. Certain Real Property Located at Route 1,*
    126 F.3d 1314 (11th Cir. 1997) ................................................ 51, 52

*United States v. Thelisma,*
    356 F. App'x 217 (11th Cir. 2009) ................................................ 82

*United States v. Van Dorn,*
    925 F.2d 1331 (11th Cir. 1991) ...................................................... 82

*Wiley v. Tom Howell & Assocs., Inc.,*
    267 S.E.2d 816 (Ga. Ct. App. 1980) ...................................... 28, 40

*Zocaras v. Castro,*
    465 F.3d 479 (11th Cir. 2006) .................................................. 56, 57

## Statutes

O.C.G.A. §
    11-2-204(3) .............................................................................. 28, 38
    11-2-306(1) .................................................................................... 33
    13-3-1 ............................................................................................ 27
    13-6-13 .................................................................. 20, 26, 66, 67

## Rules

Fed. R. Civ. P.
    26(a) ............................................................................................ 48
    26(e) ............................................................................................ 48
    26(e)(1)(A) .................................................................................. 48
    37 ................................................ 17, 25, 46, 47, 50, 51, 52, 55
    37(b)(2) ........................................................................................ 51
    37(b)(2)(A) .............................................................................. 47, 48
    37(c) ........................................................................................ 47, 48
    37(c)(1) ........................................................................................ 48
    37(d) ............................................................................................ 51
    56(c)(4) ........................................................................................ 61

Fed. R. Evid.

    401 ............................................................................................ 80

    403 ............................................................................................ 77

# INTRODUCTION

As the district court correctly concluded, this litigation is founded on a largely unenforceable contract, entered into in December 2000. That contract was a requirements contract, under which Whitesell Corporation agreed to supply to Husqvarna Outdoor Products, Inc., and Electrolux Home Products, Inc., all of their current and future needs of certain fasteners and related parts. By its plain language, the original agreement signed by the parties required that they create an exhibit that would list the specific parts that Whitesell would supply. This exhibit was never created. Moreover, when the parties entered into a settlement memorandum intended to resolve their disputes, they did not create the exhibits listing the covered parts required by that memorandum, either.

Upon reviewing the agreement, the district court correctly determined that, without the required exhibit, the agreement's subject matter was too incomplete and too indefinite to enforce as a whole. Nevertheless, the district court examined the parties' course of performance and the terms of the settlement memorandum to save as much of the agreement as it could. The district court therefore properly

granted partial summary judgment, limiting the scope of the contract to definable groups of parts based on course of performance and the settlement memorandum.

The district court also correctly granted Defendants' summary judgment on Whitesell's claims related to its attempt to increase prices for parts it supplied under the parties' agreement. No reasonable jury could find that Whitesell complied with the agreement's requirements before Whitesell could raise prices. And the district court properly exercised its discretion in denying Whitesell leave to amend its complaint to seek prejudgment interest because Whitesell's motion for leave to amend was untimely and the amendment was futile.

On the claims that survived summary judgment, Whitesell sought to recover, among other damages, lost profits. But Whitesell concealed properly discoverable cost information from Husqvarna and Electrolux—information that was crucial for Defendants to defend against Whitesell's lost profit claims—and then lied to the court about it repeatedly. After holding a hearing, the district court ultimately sanctioned Whitesell for its gamesmanship and lies and struck the lost-profits claims. That was no abuse of discretion.

What remained of the case was finally tried to a jury in 2023, and the jury returned a verdict against Whitesell, and in favor of Husqvarna and Electrolux on their counterclaims. Whitesell points to no reversible error at the trial.

Litigation concerning the agreement now spans more than twenty years. The district court's docket contains almost 2,000 entries. Two decades of litigation and thousands of written submissions about a mostly unenforceable agreement are enough. None of Whitesell's arguments warrant reopening the case, let alone turning back the clock more than fifteen years to re-start discovery anew. "All litigation, even this litigation, must come to an end." *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998). The Court should affirm the judgment.

## STATEMENT OF THE ISSUES

1.    Whether the district court correctly held that the agreement as written was too indefinite concerning the products to be sold, and correctly found instead a narrower enforceable agreement based on the parties' course of performance.

2.    Whether the district court abused its discretion in striking Whitesell's lost profits claims after Whitesell repeatedly misrepresented

to the court that it did not have product-specific cost information

connected to its lost profits claims on its Industrial and Finance

System.

3.    Whether the district court correctly granted summary

judgment on Whitesell's price-increase claims because no reasonable

jury could find that Whitesell complied with the agreement's

requirements to raise prices.

4.    Whether the district court abused its discretion in denying

Whitesell's motion to amend because the amendment was  untimely and

futile.

5.    Whether the district court abused its discretion in excluding

evidence at trial that was unrelated to the remaining claims in the case.

## STATEMENT OF THE CASE

This case arises out of a supply agreement between Electrolux,

Husqvarna,[1] and Whitesell that was, in large part, unenforceable due to

indefiniteness.

---

[1] When the SPA was executed, Electrolux had an indoor division and an
outdoor division. During this case, Electrolux spun off its outdoor
division, which became Husqvarna. Husqvarna assumed the same
obligations as Electrolux. Dkt. 1880 at 25-27.

## A.    The parties attempted to create the SPA and Settlement Memorandum.

Electrolux manufactures household appliances, and Husqvarna manufactures outdoor equipment. Dkt. 584 at 6; Dkt. 585 at 5. Whitesell produces and distributes certain materials used to manufacture consumer products. Dkt. 578 at 1.

In December 2000, Electrolux and Whitesell signed the Strategic Partnership Agreement ("SPA"). Dkt. 127-2 at 2-21. The SPA set forth the terms and conditions under which Whitesell would supply parts to Electrolux and contemplated that Electrolux would purchase from Whitesell "all of [Electrolux's] current and future needs of cold headed/threaded fasteners and various related Class C items hereafter referenced as Good(s) (as herein after defined in section 2.1.2)." *Id.* at 5. Section 2.1.2 defined "Good(s)" in terms of generic categories of parts to be supplied by Whitesell, not particular parts:

> all cold headed/threaded fasteners, clips, wire ties, nuts, pins, special cold formed parts, screw machined parts, clamps, spacers, plastic fasteners, components, sub-components, or any type of material, whether identified by an Electrolux part number or not assigned to such part, and other Class C items in similar families and/or services.

*Id.* at 5-6. As for the specific parts to be supplied by Whitesell under the SPA, it contemplated an additional agreement by the parties, providing expressly that the precise "Good(s)" were to be listed on an "Exhibit B," titled "Goods to be Purchased by Electrolux from Whitesell." *Id.* at 6.

Exhibit B was integral to the SPA. The SPA provided that Exhibit B was to be updated every six months. *Id.* Exhibit B was not only meant to identify the Goods referenced in the SPA but also to provide pricing information. *Id.* at 7-8. Further, Exhibit B was crucial for determining discounts provided in the SPA. *Id.* at 6. The SPA provided Defendants with discounts only on a cumulative basis, so Exhibit B's identification of parts and related prices was vital to ensure that Defendants received the correct discounts. *Id.*

After the parties signed the SPA, Electrolux provided Whitesell with some pricing and usage data, so that Whitesell could develop an initial draft of Exhibit B. Dkt. 164 at 5. On February 27, 2001, Whitesell sent Electrolux its proposed draft. Dkt. 164-2. The cover letter for the draft stated that "this exhibit is not yet 100% complete." *Id.* at 1. The letter explained that Whitesell had not received all the information that it needed from Electrolux, and that it would "attempt to continue

to gather and obtain the rest of the information to complete the list for all of the parts covered under our agreement." *Id.* In addition, Whitesell's understanding of what constituted Class C parts changed over time as reflected in changes to the definition on its website. Dkt. 196 at 25, 27.

Electrolux had several issues with the proposed Exhibit B, which it viewed as a "computer dump." Dkt. 127-2 at 46. Electrolux also was concerned that several of the items listed on the draft were obsolete because Whitesell had used data from the previous year. *Id.* The parties agree that, as Whitesell expressly pleaded, "a completed Exhibit 'B' was never created."[2] Dkt. 68 at 20. Nonetheless, Whitesell began selling certain parts to Electrolux. Electrolux became Whitesell's largest customer, purchasing approximately 3.5 billion items, which was more than double the amount projected by Whitesell. Dkt. 212 at 10; Dkt. 173 at 48.

---

[2] Whitesell contends that Electrolux "'confirm[ed]' the parties were 'in agreement regarding the initial scope of products to be included in Exhibit B.'" Br. 6 (quoting Dkt. 162-2 at 45). This citation does not support Whitesell's assertion. In addition, the quoted language was written by Mr. Whitesell, *not Electrolux.* Dkt. 162-3 at 45.

Eventually, the parties disagreed about whether the SPA required Electrolux to purchase certain parts from Whitesell to use in one of Electrolux's tractor manufacturing plants. Dkt. 1 at 7. Whitesell threatened to discontinue supplying any parts unless Electrolux agreed to buy the additional parts. *Id.* at 8. To resolve this dispute, Electrolux filed its initial complaint on March 24, 2003, seeking declaratory judgment that it was not obligated to buy these parts. *Id.* at 10-12.

The parties eventually entered into a 2003 "Settlement Memorandum" to resolve all disputes under the SPA. Dkt. 127-2 at 35-44. The Settlement Memorandum required Electrolux and Whitesell to "mutually agree upon a clarified Exhibit 'B.'" *Id.* at 35. The clarified Exhibit B would include:

(1)  "Part[] numbers for all current parts Whitesell now supplies to [Electrolux]";

(2)  "Part numbers for parts in process of being transitioned, a list of which will be prepared by Whitesell as soon as possible"; and

(3)   Part numbers for certain parts being supplied by another

particular supplier (Bamal) as of a date certain, which were

going to be transitioned to Whitesell.

*Id.* at 35-36. The Settlement Memorandum further provided that

Whitesell would supply Electrolux with "Brunner and/or wireform

parts,"[3] as would be described in an Exhibit B-1, if Whitesell met

certain concurrent conditions. *Id.* at 36-37. The parties were supposed

to update both Exhibit B and Exhibit B-1 every six months. *Id.* at 36.

However, the parties never created a clarified Exhibit B or Exhibit B-1.

## B.   The district court concluded that the subject matter of both the SPA and Settlement Memorandum was indefinite and unenforceable.

Nearly two years after the parties entered into the Settlement

Memorandum, Whitesell reinitiated litigation against Electrolux and

Husqvarna, asserting several breach of contract claims. Dkt. 68.

Defendants filed a motion for judgment on the pleadings or

---

[3] "Brunner parts" refer to certain parts Electrolux previously obtained from Brunner Drilling and Manufacturing. While the parties could not agree on the composition of the vague "wireform" category, bag catcher frames and bails supplied by Matrix Wire for use by Electrolux in the manufacture of walk-behind mowers were tendered for transition to Whitesell. The jury concluded that Whitesell did not meet its concurrent contractual obligations for the supply of these parts.

alternatively for partial summary judgment. Dkt. 127; Dkt. 161. After

the parties briefed the motion, the district court requested additional

briefing concerning, *inter alia*, whether the SPA was unenforceable,

because the parties failed to clearly define its subject matter, and

whether the Settlement Memorandum cured any issues with the SPA.

Dkt. 191 at 5-7. The parties extensively briefed this issue. Dkt. 196;

Dkt. 198; Dkt. 208.

On October 14, 2008, the district court entered an order

concluding that the SPA's subject matter was too indefinite to enforce in

its entirety. Dkt. 212 at 22. The court examined the SPA's definition of

Goods, noting that it began "with a list of generic categories of parts"

and then "balloon[ed]" to include phrases such as "any type of material"

and "Class C items." *Id.* at 18. The court found that this list could not

"serve as a definite subject matter for a legally enforceable agreement."

*Id.* The court then found that the parties had failed to prepare an

Exhibit B as required under the SPA and, "[w]ithout an Exhibit B, or a

workable definition that clearly identifies the scope of parts covered, the

parties—and the Court—are left without a reasonably certain basis for

giving an appropriate remedy." *Id.*

The district court turned to whether the Settlement Memorandum cured the indefiniteness of the SPA. It found that the parties had never agreed upon a clarified Exhibit B or an Exhibit B-1. *Id.* at 9. The court determined that without the exhibits the Settlement Memorandum could be enforced as to only three definable groups of parts:

(1)    "all parts Whitesell was supplying to [Electrolux] as of the date of the Settlement Agreement";

(2)    "all Springfield Division parts which were being supplied by Bamal as of January 1, 2003"; and

(3)    "the 'Brunner' parts."

*Id.* at 22-23. The court concluded that the categories of parts described as "in the process of being transitioned" and "wire form" were too uncertain. *Id.* at 23. Finally, the court determined that a fourth category of parts fell within the subject matter of the agreement based on the parties' course of performance, explaining that "as to the parts which have been supplied under the contracts, the parties have, in effect, agreed that these items fall within the scope of the Agreements." *Id.* at 24. Thus, the court concluded that Whitesell could maintain

- 11 -

breach of contract claims to the extent that they were predicated on these four categories of parts. *Id.* at 24-25.

Whitesell filed a motion for reconsideration, arguing that the court granted summary judgment prematurely before additional discovery could take place. Dkt. 251; Dkt. 288 at 7-8. The court denied the motion, explaining that no additional discovery was needed because Goods was undefined as a matter of law without the required Exhibit B, and enforceability did not turn on the parties' subjective mindset. Dkt. 288 at 8-9. The court also noted that the Settlement Memorandum "settled any dispute with respect to the scope of parts covered by [the parties'] business relationship." *Id.* at 10.

After the summary judgment order, the parties created a joint discovery plan (Dkt. 488), limited to the parts at issue after that order. Dkt. 1011-1 at 1-3.

## C. The district court sanctioned Whitesell after Whitesell repeatedly made misrepresentations to the court during discovery.

In August 2014, during discovery, Defendants served multiple interrogatories and requests for production on Whitesell seeking any information related to the costs that Whitesell incurred to manufacture

or acquire each product it sold to Defendants, for use in preparing a defense against Whitesell's lost profits claims. Dkt. 1114 at 5-6; Dkt. 1114-3 at 7-8, 10-11, 20; Dkt. 1114-4 at 7, 9, 12-14, 25. A few months later, Defendants moved to compel Whitesell to produce information responsive to these requests. Dkt. 606. The district court ordered Whitesell to respond to the requests unless it had a well-founded objection. Dkt. 612 at 15.

The district court ultimately held several hearings concerning discovery. On August 14, 2015, the court addressed "the requests and interrogatories that went to obtaining cost and expense information for the" at-issue parts. Dkt. 683 at 7-8, 29. Defendants informed the court that they were seeking all "contemporaneous cost information" in "whatever form" that existed when Whitesell supplied the parts. *Id.* at 34. Defendants explained that they had learned from court records in other litigation that Whitesell used software called Industrial and Finance System ("IFS") that "provides actual cost by part," but that Whitesell had not produced this information. *Id.* at 30-31.

The district court directly asked Whitesell whether it had IFS cost data. *Id.* at 35. Whitesell repeatedly told the court that "[t]here is no

cost of goods document." *Id.*; *see also id.* at 36-39. Whitesell told the court that the company used IFS software but did not store the cost information on the system. *Id.* at 36. The court ordered Whitesell to provide an interrogatory response verifying Whitesell did not have any other information related to the cost of goods and that the cost of goods was "not tracked in the IFS." *Id.* at 44, 48. Whitesell stated that it would provide the response, maintaining that "we don't have a document that says, 'The cost of this part is X' . . . It just doesn't exist." *Id.* at 46. Whitesell ultimately submitted a certification stating that it "produced all responsive data and information, in its possession, custody and control concerning product costs and expenses." Dkt. 923-1 at 1.

During subsequent hearings, Whitesell continued to tell the court that it did not possess any information related to product-level cost data. On January 21, 2016, Whitesell informed the court that "the IFS system never was operational with respect to the relationship with the defendants" and maintained that Whitesell did not have any documents related to product costs. Dkt. 775 at 92. On April 27, 2016, Defendants again raised the issue of producing product-level cost data. Dkt. 819 at

105-06. Whitesell stated that the "cost of parts" was "never . . . put into a program that we could press a button and get it." *Id.* at 115-16. The court took Whitesell at its word, informing Defendants that "I am at a loss at what more I can order or compel in this case. I mean, he's certified that they provided you all the documentation they had on product cost and expense information." *Id.* at 123. Finally, during a November 16, 2016, hearing, Whitesell again told the court that "[w]e do not track cost . . . information on a part-by-part basis. That has been said from the first time that we stepped into this courtroom." Dkt. 873 at 95.

Near the end of discovery, Defendants learned that, contrary to Whitesell's repeated representations to the court, in fact it used the IFS system for the SPA and that system included product cost information, which Defendants had been requesting for nearly four years. Dkt. 1070 at 7; Dkt. 1114-3 at 7-8, 10-11, 20; Dkt. 1114-4 at 7, 9, 12-14, 25. During his deposition, Whitesell employee Christopher Jones stated that a "cost number" existed on a "per part detail level" on Whitesell's IFS system. Dkt. 1070-13 at 5. Anytime Whitesell began supplying a new part, it would create an entry on the IFS system and add a cost number for that

part. *Id.* at 4-5. Jones also stated that the IFS system maintained historical information from individual purchase orders. *Id.* at 5-6. In a separate deposition, Whitesell's Rule 30(b)(6) witness Neil Whitesell confirmed that the company filled out a "standard cost field" on its IFS system. Dkt. 1070-1 at 5, 8, 11.

Defendants filed a motion to compel Whitesell to produce the IFS cost data. Dkt. 1028. After the close of fact discovery, Whitesell revealed that, without informing Defendants, it had produced some of this information just before Defendants' deposition of Neil Whitesell—the President and CEO of Whitesell—but buried the information within a large production. Dkt. 1070 at 8; Dkt. 1159 at 5 n.7.

Defendants then filed a motion seeking sanctions against Whitesell. Dkt. 1070. Whitesell argued that the product-level cost data from the IFS system was irrelevant because the information did not reflect actual costs. Dkt. 1099 at 7, 17. Contrary to this assertion, however, the IFS cost data for at least some parts clearly reflected actual costs. Dkt. 1114-19 at 2; Dkt. 1114-20 at 2-14; Dkt. 1114-21 at 2; Dkt. 1114-22 at 2.

The district court held a hearing on Defendants' motion for sanctions. Dkt. 1127. Whitesell argued that the product-level cost data from the IFS system was irrelevant because it was inaccurate. Dkt. 1162 at 13-14. The court responded that Whitesell had previously represented that the IFS cost data "did not exist"—it never told the court that the information existed but was inaccurate. *Id.* at 24.

After the hearing, the district court sanctioned Whitesell by striking its lost profits claims. Dkt. 1159. The court based its sanctions on multiple parts of Federal Rule of Civil Procedure 37 and its inherent authority. *Id.* at 7-8. The court concluded that Whitesell "had violated its discovery obligations and had misled Defendants and the Court." *Id.* at 1. The court also determined that Whitesell had acted in bad faith by representing that the IFS system's product-level cost data did not exist and by arguing that it was irrelevant. *Id.* at 14. It explained that Whitesell could "not unilaterally determine what evidence it will disclose and produce based upon its own evaluation of its usefulness or relevance." *Id.* at 6. Finally, the court concluded "that the only appropriate sanction" was to strike Whitesell's lost profits claims because Defendants' inability to use the IFS cost data throughout

discovery imposed "extraordinary" prejudice on Defendants. *Id.* at 13-14.

**D.    The district court denied Whitesell's sanctions motion.**

Whitesell then filed its own motion for sanctions seeking to reinstate its lost profits claim. Dkt. 1175. Whitesell based its motion on the  court's ruling from three years prior concerning some emails that Whitesell sought during discovery. *Id.* at 6. In that ruling, the court made "no definitive finding of spoliation." Dkt. 755 at 4, 12; Dkt. 1497 at 7.

The court denied Whitesell's motion. Dkt. 1497 at 11. It found that Whitesell waited an "unreasonable" amount of time to file its motion and that nothing showed that Defendants acted in bad faith. *Id.* at 6-7, 10. Moreover, the court concluded that Whitesell experienced no prejudice because the relevant emails did not relate to Whitesell's remaining claims. *Id.* at 9-10.

**E.    The district court granted summary judgment on Whitesell's price-increase claims.**

Whitesell asserted claims against Defendants for their alleged failure to pay increased prices on certain parts. Dkt. 68. Under the SPA, Whitesell was required "to maintain and hold firm all pricing for the

duration of the Agreement." Dkt. 127-2 at 8. Whitesell could request a price increase only if "an adverse market situation" drastically affected its costs. *Id.* If Whitesell sought to increase prices for "any Good(s)," Defendants could ask for "cost increase evidence . . . for any requested changes in any specific unit prices." *Id.* To fulfill this request, Whitesell had to provide "reasonable documentation" justifying the price increase. *Id.*

In 2005 and 2007, Whitesell notified Electrolux that it intended to raise prices on certain parts. Dkt. 267 at 2; Dkt. 290 at 1. In emails and during phone calls, Electrolux requested that Whitesell provide evidence to justify the price increase. Dkt. 289 at 1-3; Dkt. 290 at 1, 3. Whitesell pointed to information it previously provided in 2004, which consisted only of some newspaper articles describing the rise of steel prices, a chart titled "Taiwan Wire Analysis," and six invoices written in Mandarin. Dkt. 266-1 at 3-9; Dkt. 266-23 at 4-14. Whitesell never explained how these documents, or a general increase in the price of steel, justified price increases on specific parts. Dkt. 289 at 3.

The parties filed cross motions for partial summary judgment on Whitesell's price-increase claims. Dkt. 264; Dkt. 292. Whitesell offered

no evidence genuinely disputing that Electrolux requested Whitesell provide it with reasonable documentation justifying the price increases. Dkt. 265 at 13-19. And Whitesell did not even contest that Electrolux requested such documentation until its reply brief.[4] Dkt. 308 at 2; Dkt. 372 at 15. The district court granted Defendants' motion and denied Whitesell's motion. Dkt. 372. The court found undisputed evidence that "[Electrolux] requested evidence justifying the 2005 price increases." *Id.* at 19. The court concluded that no reasonable jury could find that Whitesell provided reasonable documentation to justify the price increases. *Id.* at 22. It noted that Whitesell had provided evidence of a general increase in the price of steel but had raised prices on some parts that contained no steel. *Id.* at 20-21. In addition, Whitesell's price increases for specific parts "ranged from 3.01% to 95.64%" without any evidence justifying the differences. *Id.* at 21.

## F.    The district court denied Whitesell's motion to amend its complaint to seek prejudgment interest.

More than a decade into litigation, Whitesell moved to amend its complaint to seek prejudgment interest under O.C.G.A. § 13-6-13. Dkt.

---

[4] Whitesell never denied that Electrolux requested reasonable documentation for the 2007 price increase. Dkt. 308 at 6.

801. The district court denied the motion after concluding that the amendment was untimely and futile. Dkt. 818. The court explained that Whitesell was not entitled to prejudgment interest because its "monetary loss was not ascertainable at the time of a particular breach," as required by Georgia law. *Id.* at 7.

## G. The jury ruled for Husqvarna on its affirmative defense and for Husqvarna and Electrolux on their counterclaims.

The case proceeded to trial in 2023. Whitesell's only remaining claim was against Husqvarna, alleging that it breached its contractual obligation by failing to pay for Whitesell's inventory of certain parts supplied by Brunner and Matrix Wire ("Brunner and Matrix Parts") during the failed transition effort. Dkt. 1886 at 140, 1661-62. Husqvarna asserted an affirmative defense and its own counterclaim alleging that Whitesell breached its obligations under the contract because it was not capable of or willing to supply the Brunner and Matrix Parts at contract prices. *Id.* at 156-57. In addition, both Husqvarna and Electrolux asserted counterclaims for damages resulting from Whitesell's failure to provide a timely and accurate inventory list during the phase-out period of the SPA. *Id.* at 157-59.

Before trial, the district court made several evidentiary rulings. The court excluded several internal Electrolux emails from 2004 and 2005 that included some employees' general thoughts about Whitesell, and dissatisfaction with the contract, but did not discuss the Brunner or Matrix Parts at issue. Dkt. 1863 at 109-11. The court found these emails not "relevant to the remaining claims." *Id.* at 60, 111. The court also reasoned that the emails created an "extremely high" risk "of prejudice and confusion to the jury" because they would needlessly expand the scope of the trial. *Id.* at 4, 112. Similarly, the district court excluded evidence that Defendants decided to pay outstanding invoices rather than proceed to trial on those claims. Dkt. 1874 at 70. Again, the court held that this evidence was irrelevant because it was unrelated to the Matrix and Brunner Parts and Defendants' payment satisfied Whitesell's claim for unpaid invoices. *Id.* Finally, the court excluded evidence leading up to a consent order entered into in 2005 after Whitesell moved to enforce the Settlement Memorandum. The court likewise found this evidence was irrelevant to the claims remaining to be tried. Dkt. 1863 at 47-197.

The jury returned a verdict for Defendants. Dkt. 1851. First, the jury found for Husqvarna on its affirmative defense to Whitesell's breach of contract claim. *Id.* at 2. Second, the jury found for Husqvarna on its breach of contract counterclaim against Whitesell regarding the Brunner and Matrix Parts and awarded Husqvarna $5,880,262. *Id.* at 2-3. Third, the jury found for Husqvarna and Electrolux on their breach of contract counterclaims related to the phase-out period of the parties' agreement. *Id.* at 3-4. It awarded Husqvarna $1,853,285 and Electrolux $1,192,527 for these counterclaims. *Id.* The district court entered judgment for Husqvarna and Electrolux, including other amounts previously awarded by the court and less certain setoffs not at issue here. Dkt. 1860 at 2-3.

## H.    Standard of review.

This Court reviews "the district court's summary judgment de novo, viewing the facts and drawing all reasonable inferences in the light most favorable to the non-moving party." *Ginsburg v. United States*, 17 F.4th 78, 83 (11th Cir. 2021).

A district court's decisions imposing discovery sanctions, denying amendments to a complaint, and excluding evidence are reviewed for

an abuse of discretion. *Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 799 F.2d 1510, 1519 (11th Cir. 1986); *Great Lakes Ins. SE v. Waver Cruiser LLC*, 36 F.4th 1346, 1353 (11th Cir. 2022); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005).

## SUMMARY OF THE ARGUMENT

Whitesell appeals five issues. None warrants reversal of the judgment.

*First*, the district court correctly concluded that the subject matter of the SPA was too indefinite to enforce the agreement entirely. Under Georgia law, a court cannot enforce a contract when its subject matter is incomplete or indefinite. The SPA expressly called for the creation of an Exhibit B to name the parts to be sold under the agreement, and the parties never created an Exhibit B. Without Exhibit B, the SPA's definition of Goods consisted of only extremely broad, amorphous terms—such as "components," "subcomponents," "any type of material," and "Class C items"—that do not define the SPA's subject matter. Similarly, the parties failed to create a clarified Exhibit B and Exhibit B-1 as required by the Settlement Memorandum. Faced with this incomplete and indefinite subject matter, the court correctly narrowed

the parties' agreement to the definite terms in the Settlement Memorandum and the parties' course of performance.

*Second*, the district court acted within its discretion under Rule 37 and its inherent authority to strike Whitesell's lost profits claims. Over the course of discovery, Defendants repeatedly sought product-level cost data from Whitesell's IFS system. During multiple discovery hearings, the court instructed Whitesell to produce all information related to product-level cost data. Whitesell repeatedly represented to the court that it did not possess this information and the IFS system contained no such data, but these representations were false. The court determined that Whitesell acted in bad faith based on factual findings that Whitesell does not dispute. It also correctly found that the "extraordinary" prejudice suffered by Defendants could be cured only by striking Whitesell's lost profits claims.

*Third*, the district court correctly granted summary judgment on Whitesell's price-increase claims. The undisputed record shows that multiple Electrolux employees requested that Whitesell provide evidence justifying its 2005 price increases as provided for under the SPA. In addition, no reasonable jury could find that Whitesell provided

Electrolux with reasonable documentation because Whitesell provided only evidence of a general rise in steel prices and could not show how this justified raising prices by different amounts on select parts, including parts that contained no steel.

*Fourth,* the district court did not abuse its discretion in denying Whitesell's request to amend its complaint to add prejudgment interest under O.C.G.A. § 13-6-13. Whitesell's amendment was untimely because Whitesell waited several years to amend its complaint to include prejudgment interest and then tried to amend without leave of the court. Moreover, Whitesell's amendment was futile because Whitesell's monetary loss was not ascertainable at the time of any alleged breach.

*Fifth*, the district court appropriately exercised its discretion when it excluded certain evidence from trial as irrelevant to the remaining issues at trial and because the evidence created a high risk of jury confusion.

This Court should affirm and end this 21-year-old case.

ARGUMENT

## I. The district court correctly held that the subject matter of the agreement was too indefinite to enforce.

Whitesell contends that the district court erred by concluding that the SPA was unenforceable because the agreement failed to adequately define its subject matter. Whitesell makes a similar argument concerning the Settlement Memorandum. Finally, Whitesell argues that the court erred by making these decisions without allowing for additional discovery. This Court should reject Whitesell's arguments.

### A. The subject matter of the SPA is incomplete and indefinite.

The district court correctly held that the subject matter of the SPA was incomplete and too indefinite for the contract to be enforceable in its entirety. Specifically, the court correctly determined that the SPA's definition of "Goods" encompassed "an indeterminate universe of physical items that cannot serve as a definite subject matter for a legally enforceable agreement." Dkt. 212 at 18.

Georgia law provides that "[t]o constitute a valid contract, there must be . . . a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. Georgia's Uniform Commercial Code does not "obliterate the common law rule that . . . the agreement must be

expressed plainly and explicitly enough to show what the parties agree upon; a contract cannot be enforced if its terms are incomplete or incomprehensible." *Drug Line, Inc. v. Sero-Immuno Diagnostics, Inc.*, 458 S.E.2d 170, 171 (Ga. Ct. App. 1995). The party that alleges that a contract exists has "the burden of proving its existence and its terms." *Douglas Asphalt Co. v. Martin Marietta Aggregates*, 793 S.E.2d 615, 617 (Ga. Ct. App. 2016).

"The test of an enforceable contract is whether it is expressed in language sufficiently plain and explicit to convey what the parties agreed upon." *Farmer v. Argenta*, 331 S.E.2d 60, 61 (Ga. Ct. App. 1985). Extrinsic evidence "may not be utilized to supply that which is essential to constitute a valid contract." *Wiley v. Tom Howell & Assocs., Inc.*, 267 S.E.2d 816, 818 (Ga. Ct. App. 1980). In addition, Georgia's UCC requires that a contract provide "a reasonably certain basis for giving an appropriate remedy." *AgriCommodities, Inc. v. J.D. Heiskell & Co.*, 676 S.E.2d 847, 851 (Ga. Ct. App. 2009) (quoting O.C.G.A. § 11-2-204(3)). "Although the law leans against the destruction of contracts on the ground of uncertainty, a contract is not enforceable if [i]t has not been shown, with any reasonable certainty, what the parties were

obligating themselves to do." *Roberts v. Smith*, 801 S.E.2d 915, 919 (Ga. Ct. App. 2017) (internal citation and quotations omitted).

Georgia courts and federal courts applying Georgia law have repeatedly held that "[a] promise, to be enforceable, must be sufficiently definite as to both time and subject matter." *Farmer*, 331 S.E.2d at 61; *see also OfficeMax, Inc. v. Sapp*, 132 F. Supp. 2d 1079, 1085 (M.D. Ga. 2001) (same). For example, in *Parks v. Atlanta News Agency, Inc.*, a defendant agreed to furnish the plaintiff with "a timely allotment of best selling books and other current items" and "advertising materials." 156 S.E.2d 137, 139 (Ga. Ct. App. 1967). Nothing in the agreement provided "details as to the kind or quantity of the books and materials." *Id*. Because the agreement provided no further information about the goods at issue in the agreement, the Georgia Court of Appeals determined that "the promise was too indefinite to be capable of enforcement." *Id.*

In this case, the SPA's subject matter consists of the Goods described in section 2.1.2 of the SPA. Like the generic terms "best selling books" and "advertising materials" in *Parks*, the SPA's description of Goods includes several generic items such as "pins,"

- 29 -

"components," and "subcomponents" without any further specificity.

Dkt. 127-2 at 5. Moreover, as the district court noted, the definition is

not limited to these generic items; it further "balloons" out and

encompasses "any type of material" and undefined "Class C items." Dkt.

127-2 at 5; Dkt. 212 at 18. Instead of narrowing the scope of Goods

within its text, the SPA left this for Exhibit B. Dkt. 127-2 at 6. But it is

undisputed that the parties never agreed on an Exhibit B that defined

the scope of Goods. Br. 34-35. Because no Exhibit B exists to define

Goods, the subject matter of the agreement is both incomplete and

indefinite like the terms in *Parks*.

Accordingly, the SPA did not provide "a reasonably certain basis

for giving an appropriate remedy" and "lacks an essential element

necessary for an enforceable contract." Dkt. 212 at 18, 22.

## B.    None of Whitesell's arguments save the SPA.

Whitesell's rebuttals of the district court's holding lack merit.

Whitesell first argues that the uncreated Exhibit B was not

intended to define the scope of the subject matter of the agreement but

instead was only "meant to track [Electrolux]'s changing needs." Br. 35.

At the outset, this argument is irrelevant. Whatever the function of Exhibit B, the SPA standing alone is incomplete and indefinite.

Moreover, this interpretation of the SPA makes no sense. The SPA required that the parties "shall" create an Exhibit B. Dkt. 127-2 at 6. The requirement that the parties create an Exhibit B is located within the SPA's definition of Goods directly after the list of undefined terms like "components" and "any type of material." *Id.* at 5-6. Within this context, the provision for Exhibit B can only be understood as contractual acknowledgment that the precise parts to be covered by the SPA were yet to be determined. *See Anderson v. Anderson*, 552 S.E.2d 801, 804 (Ga. 2001) ("Words, like people, are judged by the company they keep."). In addition, section 5.2 of the SPA clearly contemplates that the "Initial Pricing" of Goods should be included in Exhibit B (Dkt. 127-2 at 7), which is incompatible with Whitesell's contention that Exhibit B was intended only to track changes to parts and not define those parts initially.

Whitesell's argument concerning Exhibit B is also refuted by Neil Whitesell's contemporaneous actions confirming that Exhibit B was meant to define the SPA's subject matter. During a February 2002

meeting with Electrolux, Mr. Whitesell agreed that the definition of Goods "needed further clarification" and noted that this "clarification came in the form of a letter and Exhibit B sent to Electrolux on February 27, 2001." Dkt. 164-4 at 3. The proposed Exhibit B mentioned by Mr. Whitesell during the February 2002 meeting was by his own admission "not yet 100% complete." Dkt. 164-2 at 1.

Whitesell next argues that the SPA could include indefinite terms because it was a requirements contract. Whitesell concedes that the SPA describes Goods only in "broad terms" but contends that this "is how requirements contracts are supposed to work." Br. 31. Whitesell's description of requirements contracts is flatly wrong. The cases it cites all involved an undefined *quantity* term, not unspecified *goods*. *See O.N. Jonas Co., v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir. 1983) ("[T]he indefiniteness of the written quantity term does not invalidate the agreement."); *Integrated Micro Sys., Inc. v. NEC Home Elecs. (USA), Inc.*, 329 S.E.2d 554, 556 (Ga. Ct. App. 1985) ("the parties never ostensibly or implicitly specified or alluded to any quantity of computers"); *Billings Cottonseed, Inc. v. Albany Oil Mill, Inc.*, 328 S.E.2d 426, 429 (Ga. Ct. App. 1985) (the agreement required the buyer

to buy specified seeds that it "reasonably requires" and a seller to provide "seed sufficient to meet all reasonable requirements of" buyer). In its brief, Whitesell cites not a single case where a court upheld a contract with indefinite subject matter because it was a requirements contract.

Under Georgia law, requirements contracts remain enforceable when the *quantity term* is undefined because the buyer promises to purchase a specified product "exclusively" from a specific seller, *Billings Cottonseed*, 328 S.E.2d at 429, and the quantity is defined by the buyer's "requirements as may occur in good faith," *Cox Caulking & Insulating Co. v. Brockett Distrib. Co.*, 258 S.E.2d 51, 52 (Ga. Ct. App. 1979). The quantity of the specified goods can change as the buyer's requirements change, but the buyer remains obligated to purchase a quantity not "unreasonably disproportionate to any . . . comparable prior . . . requirements." O.C.G.A. § 11-2-306(1). However, if the contract does not identify the goods to be sold, the buyer cannot determine what goods the contract obligates it to purchase from the seller. This indefiniteness makes the contract unenforceable.

Whitesell also contends that the parties' conduct shows that the SPA was enforceable. Br. 32-34. But the parties' course of conduct cannot save the *entire*, undefined subject matter of the SPA; instead, course of conduct allows the court to enforce the contract only to the extent of the parties' performance. Under Georgia law, "a contract that may originally have been indefinite may later acquire *more precision* and become enforceable because of the subsequent words or actions of the parties." *Reebaa Constr. Co. v. Chong*, 657 S.E.2d 826, 829 (Ga. 2008) (emphasis added). For example, in *Scovill Fasteners, Inc. v. Northern Metals, Inc.*, a metal fastener manufacturer asserted a claim against a supplier, claiming that the supplier violated their agreement by failing to deliver certain "stock keeping items" within the deadline. 692 S.E.2d 840, 842 (Ga. Ct. App. 2010). On appeal, the Georgia Court of Appeals concluded that the parties' agreement "did not define the term 'stock keeping items,'" or "identify or designate the 'stock keeping items.'" *Id.* at 843. Because the terms of the agreement "lack[ed] . . . clarity," the court said it was appropriate to consider the "parties' behavior and their courses of performance and dealing" to determine the parties' intended agreement. *Id.*

In this case, the district court applied the parties' conduct to the SPA. The court explained that the parties' "course of performance cures the indefiniteness of the subject matter to the extent of the goods defined by their performance" and allowed Whitesell to seek relief for any parts that fell "under the Agreement based upon a demonstrated course of performance." Dkt. 212 at 24-25.

The cases relied on by Whitesell (Br. 32) are not to the contrary, as neither dealt with the subject matter of a contract. In *Turfgrass Group, Inc. v. Georgia Cold Storage Co.*, the court examined whether the parties' conduct related to warehouse receipts evidenced mutual assent to a contract. 816 S.E.2d 716, 721-23 (Ga. Ct. App. 2018). The definiteness of the agreement was not at issue. Similarly, in *J. Lee Gregory, Inc. v. Scandinavian House, L.P.*, neither party disputed that the agreement's subject matter concerned the installation of windows in an apartment. 433 S.E.2d 687, 687-88 (Ga. Ct. App. 1993). Instead, the court examined the parties' conduct to determine whether an agreement existed despite reservation provisions in the letter of intent. *Id.* at 690.

Finally, Whitesell argues that the SPA's definition of Goods was not "unenforceably vague" because a jury could determine the meaning

of the definition. Br. 36. This argument also fails. Parol evidence may be "admissible to explain an ambiguity" in a contract. *McTerry v. Free for All Missionary Baptist Church No. 1*, 200 S.E.2d 915, 916 (Ga. Ct. App. 1973). But parol evidence cannot be used in contracts like the SPA "where the degree of indefiniteness imparts no meaning at all [because] there is nothing to explain." *Id.*

Whitesell does not even attempt to explain how a jury could discern the meaning of such terms as "components," "sub-components," or "any type of material," which are all included within the definition of Goods. Without an agreed upon Exhibit B, nothing in the SPA gives these terms any meaning whatsoever. And Whitesell does not point to any potential evidence that would provide them meaning. These amorphous terms alone render the indefiniteness of the SPA's subject matter "so extreme as not to present anything upon which the contract may operate in a definite manner." *Jackson v. Williams*, 434 S.E.2d 98, 100 (Ga. Ct. App. 1993).

Whitesell fares no better arguing that other terms within the definition of Goods are sufficiently definite for the SPA to be enforceable. For example, Whitesell points out that an industry

definition exists for the term "fasteners." Br. 37. However, Whitesell's proffered definition highlights the term's breadth and indefiniteness, stating in part that the "names given to fasteners appear to be as limitless as the designer's imagination." Dkt. 196 at 7, 29.

Whitesell also fails to explain how "Class C items" provide any definitiveness to Goods' definition. Whitesell contends that discovery showed that Class C items were "'lower-cost, lower-risk items' that are identifiable 'based on cost.'" Br. 39 (quoting Dkt. 1726-2 at 2). But the adjective "lower" or a range of costs falls far short of identifying any particular Class C items.

The indefiniteness of Class C items is underscored by the definitions of the term on Whitesell's own website. In 2007, Whitesell's website explained that Class C items are "high volume, low cost" materials that "cover[] a very broad spectrum of products" and included a laundry list of vague terms such as "Abrasives," "Cloth + Felt Products," and "Bagged and Kitted Components." Dkt. 196 at 25. The list concluded with "And Many Others," further underlining the indefinite nature of Class C items. *Id.*

Whitesell's understanding of Class C items also has changed over time. On its 2004 website, Whitesell's definition of Class C items included far fewer materials than the 2007 version but—in a significant break from its 2007 definition—stated that Class C items included "higher value components." *Id.* at 27. Thus, Whitesell's website makes clear that the term "Class C items" is a moving target with no fixed definition.

The SPA's indefinite subject matter is further highlighted by Whitesell's failure to explain how the agreement would provide the court with a reasonable basis for granting relief as required by O.C.G.A. § 11-2-204(3). Because the identity of the products governed by the SPA is indeterminate and unknowable, it is simply impossible for the court to award breach of contract remedies. Indeed, Whitesell's only suggestion is that expert testimony could be used to guide the jury. Br. 39. But Whitesell never explains how an expert witness would provide more clarity to "any type of material" or any other of the broad descriptions of "Goods." Moreover, Whitesell does not cite a single case suggesting that an expert witness's testimony can substitute for a

meeting of the parties' minds to save a contract that is unenforceable due to indefinite subject matter.

## C. The district court did not misconstrue the Settlement Memorandum.

Whitesell next contends that the district court misconstrued the 2003 Settlement Memorandum. Specifically, Whitesell argues that the court erred by finding that the terms "wireform parts" and "parts in process of being transitioned" were indefinite. Whitesell also argues that the court erred by concluding that the Settlement Memorandum supplanted the SPA. Neither of these arguments is correct.

### 1. The district court correctly concluded that "wireform parts" and "parts in process of being transitioned" were too indefinite to enforce.

The Settlement Memorandum provided that the "parties will prepare . . . [and] mutually agree upon a clarified Exhibit 'B.'" Dkt. 127-2 at 35. Among other things, the clarified Exhibit B was intended to define "parts in process of being transitioned" by providing "[p]art numbers" for those parts. *Id.* It further provided that Whitesell would provide Electrolux with "wireform parts" that would be listed on an Exhibit B-1. *Id.* at 36. The district court found—and Whitesell does not dispute—that neither the clarified Exhibit B nor Exhibit B-1 were ever

created by the parties. Dkt. 212 at 9. Without Exhibit B and B-1, the

court concluded that these terms were "vague and indeterminate." *Id.* at

23.

Whitesell argues that the meanings of both "wireform parts" and

"parts in [the] process of being transitioned" are discernable and cites

cases on interpreting ambiguous contracts. Br. 40-41 (citing *Maiz v.*

*Virani*, 253 F.3d 641, 658-59 (11th Cir. 2001); *St. Charles Foods, Inc. v.*

*Am.'s Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999)). "There

is a difference between ambiguity, which imports doubleness and

uncertainty of meaning, and that degree of indefiniteness which

imports no meaning at all." *Wiley*, 267 S.E.2d at 818. Here, "wireform

parts" and "parts in the process of being transitioned" are not

ambiguous but completely undefined because of the absence of a

clarified Exhibit B and Exhibit B-1. Whitesell's argument fails to

acknowledge beyond a single footnote that these terms were intended to

be defined by Exhibits B and B-1.

By not completing Exhibits B and B-1 and defining the subject

matter of the agreement, the parties failed to assent to an essential

term resulting in an "unenforceable agreement to agree." *Gardner v.*

*Marcum*, 665 S.E.2d 336, 339 (Ga. Ct. App. 2008); *AgriCommodities, Inc.*, 676 S.E.2d at 851. "It is the duty of courts to . . . enforce contracts as made, and not to make them for the parties." *Gardner*, 665 S.E.2d at 339. Because the parties never reached an agreement concerning the definition of "wireform parts" and "parts in the process of being transitioned," a jury cannot decide claims based on this incomplete and undefined (but not yet sold by Whitesell) subject matter.

> **2.** **The district court correctly concluded that the Settlement Memorandum supplanted the SPA.**

Whitesell also argues that the district court incorrectly concluded that the Settlement Memorandum supplanted the SPA. This argument is refuted by the plain text of the Settlement Memorandum.

In the Settlement Memorandum, the parties expressed their intent to "resolve any and all disputes which they have with each other arising out of the [SPA]." Dkt. 127-2 at 35. As the district court correctly found, the parties' dispute centered on the identities of the parts subject to the SPA (Dkt. 212 at 6-7), so the Settlement Memorandum was intended to clarify the SPA in this area.

In any event, whether the Settlement Memorandum supplanted the SPA is irrelevant. As explained above, the district court correctly

concluded that the SPA as written was too indefinite to enforce. *Id.* at 18. Thus, the indefinite SPA could not support Whitesell's claims even if the Settlement Memorandum left the SPA intact.

### D. The district court did not abuse its discretion by not granting additional discovery.

Whitesell also argues that the district court should have granted additional discovery before concluding that the SPA was indefinite. Br. 43-46. The court did not abuse its discretion in denying additional discovery.

"[W]hether to allow discovery before ruling on a motion for summary judgment is ultimately a matter committed to the discretion of the district court." *Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1156 (11th Cir. 2018). A court's discovery ruling should be left undisturbed unless "the district court has made a clear error of judgment, or has applied the wrong legal standard." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1307 (11th Cir. 2011). "Moreover, discovery rulings will not be overturned unless it is shown that they resulted in substantial harm to the appellant's case." *Transcon. Gas Pipe Line Co.*, 910 F.3d at 1156 (internal quotation marks omitted). Whitesell cannot make these showings.

Whitesell contends that the court should have allowed it to obtain documents from Roger Leon related to the parties' intentions when entering into the SPA. But the court did not abuse its discretion in concluding that any additional discovery would be irrelevant because "in the absence of a complete and enforceable Exhibit B, the [SPA's] subject matter is too vague to provide a reasonably certain basis for affording an appropriate remedy." Dkt. 288 at 9. Whitesell once again tries to argue that additional evidence was necessary to determine whether Exhibit B was intended to give definitive content to the SPA or not. Br. 45. As explained above, the plain language of the SPA made clear that Exhibit B was intended to define the scope of the goods, so the district court did not need to resort to extrinsic evidence. *See Nationwide Agribusiness Ins. Co. v. Onionman Co.*, 894 S.E.2d 152, 160 (Ga. Ct. App. 2023) ("Extrinsic evidence cannot vary the terms of an unambiguous contract.").

To establish abuse of discretion, Whitesell has the burden to show that the court's denial of additional discovery substantially harmed its case. But Whitesell fails to explain what information it could have obtained in discovery to show that the SPA had a definite subject

matter. Whitesell says nothing about how additional discovery could define terms like "components," "sub-components," or "any type of material" (Dkt. 127-2 at 5), or why such evidence would be relevant. Indeed, no evidence that Electrolux or Husqvarna could have produced could have cured the SPA's indefiniteness or overridden the SPA's requirement that covered goods be identified on an Exhibit B. And as explained above, extrinsic evidence cannot be used to interpret a contract where the indefinite terms provide no meaning at all. *McTerry*, 200 S.E.2d at 916. Whitesell points out that it obtained evidence during discovery that Electrolux employees identified Class C items as "lower-cost, lower-risk items." Br. 46 (quoting Dkt. 1726-2 at 2). Similarly, Electrolux employee Don Market agreed that a "Class C definition is many SKUs, many vendors, low-dollar value items, high maintenance costs and disproportionate resource consumption." Dkt. 1726-1 at 4. But this hardly provides a definite scope to Class C items, let alone the definition of Goods as a whole.

### E.    The district court did not abuse its discretion in denying Whitesell's sanctions motion.

Whitesell contends that this Court should reverse the district court's order denying its request for sanctions against Electrolux and

Husqvarna related to a preliminary finding of spoliation because the

denial rested upon the summary judgment order on the SPA and

Settlement Memorandum. Br. 47-48. First, the district court correctly

granted summary judgment. *See supra*, at 27-42. Second, Whitesell is

incorrect concerning the basis of the court's denial. The court

alternatively denied sanctions because Whitesell's motion was untimely

and because no evidence showed that Defendants acted in bad faith,

(Dkt. 1497 at 10-11), so the denial is independent of the summary

judgment ruling. And Whitesell never disputes—and therefore waives

objection to—these grounds for denying sanctions.

## II.    The district court did not abuse its discretion in sanctioning Whitesell.

During numerous discovery hearings before the district court,

Defendants repeatedly requested that Whitesell comply with their

requests for production and produce *all* information related to the costs

incurred by Whitesell to manufacture or acquire the products it sold to

Defendants, including any such data on Whitesell's IFS system. This

product-level cost data was crucial for Electrolux and Husqvarna to

defend against Whitesell's lost profits claims. Dkt. 683 at 29; Dkt. 1070

at 3. In response to these requests, Whitesell *repeatedly* told the district

court that the IFS system contained no such information. Dkt. 683 at 35-36, 38-39; Dkt. 775 at 92; Dkt. 819 at 115-16; Dkt. 873 at 95. Whitesell ultimately certified to the court that it had "produced all responsive data and information, in its possession, custody and control concerning product costs and expenses." Dkt. 923-1 at 1. All of these representations were false. Near the end of discovery, Defendants learned during a deposition of a Whitesell employee that Whitesell's IFS system contained both cost "[a]t a per part detail level" and historical information based on individual purchase and shop orders. Dkt. 1070-13 at 5-6.

When Defendants discovered Whitesell's lies, they moved to compel Whitesell's production of this product-level cost data and also moved for sanctions. Dkt. 1028; Dkt. 1070. After holding a hearing, the court concluded that Whitesell had acted in bad faith, causing Defendants "extraordinary" prejudice. Dkt. 1159 at 13-15. Relying on Rule 37 and its inherent authority, the court sanctioned Whitesell by striking its lost profits claims. *Id.* at 7-8. Whitesell contends that the court abused its discretion in issuing this sanction. This argument is without merit.

**A.    The district court had discretion to sanction Whitesell.**

A district court's decision to impose sanctions is reviewed "for abuse of discretion, whether the sanction was imposed pursuant to Federal Rule of Civil Procedure 37 or the court's inherent power." *Higgs v. Costa Crociere S.P.A. Co.*, 969 F.3d 1295, 1304 (11th Cir. 2020). In this case, the court acted within its discretion when it struck Whitesell's lost profits claims after concluding that Whitesell had violated its discovery obligations and deliberately misled the court.

**1.    The district court appropriately exercised its discretion to strike Whitesell's lost profits claims under Rule 37.**

Whitesell contends that the district court abused its discretion because it struck Whitesell's lost profits claims before it issued an order instructing Whitesell to turn over product-level cost data from its IFS system. Br. 48-50. This argument overlooks the court imposed sanctions are based on violations of Rule 37(c) as well as Rule 37(b)(2)(A), ignores Whitesell's gross misrepresentations to the district court, and inaccurately states Eleventh Circuit law.

First, the district court imposed sanctions based on, *inter alia*, Rule 37(c). Dkt. 1159 at 7-8. Rule 37(c) allows a court to impose the

same sanctions as Rule 37(b)(2)(A), which include striking a pleading if
"a party fails to provide information . . . as required by Rule 26(a) or
(e)." Fed. R. Civ. P. 37(c)(1). Rule 26(e) requires a party to "supplement
or correct" its discovery "in a timely manner if the party learns that" the
information is incorrect or incomplete. Fed. R. Civ. P. 26(e)(1)(A).
Nothing in Rule 37(c) requires a prior court order before imposing
sanctions. Whitesell does not challenge the court's finding that it
violated Rule 37(c), so it has waived any challenge to sanctions based on
this provision.

Next, Whitesell's argument against sanctions ignores that its
misrepresentations to the district court prevented the court from
issuing a more specific order. The discovery hearings show that
Whitesell understood that the court required it to produce *all* product-
level cost data, including data from its IFS system. One of the primary
reasons for holding the discovery hearings was to address Defendants'
motion to compel the product-level cost data. Dkt. 606; Dkt. 612 at 17-
18; Dkt. 618 at 1-4. During the first hearing, Defendants made clear
that they were seeking *all* "contemporaneous cost information" in
"whatever form it may be in," including product-level cost data on a

"part-by-part basis" from the IFS system. Dkt. 683 at 30-34. The court pressed Whitesell about why it was not producing the information. *Id.* at 35. Whitesell expressed no confusion concerning Defendants' requests, but instead of producing the information it repeatedly misrepresented to the court that "[t]here is no cost of goods document." *Id.* at 35-41.

During subsequent hearings, Defendants continued to seek product-level cost information from Whitesell. Dkt. 819 at 105-06; Dkt. 873 at 85. Whitesell continued to lie to the district court that it did not have this information. Dkt. 775 at 92; Dkt. 819 at 115-16; Dkt. 873 at 95; Dkt. 923-1 at 1. For example, during the November 2016 discovery hearing, Whitesell's counsel told the court that "if you ordered us to produce additional information, I don't know what I would be able to give you…." Dkt. 873 at 99. Whitesell even went so far as to tell the court that "the IFS system never was operational with respect to the relationship with the defendants." Dkt. 775 at 92. The court accepted Whitesell's representations, stating during the April 2016 hearing that, "I am at a loss at what more I can order or compel in this case." Dkt. 819 at 123. But the court made clear that "to the extent that Mr.

Whitesell has information that is pertinent" then Whitesell's production "should be supplemented to provide that information." *Id. at* 128.

The hearing transcripts incontrovertibly show that Defendants requested that Whitesell produce all product-level cost information, and that the court required Whitesell to produce pertinent information. This satisfies any purported order requirement for sanctions. *See Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 n.7 (11th Cir. 1993) ("[An] oral discovery order is a valid basis for Rule 37 sanctions."). Once the court ordered Whitesell to produce *all* cost data, Rule 37 did not require the court to specify the specific subsets of cost data before issuing sanctions. Moreover, allowing Whitesell to avoid the consequences of its lies to the court would have perverse results: the court did not specifically mention the IFS cost data because it relied on Whitesell's lie that no such data existed, and Whitesell should not be able to take advantage of its misrepresentations. *See Trevor v. Icon Legacy Custom Modular Homes, LLC*, 217 A.3d 496, 513 (Vt. 2019) (explaining that a prior order to produce is not required when the party "represented to the court . . .that it had complied with its discovery obligations").

Whitesell's argument also fails because Eleventh Circuit precedent does not require that a court issue an order before striking a claim under Rule 37—even when proceeding under Rule 37(b)(2). Whitesell relies on *United States v. Certain Real Property Located at Route 1*, 126 F.3d 1314 (11th Cir. 1997), for this proposition. Br. 48. But the Eleventh Circuit has not interpreted *Certain Real Property* this way; instead, the Court has allowed district courts to strike claims absent a previous order. In *OFS Fitel, LLC v. Epstein, Becker & Green, P.C.*, the court struck the plaintiff's claim for attorney's fees under Rule 37(b)(2) and 37(d) because of the plaintiff's "complete and willful failure to provide the defendants with discovery" related to that claim. 549 F.3d 1344, 1350 (11th Cir. 2008). On appeal, this Court affirmed. *Id.* at 1366-67. The Court recognized *Certain Real Property* but explained that the decision only prevented striking a claim under Rule 37 "in 'the absence of either a motion to compel filed by the opposing party or an order of the court compelling discovery.'" *Id.* at 1366 n.23 (quoting *Certain Real Property*, 126 F.3d at 1318). The Court explained that the defendant had filed a motion to compel as an alternative to its sanctions motion, and that this was sufficient for dismissal sanctions under Rule

37 as long as the plaintiff's conduct was willful or in bad faith. *Id.* at 1366 nn.23-24.

The district court exercised its discretion to issue sanctions within the limits recognized by *Certain Real Property* and *OFS Fitel* because the court concluded that Whitesell acted willfully and in bad faith and because Defendants filed motions to compel. The court determined that Whitesell acted willfully and in bad faith because it repeatedly falsely denied the existence of information related to product-level cost data. Dkt. 1159 at 14. The court's findings are supported by the record. Dkt. 683 at 35-36, 38-39; Dkt. 775 at 92; Dkt. 819 at 115-16; Dkt. 873 at 95; Dkt. 923-1 at 1.

The district court found additional bad faith in Whitesell's argument that it did not produce the IFS costs data because it consisted of plug-in numbers that did not reflect actual costs. Dkt. 1159 at 14. The court's factual findings refuted this argument. *Id.* at 12. The court noted that it strained credulity that a placeholder number would extend several decimal points, as the IFS data did. *Id.* The court found "that the unit costs were updated or changed" and that "the prices negotiated by Plaintiff with a sub-supplier were the same as the unit cost entered

into IFS." *Id.* It also found a correlation between per-part costs in Whitesell's internal documents and the unit costs listed in the IFS system for the same parts. *Id.* For example, internal Whitesell emails showed that Whitesell negotiated the price of $7.20 for one part and $6.88 for another, which matched the costs in the IFS data. Dkt. 1114-19 at 2 (price listed for August 26, 2002 "Written quote"); Dkt. 1114-20 at 2–14. Similarly, another email showed that Whitesell negotiated to pay a sub-supplier $4.00 for a part; the IFS data reflected the cost as $3.999999. Dkt. 1114-21 at 2; Dkt. 1114-22 at 2. Although Whitesell persists in contending that the IFS system contains no actual unit-cost data (Br. 52), Whitesell does not dispute that the record supports these findings. Dkt. 1114 at 12-15; Dkt. 1114-19 at 2; Dkt. 1114-20 at 2-14; Dkt. 1114-21; Dkt. 1114-22; Dkt. 1162 at 129, 134.

Moreover, the district court correctly explained that Whitesell could not deny the existence of information just because Whitesell unilaterally believed that it did not reflect product-level cost data. *See Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir. 1991) ("The district court has wide discretion in determining the scope and effect of discovery ...."). If Whitesell genuinely believed that the IFS information

was not responsive to the district court's directive, it should have raised the question with the court—not lied about the existence of the data. *See Malautea*, 987 F.2d at 1543 (upholding sanctions partly because party failed to ask district court "to clarify" its rulings). For these reasons, the district court correctly concluded that Whitesell acted in bad faith.

Further, like the defendant in *OFS Fitel*, Defendants moved to compel Whitesell to produce product-level cost data from its IFS system. First, Defendants filed a motion to compel in November 2014 after Whitesell refused to comply with Defendants' August 2014 discovery requests. Dkt. 606; Dkt. 1114-3 at 7-8,10-11, 20; Dkt. 1114-4 at 7, 9, 12-14, 25. Then, Defendants repeatedly asked for this information during the discovery hearings and filed another formal motion when they discovered Whitesell's falsehoods. Dkt. 1028; Dkt. 1070 at 3 n.1.

Although it ignores Defendants' 2014 motion to compel, Whitesell claims that it provided responsive information to Defendants before Defendants filed their second motion to compel. Br. 49. But Whitesell buried certain of the requested information in inventory transaction spreadsheets that were part of a mountain of documents produced

during the final week of discovery and a day before the deposition of Whitesell's Rule 30(b)(6) witness. Dkt. 1033 at 2. Although Defendants had asked for this data literally for years, Whitesell did not inform them that some of the IFS information was included in the massive production until after Defendants filed their motion to compel. Dkt. 1070 at 12-13; Dkt. 1159 at 5 n.7.

Whitesell also argues that the district court never ruled on Defendants' motion to compel. But, as explained above, the court repeatedly instructed Whitesell to produce all product-level cost data. In any event, *OFS Fitel* does not require that the court rule on a motion to compel before issuing sanctions. Accordingly, the court met all the requirements to exercise its discretion to strike Whitesell's lost profits claims.

> **2.      The district court appropriately exercised its discretion to strike Whitesell's lost profits claims under its inherent authority.**

In addition to Rule 37, the district court explained that its sanctions order was grounded in the court's inherent authority. Dkt. 1159 at 7 n.8. This was not an abuse of discretion.

Whitesell argues that the district court could not rely on its inherent authority because that requires a finding of bad faith. Br. 54. But the court correctly determined that Whitesell acted in bad faith by representing that the requested IFS information did not exist and by thereafter asserting that it did not produce the information because it was irrelevant. *See supra*, at 52-54. Whitesell argues that the court did not properly consider its arguments that the IFS data was "meaningless" and irrelevant. Br. 52, 55. But the court considered and rejected these arguments, finding that the data was not meaningless and therefore was discoverable. *See supra*, at 52-53. Whitesell does not challenge those factual findings on appeal. Accordingly, the court made the requisite finding of bad faith to invoke its inherent authority.

Whitesell also argues that the district court could not apply sanctions based on its inherent authority because such "[s]anctions are intended to prevent unfair prejudice to litigants and to ensure the integrity of the judicial process." Br. 55. As an initial matter, Whitesell relies on *Zocaras v. Castro*, 465 F.3d 479 (11th Cir. 2006), but that case did not create a blanket rule that sanctions must be justified only on these grounds. In *Zocaras*, this Court simply stated that a district court

could consider both things without abusing its discretion. *See id.* at 484-85.

Even if sanctions were appropriate only to protect the judicial process and prevent unfair prejudice, both requirements are met here. Whitesell's actions unfairly prejudiced Defendants by preventing them from using the IFS product-level cost data before the close of discovery. Sanctions also protected the judicial process by deterring Whitesell and other future litigants from repeatedly making misrepresentations to the court concerning discovery. Permitting Whitesell to pursue its lost profits claims "would take the punch out of the punishment for pummeling the probity of the judicial system." *Id.* at 484.

### B. The district court considered alternative sanctions and correctly determined that striking Whitesell's lost profits claims was necessary.

The district court also did not abuse its discretion by declining to apply lesser sanctions. "Although the district court is always required to assess whether lesser sanctions would suffice, it is not required to explicitly say as much when the rest of its analysis makes that finding obvious." *Consumer Fin. Prot. Bureau v. Brown*, 69 F.4th 1321, 1331 (11th Cir. 2023). And "the Supreme Court has warned against viewing

dismissal as too extreme when reviewed on appeal with the benefit of hindsight." *Id.* at 1331-32. Here, the court held a hearing to consider appropriate sanctions, and it concluded that the "only appropriate sanction" was to strike Whitesell's lost profits claims. Dkt. 1159 at 2, 14. This conclusion was appropriately within its discretion.

Whitesell argues that the district court failed to consider lesser sanctions. Br. 52-54. This is not true. The court determined that no other sanctions could adequately repair the prejudice Defendants experienced by not receiving the requested IFS information earlier in discovery. Dkt. 1159 at 14.

The lesser sanctions suggested in Whitesell's brief would not have sufficed. Barring Whitesell from using the IFS data at trial would not have repaired the prejudice Defendants experienced from not having the benefit of that information during discovery to rebut Whitesell's lost profits claims. Because of Whitesell's lies, Defendants were unable to use the IFS data during their depositions of Whitesell employees, and Defendants' experts were unable to use the data when developing their opinions. Whitesell also suggests that the district court should have extended discovery. But at the time of the sanctions order, Defendants

had already expended tremendous resources taking depositions of numerous Whitesell witnesses. It would be unfair to force Defendants to re-do those depositions, at substantial cost, because of Whitesell's misconduct. Moreover, this case had gone on for more than fifteen years. The court was under no obligation to further extend this case to compensate for Whitesell's bad faith.

In addition, this Court has stated that "the failure to explain why a lesser sanction was not used" can result in reversal only "in the close cases." *Phipps v. Blakeney*, 8 F.3d 788, 791 (11th Cir. 1993). This was not a close case. As detailed above, Whitesell repeatedly misled the district court for years. Considering this misconduct, the court was within its discretion in concluding that lesser sanctions would not suffice. *See Consumer Fin. Prot. Bureau*, 69 F.4th at 1332 ("[W]e decline to second-guess the district court's conclusion that reopening discovery would not be fruitful in this case that it was intimately familiar with.").

## III.  The district court correctly granted summary judgment on Whitesell's price-increase claims.

The district court granted summary judgment on Whitesell's price-increase claims after determining that it was undisputed that (1) Electrolux asked Whitesell to justify its 2005 price increases in

- 59 -

compliance with SPA section 5.5; and (2) Whitesell did not supply

reasonable documentation for the price increases. Dkt. 372 at 17-23.

Whitesell contends that there are genuine jury questions as to both

issues. But its arguments are meritless.

### A. The undisputed record shows that Electrolux requested evidence to justify Whitesell's price increases.

Before Whitesell could raise prices, section 5.5 of the SPA required

it to provide evidence justifying the cost increases for specific items

"upon the request of Electrolux." Dkt. 127-2 at 8. There is no genuine

dispute of fact as to whether Electrolux requested this evidence.

Electrolux employees Roger Leon and Don Market testified in

declarations that Electrolux contacted Neil Whitesell and other

Whitesell employees multiple times in 2005 seeking evidence that

supported Whitesell's price increases. Dkt. 289 at 1-3; Dkt. 290 at 1.

Whitesell argues that these affidavits are not "contemporaneous

evidence." Br. 57. But there is no "contemporaneous evidence"

requirement for summary judgment, and sworn declarations can

support summary judgment. *See Feliciano v. City of Miami Beach*, 707

F.3d 1244, 1247 (11th Cir. 2013). Declarations that provide first-hand

evidence of past events suffice at summary judgment. Fed. R. Civ. P. 56(c)(4).

Despite Mr. Leon's declaration that he made "repeated requests" for evidence (Dkt. 289 at 3), Whitesell argues that a jury could view this and Mr. Market's declarations as "simply pushing back" on Whitesell raising prices, Br. 58. But that is plainly not what the declarations say. For example, Mr. Leon's declaration states that after Whitesell announced its planned 2005 price increase, he had "numerous conversations with Mr. Neil Whitesell in which [Mr. Leon] requested the cost increase evidence required by § 5.5." Dkt. 289 at 3. Whitesell points (Br. 57) to a March 2005 email communication between Mr. Whitesell and Mr. Market in which the latter "acknowledge[d] receipt of price increase notifications" but criticized Whitesell for "cherry pick[ing]" price increases and insisted that the company "rescind" the cost increase requests. Dkt. 290-1 at 3. That Electrolux did not request the required justification for the price increases in *this email* does not refute Defendants' evidence that they requested it in *other* communications. Indeed, Mr. Leon's declaration states that he had "telephone" conversations with Mr. Whitesell and other Whitesell

employees requesting justifications for the price increases. Dkt. 289 at 1-4. And Neil Whitesell implicitly acknowledged these requests in his response to Mr. Market by asserting that Whitesell had already complied with section 5.5 by providing documentation in 2004. Dkt. 290-1 at 2.

Apart from the declarations, the district court also examined Electrolux's 2005 court filings in response to Whitesell's motion to compel Electrolux to pay the 2005 price increases. Dkt. 372 at 17-18. In multiple filings, Electrolux asserted that it had requested evidence from Whitesell about the 2005 price increases. Dkt. 45 at 6; Dkt. 54 at 25-26. Whitesell never disputed these assertions, and still cannot provide a reason for why it did not do so. Whitesell argues that a jury should resolve the "competing inferences" (Br. 59), but the only reasonable inference is that Whitesell did not provide the necessary documentation to support the price increases.

The only other evidence that Whitesell relies on (Br. 57) is a single email chain between Electrolux employees. Dkt. 266-15 at 4-5. These emails do not discuss whether Electrolux requested evidence justifying price increases and do not include Mr. Leon, so they are "not

significantly probative" and cannot preclude summary judgment. *James River Ins. Co. v. Ultratec Special Effects Inc.*, 22 F.4th 1246, 1251 (11th Cir. 2022).

Finally, even if the record did not undisputedly show that Electrolux requested reasonable documentation under section 5.5, summary judgment was still proper because Whitesell's actions relieved Electrolux of its obligation to request the supporting documentation. After notifying Electrolux of its 2005 price increases, it is undisputed that Whitesell took the position that the information it previously provided in 2004 was sufficient to meet the requirements of section 5.5. *See* Dkt. 289 at 3; Dkt. 290-1 at 2; Dkt. 290 at 1-2. Under Georgia law, if one party "takes a position which renders [the other party's] performance of the obligation useless," then the party is relieved from performing that obligation. *Taliafaro, Inc. v. Rose*, 469 S.E.2d 246, 247-48 (Ga. Ct. App. 1996). Because the undisputed record shows that Whitesell would only provide documentation that it had previously provided in 2004, Electrolux was under no obligation to request additional information.

**B.    The undisputed evidence shows that Whitesell failed to provide sufficient cost increase evidence.**

The district court also correctly found no genuine dispute of material fact concerning whether Whitesell complied with its obligation under section 5.5 to provide reasonable documentation of its cost increases. In a sparse three paragraphs, Whitesell contends that a jury could find that Whitesell complied with section 5.5. Br. 59-60. This truncated argument is unconvincing.

Tellingly, Whitesell never discusses the documentation that it provided Electrolux to justify its cost increases. Those documents consist only of some newspaper articles describing the rise of steel prices, a chart titled "Taiwan Wire Analysis," and six untranslated invoices written in Mandarin. Dkt. 266-1 at 3-9; Dkt. 266-23 at 4-14. Whitesell provided no evidence and made no attempt to explain how a general increase in steel prices justified raising prices on specific parts anywhere from 3.01% to 95.64%. Dkt. 289 at 5. More egregiously, Whitesell does not explain how evidence of increased steel prices justified raising prices on plastic parts *that contained no steel.* Dkt. 290 at 4; Dkt. 290-17 at 2-3.

Whitesell instead attempts to move the goalposts. It argues that it only needed to provide evidence to justify a general increase in price and not changes to specific unit prices. Br. 60. But the plain language of the SPA states that "Whitesell shall provide such cost increase evidence to Electrolux for any requested changes in any *specific unit prices*." Dkt. 127-2 at 8 (emphasis added). Uncoupling the evidence required by section 5.5 from specific unit prices would improperly read this language out of the SPA. *See Primary Invs. LLC v. Wee Tender Care III, Inc.*, 746 S.E.2d 823, 826 (Ga. Ct. App. 2013) ("[T]he favored construction will be that which gives meaning and effect to all the terms of the contract . . . ."). Section 5.5's reference to "an adverse market situation" does not change this. This language notes that Whitesell cannot seek a price increase at all unless changes in the market drastically impact its costs. It does not excuse Whitesell from providing documentation justifying changes to specific prices.

## IV.   The district court, in its sound discretion, properly denied Whitesell's request to amend its complaint to add prejudgment interest.

### A.   The court did not abuse its discretion in denying Whitesell's untimely motion to amend.

Whitesell claims that the district court erred in denying Whitesell the opportunity to seek prejudgment interest under O.C.G.A. § 13-6-13. It did not.

To begin, Whitesell's prejudgment interest argument is viable only if the Court reverses one of Whitesell's other claims on appeal. Because this Court should affirm across the board, the Court need not address this argument.

In any event, the district court correctly exercised its discretion in denying Whitesell's amendment because it was untimely. On April 10, 2014, more than ten years after this case began, Whitesell filed a proposed Second Amended Complaint (Dkt. 568) that the court expected to be its "complete statement of its case." Dkt. 896 at 10. However, Whitesell failed to include any claim for prejudgment interest under O.C.G.A. § 13-6-13. Dkt. 568. Because Whitesell did not include a

demand for prejudgment interest under § 13-6-13[5] in the Second

Amended Complaint, the district court had discretion to decide whether

to allow it to amend again. The court did not abuse that discretion in

declining to allow further amendment two years later (and seven and

half years after the First Amended Complaint). Any fault lies with

Whitesell, not the court, and none of Whitesell's cited case law

demonstrates that the court exceeded the bounds of its discretion. *See*

*Stuckey Health Care, Inc. v. State*, 389 S.E.2d 349, 349-50 (Ga. Ct. App.

1989) (where appellant could not amend complaint without leave of

court, trial court did not abuse its discretion in denying motion to

amend complaint to add claim for prejudgment interest).

To show an abuse of discretion, Whitesell primarily relies on

*Caradigm USA LLC v. PruittHealth, Inc.*, No. 1:15-cv-2504, 2018 WL

1959498 (N.D. Ga. Apr. 25, 2018), for the proposition that § 13-6-13

"sets forth no specific pleading requirement" and that "[p]arties thus

---

[5] Whitesell did not seek prejudgment interest under § 13-6-13 until it
filed a revised version of its Second Amended Complaint after the court
ordered it to strike a different interest claim. However, as the court
explained, its order to strike one interest claim "did not thereby permit
the addition of another interest claim where there was not one before."
Dkt. 818 at 4.

may seek prejudgment interest even when it is not pleaded at all—and even when it is first raised at trial—so long as the opposing party has an opportunity to litigate the issue." Br. 61. But rather than support Whitesell's argument, *Caradigm* directly undermines it.

In particular, the *Caradigm* court explained that "[t]he Georgia Court of Appeals has consistently held that it is *within the trial court's discretion* to allow a party to make a demand of prejudgment interest in a pre-trial order because the opposing party has a fair opportunity to litigate and assert defenses to the claim." 2018 WL 1959498, at *4 (emphasis added). The court here exercised its discretion to find the request untimely. Indeed, *Caradigm* explicitly distinguished the court's decision in this case from the situation presented there, explaining that the district court here acted within its discretion by not allowing Whitesell's amendment because Whitesell waited "seven-and-a-half years after filing the first amended complaint and two years after the court's mandate to file a final amended complaint." *Id.* at *4 n.6.

## B.   The district court correctly found that amendment would be futile.

The district court also did not abuse its discretion in finding that Whitesell's monetary loss was not ascertainable at the time of any

alleged breach and therefore that an amendment to add prejudgment interest was futile.

*Malta Construction Co. v. Henningson, Durham & Richardson, Inc.*, 716 F. Supp. 1466 (N.D. Ga. 1989)—relied upon by the district court—is particularly instructive. There, the plaintiff's loss was not directly ascertainable at the time of the breach because damages could only be known after the jury evaluated *several* alleged breaches and the effect of *numerous* delays. *Id.* at 1469-70. The court correctly concluded that Whitesell "sits in the same position as the plaintiff in *Malta*" because "the amount of damages" would be affected by multiple factors including "allegations of multiple breaches." Dkt. 818 at 6-7.

In attempting to demonstrate that the district court abused its discretion, Whitesell, citing *Caradigm* once again, argues that simply because "amounts are 'disputed and must be calculated by a jury' does not mean they were unascertainable as of the breach." Br. 62. Instead, according to Whitesell, a "properly instructed jury would calculate the harm incurred 'at the time of a breach'—which includes any 'monetary loss immediately and necessarily flow[ing] to the injured party' from the breach." *Id.* The problem with Whitesell's argument is that even if the

jury awarded damages, it would be impossible to attribute portions of those damages to a single breach because Whitesell's claims involved several alleged breaches. Thus, as the district court correctly found, "[t]his is not a case in which the plaintiff's loss will be directly ascertainable as of a given breach." *Malta*, 716 F. Supp. at 1469.

The cases relied upon by Whitesell do not alter that result. *Caradigm* cites *Malta* for the very same proposition as the district court in this case. According to *Caradigm*, the reason *Malta* found that prejudgment interest was inappropriate "was *not* because the jury would have to calculate the amount of damages; *it was because the damages to the third party did not 'immediately and necessarily' flow from the breach.*" *Caradigm*, 2018 WL 1959498, at *5 (emphasis added). The same was true here.

*Norair Engineering Corp. v. St. Joseph's Hospital, Inc.*, 249 S.E. 2d 642, 649 (Ga. Ct. App. 1978), is likewise inapposite. *Norair* involved a defectively constructed hospital, where the damages resulting from the defective construction were "complete at the time [the hospital] took over the building." *Id*. By contrast, Whitesell's damages involved multiple interrelated breaches and thousands of different parts with

different transition dates, rather than a single event (a building handed over at a date certain). Indeed, after more than a decade of litigation, the identity of the parts that would have been the subject of Whitesell's breach claim and the price of those parts remained unsettled.

The district court correctly found that Whitesell's monetary loss was not ascertainable at the time of breach and therefore did not abuse its discretion in denying Whitesell leave to amend.

## V.   The district court properly exercised its discretion in excluding irrelevant evidence that would unfairly prejudice and confuse the jury.

### A.   The district court properly excluded the "bad-faith emails."

Whitesell contends that the district court abused its discretion in precluding Whitesell from introducing at trial ten emails (Dkt. 1566 at 2-5) sent by Electrolux's Indoor Division in 2005 that purportedly demonstrate Electrolux's and Husqvarna's bad faith intent to "breach the parties' agreements." Br. 23. Whitesell does not, and cannot, argue that these emails were relevant to Whitesell's affirmative claim at trial (brought against Husqvarna for failure to purchase Brunner and Matrix Parts Whitesell acquired from 2007 to 2010). That is because the emails relate to the Indoor Division's 2005 concerns about whether Whitesell

was charging competitive prices for the parts it supplied for indoor products. Dkt. 1557 at 7-9; Dkt. 1769 at 3-4. As a consequence of the sanctions order, Whitesell no longer had any claims for lost profits incurred as a result of the alleged failure to transition indoor parts from Whitesell at the time of trial.

Instead, Whitesell claims these "bad faith" emails were relevant to: (1) Whitesell's prior-breach (or "first-breach") defense; (2) Husqvarna's defense that Whitesell failed to perform a concurrent condition; and (3) the good-faith element of Husqvarna's counterclaim. Br. 63-65. Whitesell is wrong on all counts.

*First*, these emails cannot, as a matter of law, support Whitesell's first-breach affirmative defense. In the district court, Whitesell repeatedly cited *Moore v. Grady Memorial Hospital Corporation*, 778 F. App'x 699, 706 (11th Cir. 2019), for the proposition that "the effect of a material or substantial breach of contract is, generally, to preclude the party guilty of the first such breach from recovering on the contract." *See, e.g.*, Dkt. 1796-2 at 43 n.52; Dkt. 1296 at 5-6. Whitesell claims that the emails "proposing to breach the contracts" were "powerful evidence that defendants *in fact* breached." Br. 24. Further, because "the

statements came in 2004-2005, *years before* Whitesell's alleged 2008 breach of Phase-Out obligations," the jury could purportedly conclude that "defendants breached *first*," which would "give Whitesell an affirmative defense." *Id.* at 64.

But as the district court noted when it previously rejected Whitesell's first-breach argument with respect to a claim that was resolved prior to trial, "[w]hen [the other] party knows a contract has been breached and continues to perform or accept performance under the contract, that party can be said to have made an election" and "has ended its right to refuse to perform." Dkt. 1354 at 7 (quoting *Moore*, 778 F. App'x at 706). Indeed, "[a]t the point of breach," a party must decide to either continue the contract (and allege a partial breach) or refuse to perform (and terminate the contract and bring suit for total breach). *Clower v. Orthalliance, Inc.*, 337 F. Supp. 2d 1322, 1331 (N.D. Ga. 2004).

Setting aside the inferential leap in Whitesell's logic—that emails supposedly evincing a desire not to be bound by a contract are evidence

that the contract was in fact breached[6]—the 2005 emails cannot excuse

Whitesell from contractual performance years later. Whitesell was

required, at the point of the alleged breach, to elect whether to continue

the contract or to refuse to perform. Whitesell could not lie in wait,

continuing to perform under the agreement while accepting hundreds of

millions in purchases (Dkt. 1863 at 99), and then absolve itself of

liability by claiming a prior material breach. In fact, the district court

found, as a matter of law, that Whitesell "continued to perform under

the agreements for several years" and never "repudiated the contract."

Dkt. 1354 at 7. Accordingly, Whitesell's misguided first-breach

argument does not provide it with a hook for relevancy.

Second, the 2005 emails have no bearing on Husqvarna's

affirmative defense of failure to perform a concurrent condition. At trial,

Husqvarna asserted that, to the extent it breached its contractual

obligations related to Brunner and Matrix inventory, Whitesell was

precluded from recovering on its breach of contract claim because

---

[6] A plaintiff "trying to point to [a defendant's] bad motives cannot create a breach of contract where none exists." *Endurance Am. Specialty Ins. Co. v. Liberty Mut. Ins. Co.*, 34 F.4th 978, 984 n.11 (11th Cir. 2022) (labeling facts about the defendant's allegedly corrupt motives as "irrelevant").

Whitesell failed to satisfy concurrent contractual obligations. *See* Dkt. 1795-5 at 3; Dkt. 1886 at 1501-02, 1672. None of the 2005 emails, sent by Electrolux's Indoor Division, relate to Husqvarna's obligation to purchase Brunner and Matrix inventory for outdoor parts. And the jury found that Husqvarna breached its contractual obligations regarding Brunner and Matrix Parts—but that Whitesell could not recover based on its failure to perform a concurrent condition (Dkt. 1851 at 1-2)—such that even if the emails were somehow relevant, Whitesell was not prejudiced by their exclusion.

Unable to connect the emails to the Brunner and Matrix Parts, Whitesell falls back to its failed prior breach argument, contending that "[a]n earlier breach" would "refute [Husqvarna's] contention that its failure to pay inventory and other costs in 2009 should be excused by Whitesell's purported failure to perform some 'concurrent' condition." Br. 64. But, again, this argument fails because Whitesell chose to continue operating under the agreement instead of rescinding it.

*Third*, Whitesell's attempt to link the emails to "the good-faith element of [Husqvarna's] counterclaim regarding Brunner and Matrix Parts" fails. *Id.* at 65. Under Georgia law, the covenant of good faith

and fair dealing "is not an independent contract term"—"[i]t is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure.*" *Alan's of Atlanta, Inc. v. Minolta Corp.*, 903 F.2d 1414, 1429 (11th Cir. 1990). Accordingly, the emails at issue could be relevant only if they bear directly on the interpretation and performance of a contract term underpinning Husqvarna's counterclaim regarding Whitesell's failure to transition the supply of Brunner and Matrix Parts.[7] But, again, the emails do not relate to Husqvarna or Brunner and Matrix Parts. Dkt. 1863 at 111. More importantly, Whitesell does not seek to use the emails to interpret the parties' contractual obligations incumbent to the transition and supply of Brunner and Matrix Parts, but, instead, to totally excuse Whitesell's failure to comply with these obligations.

Whitesell is left arguing that the emails "reflect a scheme to scuttle the *entire* contractual relationship." Br. 66. The problem with

---

[7] Whitesell apparently agrees: "That counterclaim required [Husqvarna] to show it 'performed its contractual obligations *relating to the transition of Brunner and Matrix parts*' 'in good faith.'" Br. 65 (emphasis added).

that argument is that Electrolux never acted on any such scheme. As Electrolux's witness Don Market explained, "we also never got out of [the Whitesell contract] . . . we lived to the agreement regardless of how individuals or the entire organization felt [about] Whitesell." Dkt. 1769 at 4. It is undisputed that the parties' contractual relationship continued for many years to Whitesell's tremendous financial benefit.

Finally, even if the bad faith emails had any relevance, their probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, and wasting time. Whitesell claims in a footnote that the district court never engaged in the balancing necessary to invoke Rule 403. The hearing transcript shows otherwise as the court clearly explained that the "risk of prejudice and confusion to the jury is extremely high" and would lead the jury down irrelevant "rabbit paths." Dkt. 1863 at 112. The court did not abuse its discretion in excluding the emails.

## B. The district court properly excluded evidence regarding unpaid invoices.

Whitesell's arguments concerning the court's exclusion of evidence regarding non-payment of invoices is more of the same. Whitesell initially sought over $6.5 million for the non-payment of invoices. Dkt.

1617 at 2. Whitesell's own forensic accountant and the district court found that Whitesell was not entitled to recover over $5 million of that amount. Rather than using valuable time at the trial to refute Whitesell's claims of unpaid invoices, Electrolux and Husqvarna paid $1.3 million shortly before trial. Dkt. 1754; Dkt. 1772. Indeed, it was Whitesell that exhibited bad faith by fabricating millions of dollars of invoices, the overwhelming majority of which ran contrary to pertinent contractual provisions. *See* Dkt. 1884 at 3 (concluding that Whitesell was not the prevailing party with respect to its invoice claim).

Whitesell claims it should have been permitted to present evidence to the jury that Electrolux and Husqvarna repeatedly failed to make payments due. But Whitesell's argument fails for the same reasons above. By electing to continue the contract after the alleged non-payment, Whitesell cannot claim there was a material breach that excuses its performance. The unpaid invoices do not bear on the interpretation and performance of a contract term regarding any claim at issue. And the fact that there was a dispute regarding $1 million in invoices arising out of a contract generating over $400 million in revenue does not tend to make it any more or less likely that

Husqvarna complied with its obligations regarding the transition of Brunner and Matrix Parts.

### C. The district court properly excluded evidence of events purportedly leading to the consent order.

The district court's decision to exclude certain evidence leading up to the 2005 Consent Order was also well within the bounds of its discretion. That evidence included documents related to the 2004 and 2005 price increase requests. *See* Dkt. 1863 at 39, 47; Dkt. 1778 at 4-5; Dkt. 1677 at 1-3. None of that evidence was relevant to the remaining claims in the case.[8] The price increase requests did not concern the Brunner and Matrix Parts and, as explained above, the court properly dismissed Whitesell's price-increase claims prior to trial. *See* Dkt. 372; Dkt. 1778 at 4-5.

Whitesell nevertheless contends that the district court erred by applying a "strict" approach to the relevance of these documents, when

---

[8] Whitesell claimed these documents were relevant to its overarching "theme" that Husqvarna and Electrolux wanted to "get out" of the contract. Dkt. 1863 at 51. But whether Electrolux and Husqvarna subjectively wanted out of the contract is not probative of whether a breach actually occurred. Even if there were any probative value, that value would have been substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, and undue delay. *Id.* at 4.

Evidence Rule 401 embodies a "liberal" standard. Br. 69. But Whitesell misconstrues the court's comments. The court explained that "this case is not about most of what the case was about when we started," before remarking that the court was going to "*strictly apply* the 401 standard as to relevancy *to the claims that we are trying*." Dkt. 1863 at 4, 60 (emphasis added).

The district court did not raise the bar as to what constitutes relevant evidence. It took a discerning eye in determining whether the evidence actually related to any remaining claim, or instead concerned a previously dismissed claim (like the price increase claim). That is entirely appropriate: "Generally, evidence concerning previously dismissed claims is not relevant and, consequently, is not admissible." *Anderson v. Brown Indus.*, No. 4:11-cv-0225, 2014 WL 12521732, at *4 (N.D. Ga. Mar. 14, 2014).

Whitesell also claims the evidence should have been admitted at least to impeach Roger Leon's testimony that "the Consent Order was prompted by supposed Whitesell threats to cut off supply." Br. 70. But the trial transcript—including the portion Whitesell cites in support—shows that the district court gave Whitesell tremendous leeway, over

Husqvarna's objections, to attempt to impeach Mr. Leon's testimony about Whitesell's threats to cut off supply. *Id.* (citing Dkt. 1886 at 820-21); Dkt. 1886 at 1003-09.

The district court shut down a single line of questioning on this topic, when Whitesell attempted to introduce the 2005 Consent Order to impeach Mr. Leon's testimony that Whitesell threatened to "cut off supply . . . in '05 and that led to the Consent Order." Dkt. 1886 at 1010-12. But the Consent Order is entirely consistent with Mr. Leon's testimony. *Id.* at 1012-13; Dkt. 30 at 2. The court accordingly ruled there was no need to "go into the Consent Order issues on impeachment if [the testimony was] consistent [with] the Consent Order." Dkt. 1886 at 1013. Whitesell did not object.

Whitesell now attributes a different interpretation to the Consent Order, claiming that the language indicating that Electrolux would not utilize parts from anyone other than Whitesell is *consistent* with Whitesell's account that Electrolux sought alternative suppliers. But the Consent Order makes no reference to any attempt by Electrolux to source parts from alternative suppliers, and it certainly does not indicate that the reason for the Consent Order was these re-sourcing

attempts rather than Whitesell's threats to cut off supply. Therefore, the court did not abuse its discretion in precluding the introduction of impeachment evidence that was "not clearly inconsistent" with prior testimony. *United States v. Thelisma*, 356 F. App'x 217, 220 (11th Cir. 2009). This is particularly true given that district courts' discretion is "especially broad when it comes to controlling cross-examination for impeachment purposes." *United States v. Van Dorn*, 925 F.2d 1331, 1335 (11th Cir. 1991).

## CONCLUSION

This Court should affirm the judgment.[9]

---

[9] Whitesell offhandedly suggests (Br. 71) that, if there is a remand, this Court should "relieve" Judge Hall of responsibility for this case, citing *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353 (11th Cir. 1997). But Whitesell fails to mention the three-part standard articulated in *Chudasama*, let alone explain why it is satisfied here. Because Whitesell "failed to develop" this argument, it is waived. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1283 (11th Cir. 2009).

Respectfully submitted, this 28th day of June, 2024.

/s/ *Amanda M. Waide*
AMANDA M. WAIDE
JAMIE S. GEORGE
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
(404) 881-7000
amanda.waide@alston.com
jamie.george@alston.com

*Counsel for Appellee Electrolux
Home Products, Inc.*

/s/ *Adam H. Charnes*
ADAM H. CHARNES
KILPATRICK TOWNSEND
 & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7106
acharnes@ktslaw.com

R. PERRY SENTELL, III
LAUREL PAYNE LANDON
KILPATRICK TOWNSEND
 & STOCKTON LLP
1450 Green Street, Suite 230
Augusta, Georgia 30901
(706) 724-2622
psentell@ktslaw.com
llandon@ktslaw.com

JAMES M. BROGAN
BRIAN J. BOYLE
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 5000
Philadelphia, PA 19103
(215) 656-3330
james.brogan@dlapiper.com
brian.boyle@dlapiper.com

*Counsel for Appellee Husqvarna
Outdoor Products Inc.*

# CERTIFICATE OF COMPLIANCE

In accordance with this Court's order dated May 21, 2024, I hereby certify that, excluding the materials authorized to be excluded from the word count by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this brief contains 15,998 words. I have relied on a word-processing system for the word count.

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 and 14-point Century Schoolbook font.

DATED:    June 28, 2024

*/s/ Adam H. Charnes*
Adam H. Charnes
KILPATRICK TOWNSEND
 & STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, Texas 75201
(214) 922-7106
acharnes@kilpatricktownsend.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed **HUSQVARNA OUTDOOR PRODUCTS, INC. AND ELECTROLUX HOME PRODUCTS, INC.'S RESPONSE BRIEF** with the Clerk of Court using the CM/ECF System. Counsel for all parties are registered CM/ECF users and will be served with the foregoing document by the Court's CM/ECF System.

> */s/ Adam H. Charnes*
> ADAM H. CHARNES
> KILPATRICK TOWNSEND
>  & STOCKTON LLP
> 2001 Ross Avenue, Suite 4400
> Dallas, Texas 75201
> (214) 922-7106
> acharnes@ktslaw.com